# Oregon
# Rule 847-008-0020
# Locum Tenens Registration

**(1)** Any licensee whose official state of residence is a state other than Oregon who proposes to practice intermittently within the State shall register and pay the biennial locum tenens registration fee.

**(2)** The licensee practicing in Oregon with a locum tenens registration status may practice for a period not longer than two hundred and forty consecutive days in the biennium, or a total of two hundred and forty days on an intermittent basis in the biennium. A licensee practicing in Oregon with a locum tenens registration status who wishes to reactivate to active registration status, may be granted an additional ninety days to complete the reactivation process.

**(3)** A volunteer camp physician, who provides medical care at a non-profit camp, shall practice with locum tenens registration status. The volunteer camp physician with locum tenens status may practice in Oregon for a period not longer than fourteen days per year.

**(4)** A licensee who registers as locum tenens and who does not practice in Oregon during the biennium, shall be registered as inactive at the time of registration renewal, and shall be required to reactivate to locum tenens registration status prior to practicing in Oregon.

**(5)** Requirements, procedures, and fees for a Locum Tenens registration shall be the same as for active registration.

**(6)** Any licensee registered as locum tenens shall provide the Board with timely notification of the location and duration of each Oregon practice prior to beginning of such practice.

**(7)** The licensee with locum tenens status who wishes to practice under a different license status must submit the reactivation application and fee and satisfactorily complete the reactivation process.

*Location:*https://oregon.public.law/rules/oar_847-008-0020.

*Original Source: § 847-008-0020 — Locum Tenens Registration,* https://secure.sos.state.or.us/oard/view.action?ruleNumber=847-008-0020 (last accessed Oct. 8, 2020).

1
2                          **Exhibit BB**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DAMAGES – 41

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



**Oregon**
Kate Brown, Governor

**Oregon Medical Board**
1500 S.W. First Ave., Suite 620
Portland, OR 97201-5847
Voice (971) 673-2700
FAX (971) 673-2672
www.oregon.gov/OMB

September 5, 2018

**PERSONAL AND CONFIDENTIAL**

Jeremy Henry Conklin, DO
2222 Medical District Drive
Apt 4211
Dallas, TX 75235

Re: Notice of Civil Penalty

Dear Dr. Conklin:

Enclosed you will receive a Notice of Civil Penalty. Please read the Notice carefully as your action is required. In brief, the Notice of Civil Penalty issues a civil penalty fine against you in the amount of $195.00 for violating the Medical Practice Act, specifically Oregon Administrative Rule 847-008-0058. You may either pay the civil penalty or you may request a hearing on the matter before an Administrative Law Judge.

If you desire a hearing, your request for hearing must be in writing and must be received by the Board by September 25, 2018. In the event of a hearing, the Board would also be seeking the costs associated with the hearing.

If you do not desire a hearing, your civil penalty payment of $195.00 must be received by the Board by October 5, 2018. Upon receipt of the civil penalty payment, the Board will close this matter.

If you have any questions, please contact me at 971-673-2700.

Sincerely,

Nicole Krishnaswami, JD
Interim Executive Director

Shayne Nylund
Licensing Specialist

NK: sn

Enclosure:    Notice of Civil Penalty



Kate Brown, Governor

**Oregon Medical Board**

1500 S.W. First Ave., Suite 620
Portland, OR 97201-5847
Voice (971) 673-2700
FAX (971) 673-2672
www.oregon.gov/OMB

October 9, 2018

## PERSONAL AND CONFIDENTIAL

Jeremy Henry Conklin, DO
1414 10th Ave
Apt 734E
Seattle, WA 98122

Re: Civil Penalty Payment Received

Dear Dr. Conklin:

The Oregon Medical Board has received your payment of $195.00 to resolve the Notice of Civil Penalty. The Board thanks you for your attention to this matter and considers this matter closed at this time.

You are reminded to comply with the guidelines outlined in Oregon Administrative Rule 847-008-0058. A copy of the rule is enclosed for your reference. Further failure to adhere to this rule could lead to additional civil penalties being assessed or to disciplinary action by the Board.

Sincerely,

Nicole Krishnaswami, JD
Executive Director

Shayne Nylund
Licensing Specialist

NK: sn

Enclosure:    Oregon Administrative Rule 847-008-0058

1          BEFORE THE

2     OREGON MEDICAL BOARD

3         STATE OF OREGON

4   In the Matter of                    )
                                        )
5   JEREMY HENRY CONKLIN, DO            )    NOTICE OF CIVIL PENALTY
    APPLICATION NO. 190014              )
6                                       )

7

8                                   1.

9       The Oregon Medical Board (Board) is the state agency responsible for licensing,

10  regulating and disciplining certain health care providers, including physicians, in the State of

11  Oregon. Jeremy Henry Conklin, DO (Applicant) is an applicant for an active license to practice

12  medicine in the State of Oregon.

13                                  2.

14      The Board now issues this civil penalty fine of $195.00 pursuant to ORS 677.205 against

15  Applicant for violating the Medical Practice Act, to wit:  ORS 677.190(8) and ORS 677.190(17),

16  specifically OAR 847-008-0058.  In the event of a hearing on this matter, the Board proposes to

17  assess the costs of such a hearing pursuant to ORS 677.205.  This is a minor violation that is not

18  considered an investigation or adverse action.

19                                  3.

20                      **ALLEGED FINDINGS OF FACT**

21      On July 18, 2018, Applicant applied for an active license to practice medicine in the State

22  of Oregon.  Personal History Question 13 on the application asks, "During medical school or

23  postgraduate training, were you ever subject to an action for any academic, clinical or

24  professional concerns, including actions such as warning, remediation, probation, restriction,

25  suspension, termination, or request to voluntarily resign?" Applicant answered "no."  Applicant

26  was placed on probation during residency.

27  / / /

Page 1 – *NOTICE OF CIVIL PENALTY* – Jeremy Henry Conklin, DO

1                                      4.

2                    **ALLEGED CONCLUSIONS OF LAW**

3          Applicant's failure to accurately answer Personal History Question 13 violates ORS

4    677.190(8) and ORS 677.190(17), specifically OAR 847-008-0058.

5                                      5.

6          Applicant is entitled to a hearing as provided by ORS 183.745(4). Applicant may be

7    represented by counsel at the hearing. A contested case hearing is conducted by and under the

8    control of an administrative law judge pursuant to OAR 137-003-0600. If Applicant desires a

9    hearing, the Board must receive Applicant's written request for hearing within twenty (20) days

10   of the mailing of this Notice to Applicant. Upon receipt of a request for a hearing, the Board will

11   notify Applicant of the time and place of the hearing.

12                                     6.

13         If Applicant requests a hearing, Applicant will be given information on the procedures,

14   right of representation, and other rights of parties relating to the conduct of the hearing as

15   required under ORS 183.413(2) before commencement of the hearing. In the event of such a

16   hearing, the Board intends to pursue the costs of the hearing.

17                                     7.

18         **NOTICE TO ACTIVE DUTY SERVICEMEMBERS:** Active duty servicemembers

19   have a right to stay these proceedings under the federal Servicemembers Civil Relief Act. For

20   more information, contact the Oregon State Bar at 800-452-8260, the Oregon Military

21   Department at 800-452-7500 or the nearest United States Armed Forces Legal Assistance Office

22   through http://legalassistance.law.af.mil.

23                                     8.

24         Failure by Applicant to request a hearing or failure to appear at any hearing scheduled by

25   the Board will constitute waiver of the right to a contested case hearing and will result in this

26   Notice of Civil Penalty becoming the Board's Final Order, which requires Applicant to pay a

27   civil penalty of $195.00, to be paid in full thirty (30) days after the mailing of this Notice to

Page 2 – *NOTICE OF CIVIL PENALTY* – Jeremy Henry Conklin, DO

1   Applicant. In such an event, the record of proceeding to date, including Applicant's file with the

2   Board and any information on the subject of this Notice of Civil Penalty, automatically becomes

3   part of the record for the purpose of imposing the fine. The Board will not approve Applicant's

4   application for an active license to practice medicine until Applicant has paid the civil penalty or

5   is proceeding to a hearing, in accordance with OAR 847-008-0058(2). Applicant has the right to

6   appeal the Board's Final Order to the Court of Appeals, in accordance with ORS 183.480, et seq.

7                           DATED this 5th day of September, 2018.

8

9                           OREGON MEDICAL BOARD
                            State of Oregon

10

11

12                          NICOLE KRISHNASWAMI, JD
                            INTERIM EXECUTIVE DIRECTOR

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Page 3 – *NOTICE OF CIVIL PENALTY* – Jeremy Henry Conklin, DO

1

## CERTIFICATE OF MAILING

2

3

4    On, September 5, 2018, I mailed the foregoing Notice of Civil Penalty regarding Jeremy Henry
     Conklin, DO, to the following parties:

5

6    **By: First Class Certified/Return Receipt U.S. Mail**
     **Certified Mail Receipt #** 9590 9402 3786 8032 3890 34

7

8    Jeremy Henry Conklin, DO
     2222 Medical District Drive
     Apt 4211

9    Dallas, TX 75235

10

11   _____

     Shayne J. Nylund
12   Licensing Specialist
     Oregon Medical Board

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Page 4 – *NOTICE OF CIVIL PENALTY* – Jeremy Henry Conklin, DO

**From:** Jeremy Conklin jhconklin@me.com  🖉
**Subject:** Fwd: Oregon Medical Board - Notice of Civil Penalty
**Date:** September 10, 2018 at 14:21
**To:** McKay McFarland mckay.mcfarland@comphealth.com

JC

McKay,

This is the e-mail I have received. I have not received a letter. The e-mail states I will receive a letter, which I am waiting to get. There is a problem with this action.

1) The board asked me to clarify my answer to the question of my residency disciplinary issue. I submitted materials to clarify my answer. The board is supposed to make a determination regarding my clarification. My application is incomplete as the board has not made a determination.

2) It appears that the materials I provided, which the board requested, were used to pursue a disciplinary action against me. This is unconstitutional. I was not advised that the materials I submitted, as requested by the board, would be used against me. This violates my 5th Amendment Constitutional Rights of both due process and self incrimination. If the board requests information from me and does not advise me that the information can be used against me then the board is not respecting my rights against self incrimination. The ONLY purpose for the information the board requested is to make a determination regarding my residency issues. If the board advised me that any materials I submitted may be used against me then any of the materials I submitted to clarify my answers can be used against me. However, in my case this did not occur.

When I receive the letter I intend to consider the appeals process, if one exists. Alternatively, I will consider filing a civil suit for violation of my constitutional rights under 42 USC Sec 1983 - Civil Action for Deprivation of Rights.

In either case, neither of these actions should affect my application, as that would be retaliation.

When I receive the letter I will forward you a copy. My impression is that my application is being held up as the board has to make a determination of my residency disciplinary action.

Jeremy Conklin

Begin forwarded message:

**From:** Shayne Nylund <Shayne.Nylund@omb.oregon.gov>
**Subject: Oregon Medical Board - Notice of Civil Penalty**
**Date:** September 5, 2018 at 10:29:27 PDT
**To:** "jhconklin@icloud.com" <jhconklin@icloud.com>

Dear Dr. Conklin,

Your application was recently reviewed by the IInterim Executive Director and it has been decided that a Notice of Civil Penalty is being issued due to failure to answer one of the application personal history questions affirmatively. This notice has been sent via certified mail and you will receive it shortly.

### In regards to the Civil Penalty:
o          This is a minor violation.
o          This is not investigatory.
o          This is not an adverse action.
o          Licensee/applicants should read any personal history or other disclosure questions for other license or credentialing applications carefully to determine whether or not they must disclose the civil penalty. However, from the OMB perspective, we prefer that applicants/licensees err on the side of disclosure.

### This is a public Order, but:
o          It's not on our website
·          It's not reported to the databanks

If someone to request your application file in a public records request, this would be a public document.

If you have any questions, please contact our Call Center at
**licensing@omb.oregon.gov** or 971-673-2700 or, toll free in Oregon, 1-877-254-6263. Our Call Center is open from 9 AM to 12 PM and 1 PM to 3 PM (Pacific Standard Time).

Respectfully

Respectfully,

**Shayne J. Nylund**
Acupuncture Licensing Specialist
Physician Licensing Specialist
EMS Committee Coordinator

Oregon Medical Board
1500 SW 1st Avenue, Ste. 620
Portland, OR  97201-5847

Phone: 971-673-2700
Fax: 971 673-2672
shayne.nylund@omb.oregon.gov

**Your opinion matters!  Did the OMB provide good customer service?** 



**Yes**: https://omb.oregon.gov/Survey?Who=Gen&Process=Gen&GoodService=Yes
**No**: https://omb.oregon.gov/Survey?Who=Gen&Process=Gen&GoodService=No

**OUR MISSION:**  To protect the health, safety, and wellbeing of Oregonians by regulating the practice of medicine in a manner that promotes access to quality care.

**Data Classification Level 2 - Limited**

This e-mail is intended for the named recipient only and may not be read, copied, discussed, or distributed by anyone except the named recipient or the agent or employee of the named recipient acting upon the named recipient's directions. The named recipient is responsible for the confidentiality of the message. Please notify the sender should any part of the following document(s) fail to transmit correctly. Please destroy incorrectly transmitted documents immediately.

**From:** **Jeremy Conklin** jhconklin@icloud.com
**Subject:** Re: Motion to Dismiss Civil Penalties for application #190014
**Date:** September 12, 2018 at 15:53
**To:** OMB Info info@omb.oregon.gov

Dear Sir or Ma'am,

Please provide the evidence against me that OMB used to conclude I violate OMB regulations.

Thank you,
Jeremy Conklin

Sent from my iPad

On Sep 12, 2018, at 15:30, OMB Info <info@omb.oregon.gov> wrote:

Good Afternoon, Dr. Conklin -

Thank you for your detailed response. At this time, your options regarding the fine issued are to either remit payment or request a hearing. The civil penalty process is not meant to be punitive, rather it is to say that the personal history questions needs to be answered accurately. As it stands, the Board has received information that you answered the application question incorrectly.

The civil penalty is considered a public record, meaning if one were to initiate a public request to review your file then the document itself is considered "public" and it would be releasable. However, issuance of the fine is not published in our newsletter, on our website, nor do we "advertise" that is was issued.

Please be aware that should you request a hearing, the timing of the hearing is contingent upon the schedules of the administrative law judge, the Department of Justice counsel, and the availability to hold the meeting at the Board. Therefore, this process may not begin as expeditiously as you'd desire. Additionally, should the outcome of the hearing not be found in your favor, you may be responsible for the costs of the hearing, including the civil penalty. Results from the hearing may become a published public document. Additionally, your application request for licensure will not move forward until conclusion of the hearing.

Please refer to the civil penalty document regarding "requested by" dates.

Respectfully,

The Licensing Department

-----Original Message-----
From: Jeremy Conklin [mailto:jhconklin@icloud.com]
Sent: Wednesday, September 12, 2018 1:13 PM
To: OMB Info <info@omb.oregon.gov>
Subject: Motion to Dismiss Civil Penalties for application #190014

Dear Sir or Ma'am,

Attached please find my motion requesting dismissal of the Civil Penalties Complaint.

Very Respectfully,
Jeremy Conklin, DO, MPH, MBA, FACOS

1
2                                    **Exhibit CC**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DAMAGES – 42

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

Jeremy Conklin
1414 10th Ave
Apt 734E
Seattle, WA 98122
jhconklin@icloud.com

August 27, 2018

Medical Board
1500 SW 1st Ave, Ste 620
Portland, OR 97201-5847

Re: Motion to Dismiss claim of Civil Penalty

Dear Board Members,

Background:

On 29 Aug 2018, I responded to an incomplete task listed on my Oregon Medical License Application. There was a question of "During Medical School or post graduate training, were you ever subject to an action for any academic, clinical or professional concerns, including actions such as warning, remediation, probation, restriction, suspension, termination, or request to voluntarily resign?" I answered "No". The Oregon Medial Board concluded I violated ORS 67.190(8) "Omissions or false, misleading or deceptive statements or information on any Board application, affidavit or registration is a violation of ORS 67.190(8).

Facts:

On 29 Aug 2018 I uploaded 3 documents to the OMB: a letter explaining my answer to Question 13, a letter of recommendation from my program director, Dr. Joseph Stella, dated 14 Feb 2012, and a letter from my program director, Dr. Joseph Stella, dated 1 Mar 2012.

In the letter I provided the OMB explaining my answer, I stated that my program director wrote me a letter of recommendation for cardiothoracic surgery fellowship on 14 Feb 2012, which was on official Geisinger Letterhead. In late Feb 2012 my program director and I had an argument regarding patient care issues. After the argument, my program director provided me a letter, which conflicted with the letter of recommendation he wrote me 2 weeks earlier. The 1 Mar 2012 letter was not on Geisinger Letterhead. I believed the letter was written after a heated discussion with Dr. Stella and was not an accurate representation of my performance for two reasons. One, the letter was not written on Geisinger Letterhead, and therefore was not an official Geisinger Document. Two, the letter contradicted Dr. Stella's statements of my performance in the official letter of recommendation he wrote me 2 weeks earlier. In my explanation I stated that both letters cannot be true. Because one letter was written on official

Geisinger Letterhead and one was not, I believed the 14 Feb 2012 letter to be true and disregarded the 1 Mar 2012 letter as "heat of the moment" literature.

Therefore, I believed that I was not on probation while a resident at Geisinger.

Arguments:

A

I am alleged to have violated OMB 847-008-0058 Fraud or Misrepresentation. Fraud or misrepresentation has several elements-

1) Intentional misrepresentation or intentional misstatement of a material fact
2) Concealment of or failure to make known a material fact
3) Any other means by which misinformation or a false impression is knowingly given.

I believed that I was not on probation because I believed that the 1 Mar 2012 letter Dr. Stella wrote was in the heat of the moment and not an official Geisinger document. The 1 Mar 2012 letter was not written on official Geisinger letterhead, and the 1 Mar 2012 letter contradicted the statements Dr. Stella made regarding my performance in his 14 Feb 2012 letter of recommendation 2 weeks earlier.

Therefore, I did not intentionally misrepresent or intentionally misstate a material fact. I did not conceal any of the information from the OMB as I provided the OMB with copies of the 14 Feb 2012 and 1 Mar 2012 letters from Dr. Stella. I made no other attempts to misinform the OMB about Question 13 or any other aspect of my application.

The elements to show Fraud or Misrepresentation have not been met and the complaint for civil penalty should be dismissed.

B

The OMB used the information I provided, 14 Feb 2012 and 1 Mar 2012 letters, to allege I violated OMB 847-008-0058. In order to complete my Oregon Medical License application, I was required to address the incomplete items on my application. I addressed the issue regarding Question 13 with candor, honesty, and full disclosure. The information I provided the board to address the issue with Question 13 was used against me to allege I violated OMB 847-008-0058. I was not informed that information I submitted to the OMB could, and would, be used against me for penalties. Therefore, the OMB violated my 5th Amendment Constitutional Right against self-incrimination. If the case stands the OMB will also have violated 42 USC Sec 1983 – Civil action for deprivation of rights. Information applicants provide cannot be used against them or else applicants will refrain from candor and accuracy in their responses to questions from the OMB. Therefore, the complaint for civil penalty should be dismissed.

C

The complaint for civil penalty is against public policy. The purpose of responding to questions regarding Oregon Medical Licensing applications is to obtain the most accurate and complete information from an applicant to judge fitness to practice medicine in Oregon. If applicants are

fearful that answers with candor and accuracy will result in civil penalties, then applicants will not provide truthful and exact answers. The purpose of answering questions should be to find the truth, and not to set a trap for applicants to spring and incur civil penalties. How is intent interpreted from checking a box? How is intent determined if the OMB does not have all of the information from an applicant regarding an OMB inquiry of an application question? To meet the elements of Fraud or Misrepresentation intent needs to be established. Without a full accounting of the answers an applicant provides one cannot determine intent. Therefore, applicants must be able to provide answers to questions in a non-punitive environment. Furthermore, applicant's answers to question cannot be used against them for civil punishment or else a non-punitive environment will not exist.

It is in the best interest of public policy to dismiss the compliant for civil penalty.

Conclusion:

The complaint for civil penalty should be dismissed. The complaint fails to show intentional misrepresentation or fraud and does not meet the legal elements of Fraud or Misrepresentation defined in 2017 ORS 677.188 Definitions for ORS 677.190. The complaint uses information I provided the OMB in response to the OMB's inquiry. The OMB did not inform me that information I provided would be used against me for punishment. The OMB violated my Constitutional Right against self-incrimination. Finally, the OMB's actions are against public policy. The intent of the Oregon Medical License application is to obtain the most accurate, and complete representation of an applicant. Setting civil penalty traps for answers that demonstrate candor and honesty will lead to applicants not demonstrating candor or honesty in their responses to OMB inquiries.

Very Respectfully,

Jeremy Conklin, DO, MPH, MBA, FACOS

From: **Jeremy Conklin** jhconklin@icloud.com
Subject: Re: Motion to Dismiss Civil Penalties for application #190014
Date: September 12, 2018 at 15:42
To: OMB Info info@omb.oregon.gov



Dear Sir or Ma'am,

According to Oregon Administrative Process I am allowed to file motions prior to any request for a hearing.  Under Oregon Administrative Process section 15.5 I may motion to dismiss.  I previously asked the question, to whom do I submit a motion for dismissal?  Is there a law judge I should be petitioning?  The board cannot adjudicate civil penalty complaints and motions to dismiss as that violates the notion of Nemo iudex in causa sua.  What authority is the proper authority to petition for motions to dismiss?

Furthermore, incorrectly answering a question is NOT a violation unless there was intent to answer the question incorrectly.  OMB has not proven intent.  OMB claims I need to pay the penalty or request a hearing.  If OMB has not proven the allegations, not met the legal elements of fraud or misrepresentation, then a hearing is a waste of Oregon taxpayers money.  What authority decides if OMB has met the elements required to go forward with a hearing?

Thank you,
Jeremy Conklin

> On Sep 5, 2018. at 15:30, OMB Info <info@omb.oregon.gov> wrote:
>
> Good Afternoon, Dr. Conklin -
>
> Thank you for your detailed response. At this time, your options regarding the fine issued are to either remit payment or request a hearing. The civil penalty process is not meant to be punitive, rather it is to say that the personal history questions needs to be answered accurately. As it stands, the Board has received information that you answered the application question incorrectly.
>
> The civil penalty is considered a public record, meaning if one were to initiate a public request to review your file then the document itself is considered "public" and it would be releasable. However, issuance of the fine is not published in our newsletter, on our website, nor do we "advertise" that is was issued.
>
> Please be aware that should you request a hearing, the timing of the hearing is contingent upon the schedules of the administrative law judge, the Department of Justice counsel, and the availability to hold the meeting at the Board. Therefore, this process may not begin as expeditiously as you'd desire. Additionally, should the outcome of the hearing not be found in your favor, you may be responsible for the costs of the hearing, including the civil penalty. Results from the hearing may become a published public document. Additionally, your application request for licensure will not move forward until conclusion of the hearing.
>
> Please refer to the civil penalty document regarding "requested by" dates.
>
> Respectfully,
>
> The Licensing Department
>
> -----Original Message-----
> From: Jeremy Conklin [mailto:jhconklin@icloud.com]
> Sent: Wednesday, September 12, 2018 1:13 PM
> To: OMB Info <info@omb.oregon.gov>
> Subject: Motion to Dismiss Civil Penalties for application #190014

Dear Sir or Ma'am,

Attached please find my motion requesting dismissal of the Civil Penalties Complaint.

Very Respectfully,
Jeremy Conklin, DO, MPH, MBA, FACOS

1

2                                    **Exhibit DD**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 43

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



**Oregon Medical Board**
**1500 SW 1st Ave, Ste 620**
**Portland, OR 97201-5847**
**971-673-2700**
**www.oregon.gov/omb**

<u>AUDIT NO.</u>

№ 223094

EXPIRATION DATE: 12/31/2021
EFFECTIVE DATE: 01/01/2020
DISPENSING: No

CERTIFICATE OF REGISTRATION FOR DO License
LICENSE NUMBER: DO190014
PROFESSION: Doctor of Osteopathic Medicine
LICENSE STATUS: Locum Tenens

**MUST BE POSTED IN A**
**CONSPICUOUS PLACE**

**NON TRANSFERABLE**

JEREMY HENRY CONKLIN, DO
1414 10TH AVE
APT 734E
SEATTLE, WA 98122

For verification of license, please visit the Board's website at www.oregon.gov/O    call 971-673-2700.

**Locum Tenens** status is granted to you as a licensee who lives outside of Oregon but intends to practice intermittently within the State of Oregon. This license must be renewed by the expiration date above.

You must provide the Board with timely notification of the location and duration  f each Oregon practice prior to beginning the practice.    **Notification may be provided by e-mail, mail or  .  using the Locum Tenens form on our website: www.oregon.gov/OMB**.

A licensee with Locum Tenens status who does not practice in the State of Oregon   the biennium will be placed at **Inactive** status.    The licensee must reactivate to Locum Tenens or Active status prior to returning to practice in Oregon. The reactivation process takes approximately 4-6 weeks.

**State of Oregon**
**OREGON MEDICAL BOARD**
This certifies that having fulfilled all the requirements of the Laws of the State of Oregon and possessing the prescribed qualifications, the following person is hereby licensed as a DO Licensee in the State of Oregon.

JEREMY HENRY CONKLIN, DO
DO190014
Original Issue Date: 10/12/2018
Effective Date: 01/01/2020
Expiration Date: 12/31/2021
License Status: Locum Tenens

OREGON                    D
                          et   620
          gon 97201-5847
          (971) 673-2700

* Furnish your OREGON license number when contacting the Board.
* Reactivation is required to change to ACTIVE status from **INACTIVE** or any other practicing status.
* ALWAYS keep the Board informed of your correct MAILING ADDRESS. Failure to do so may result in discipline.

For verification of license, please visit the Board's website at www.oregon.gov/OMB or call 971-673-2700.

1

2                              **Exhibit EE**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 44

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

From: **OMB Info** info@omb.oregon.gov  
Subject: Oregon License Inquiry  
Date: June 21, 2019 at 14:36  
To: jhconklin@icloud.com

Good Afternoon, Dr. Conklin –

Thank you for you recent inquiry. Physicians who actively practice in Oregon, with a current Oregon practice address may register the active license at **Active status**. Physicians who do not live in Oregon, but who practice intermittently within Oregon for no more than 240 days every two years may register the active license at **Locum Tenens status**, per Oregon Administrative Rule (OAR).

Please be aware that in Oregon, physicians, physician assistants, and acupuncturists are governed by the **Medical Practice Act (Oregon Revised Statutes (ORS) Chapter 677).** These laws are enacted by the **Oregon State Legislature**, which delegates enforcement to the Board. As a result, the Board establishes administrative rules to help further define the privilege, not the entitlement, to receive licensure for the practice of medicine and acupuncture in the state of Oregon.

Of note, the handbook, which was sent to you upon initial licensure reflects the Board's Statement of Purpose:

"Recognized that to practice medicine is not a natural right of any person, but is a privilege granted by legislative authority, it is necessary, in the interests of health, safety, and welfare of the people of this state to provide for the granting of that privilege and the regulation of it use…."

As it is within The Oregon Medical Board's authority to regulate the privilege to practice in Oregon, licensure status is one mechanism in assisting with the knowledge of how medical providers are providing services in our state. As you clearly indicated on your initial application that you are only providing locum tenens coverage in Oregon while remaining located in Washington, you were granted the appropriate license status.

Should you wish to practice in Oregon on a full-time basis, please contact our Call Center at 971-673-2700 to obtain information on changing your current license status.

Please feel free to become familiar with the **Oregon Revised Statutes** and **Oregon Administrative Rules** applicable to the regulation of medicine by the Oregon Medical Board at: https://www.oregon.gov/omb/statutesrules/Pages/Statutes-Rules-Overview.aspx

Thank you, again, for your inquiry regarding the practice of medicine in Oregon.

Respectfully,

The Licensing Department



Jeremy Conklin
1414 10th Ave
Apt 734E
Seattle, WA 98122
(570) 764-0102
jhconklin@icloud.com

**Rec'd by OMB**

JUN 1 7 2019

June 11, 2019

Oregon Medical Board
1500 SW 1st Ave
Suite 620
Portland, OR 97201

Re: Locum Tenens License

Dear Sir or Ma'am,

I received a letter from the Oregon Medical Board regarding my Oregon Medical License, and my locum tenens status. I live in Seattle, WA, and am scheduled to do some locums work in Oregon, which is why I have an Oregon Medical license. Because I do not live in Oregon, or have a practice address in Oregon, I was not able to qualify for an "Active" Oregon Medical license. Instead, I had to apply for a locum tenens medical license. Would you please explain to me why I cannot hold an active Oregon Medical license and how that policy comports with Article IV, Section 2 of the U. S. Constitution that states "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." Also, please explain how the Oregon Medical Board's active license policy aligns with the U.S. Supreme Court case of *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985).

I am curious about the Oregon Medical Board's policies for obtaining an active medical license by out of state physicians.

Any guidance the Oregon Medical Board can provide would be greatly appreciated.

Sincerely,

Jeremy Conklin, DO

1

2
                                            **Exhibit FF**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 45

Jeremy Conklin
1414 10th Ave, Apt 73 4E
Seattle, Washington 98122
(570) 764-0102
jnconklin@icloud.com

1
2                                    **Exhibit F**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

COMPLAINT FOR DAMAGES – 30

**Jeremy Conklin**
1414 10th Ave. Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

From: **OMB Licensing \* OMB** licensing@omb.oregon.gov 📎
Subject: Locum Tenens Notification Reminder -- \*\*Urgent Final Notice\*\*
Date: January 31, 2024 at 14:23
To: jhconklin@icloud.com




## OREGON MEDICAL BOARD
Oregon.gov/OMB

Dear Licensee,

To date, the Oregon Medical Board has not received a Locum Tenens notification reflecting employment in Oregon within the past biennium. This is your final reminder.

If a reported assignment has not been received in our office by **February 7, 2024**, your license status will be changed to Inactive, and you will no longer be authorized to practice medicine in Oregon.

***Please be aware: Licensees with Locum Tenens status may not provide telemedicine services in Oregon as they require a license status at Telemedicine status.***

You may report Locum Tenens Employment assignments online using Applicant/Licensee Services on our website or you may utilize the Locum Tenens notification paper form on our website at https://omb.oregon.gov for submission via regular mail.

If you have any questions, please contact the Licensing Department Call Center at licensing@omb.oregon.gov or (971) 673-2700.

Sincerely,

The Licensing Department
Oregon Medical Board
1500 SW 1st Ave, Suite 620, Portland, OR 97201
**OMB:** 971-673-2700 / Fax 971-673-2672

https://oregon.gov/omb





**OUR MISSION:** *To protect the health, safety, and wellbeing of Oregon citizens by regulating the practice of medicine in a manner that promotes access to quality care.*

**Your opinion matters! Please take two minutes to complete our customer satisfaction survey. Survey responses guide our continuous improvement efforts.**

Take the Survey ✓

Data Classification Level 2 - Limited

*****CONFIDENTIALITY NOTICE*****

This email may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system.

***************************

1

2                                    **Exhibit GG**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Jeremy Conklin
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



# Oregon

Tina Kotek, Governor

**Medical Board**
1500 S.W. 1st Ave., Suite 620
Portland, OR 97201-5847
(971) 673-2700
FAX (971) 673-2670
www.oregon.gov/omb

February 8, 2024

JEREMY HENRY CONKLIN, DO
1414 10TH AVE
APT 734E
SEATTLE, WA 98122

Dear Dr. Conklin:

Effective February 8, 2024, your Oregon license DO190014, originally issued on 10/12/2018, was changed to Inactive status for no assignment during the biennium.

If you have any questions, please contact the Licensing Department Call Center at licensing@omb.oregon.gov or (971) 673-2700.

Sincerely,

Nicole Krishnaswami, JD
Executive Director

Megan Watson
Licensing Representative

1

2                                **Exhibit HH**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

COMPLAINT FOR DAMAGES – 47

iMessage
Jun 5, 2023 at 12:50

Dr. O'Herron, this Jeremy Conklin, the locums. I am finished with orientation. Did you have time to show me around.

Yes. Where should I meet you?

I am in the basement of the B building in the Epic training classroom.

I'll be there soon

Jun 5, 2023 at 18:55

Ok, I am in the lobby. How do I get to the sign out room?

Take the elevator to the 6th floor on the B building. I just finished a case. I'll meet you there in 5

Jun 5, 2023 at 20:56

You jinxed me!

Sorry! Murphy's law

Are you still here?

Yes

Rads initially thought colon as source of air, but final read says posterior prepyloric wall.

Of course his abd exam is terrible

That sucks!

If it gets late you could put him on for a 730am start tomorrow with Dr VanDerHeyden. Make sure to get the OR to promise you it will be first case

OR to promise you it will be first case

He is on for 1st case with VanDerHeyden. Apparently, a perforated gastric/pyloric ulcer is a class D.

Read

Seems like a good plan

1

2 **Exhibit II**

3
**CONFIDENTIAL INFORMATION**
4

5 **SEE STIPULATED PROTECTIVE ORDER**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 48

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

**From:** Jeremy Conklin jhconklin@icloud.com
**Subject:** Fwd: Breach of Contract
**Date:** June 8, 2023 at 13:35
**To:** cheryl.wolfe@salemhealth.org

Dear Ms. Wolfe,

I am a surgeon and attorney. I practice both medicine and health law in Washington State. Recently, I signed a locum tenens contract with ICON Medical Network to perform surgery shifts at Salem Health Hospital. An unfortunate incident occurred on the evening of 5 Jun 2023 to 6 Jun 2023.

On 5 Jun 2023, I attended the new physician orientation, then I worked a TRAC shift from 1900 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia. The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction. Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised. The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery. During my history and physical of the patient, I learned that the patient had a significant cardiac history. The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia. Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin. The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement.

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications. I further explained that there was no effective way to reverse his antiplatelet medications, and even if there were, reversal of his antiplatelet medications would place the patient at risk of stent occlusion. Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils - bleeding or stent occlusion. I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery. I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding. I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis. The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023. Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison to proctor me. Dr. Allison agreed to proctor me. To begin my case and Dr. Allison scrubbed in to assist me. I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair. It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs. A routine inguinal hernia repair usually takes an hour or less. Because of the patient's large hernia, which distorted normal surgical planes, the surgery was more difficult and took more time to complete.

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix. I said, "Plavix is irreversible, and I believed that reversing the patient's Plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis. Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique. I learned how to perform an inguinal hernia repair in residency, and I use the same technique today. Dr. Allison's technique is different than mine, and rather than observe me operating as a proctor, Dr. Allison kept suggesting using her technique. The situation was uncomfortable. I did not want to say anything to Dr. Allison in front of the OR staff. Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia. While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length. Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it; dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient. Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

On 6 Jun 2023, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine. I asked what the concerns were. I was told the concerns were that I did not reverse the patient's Plavix and I could not suture fascia properly. With regards to reversal of Plavix and aspirin, please find attached, an evidence-based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, **"There are no specific reversal agents for clopidogrel. Since its effects are irreversible, the resultant platelet inhibition lasts for the lifespan of the platelet, ~7–9 days."**

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence-based guidelines for the management of surgical patients administered anti-platelet medications. Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach. Therefore, Salem Health Hospital's breach of my contract is unjustified. Salem Health Hospital used the opinion of one surgeon, who is not following evidence-based standards, to determine that my patient care places patients at risk. Salem Health Hospital used the opinion of one ill-informed surgeon to justify Salem Health Hospital's decision to breach my contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the

contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision. It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care. To date, no one from Salem Health has contacted me regarding the incident.

For argument's sake, let us assume that Dr. Allison was correct, and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk. If that was the case shouldn't the patient have exsanguinated during surgery? Shouldn't there have been excessive blood loss? The recorded blood loss for the case was 75 ml. The recorded blood loss is a fact that cannot be disputed. Is a quarter of a can of Coca-Cola, in 3-hour surgery, on a patient taking dual antiplatelet medication, an excessive amount of blood loss that places the patient at risk?

Another reason given by Dr. Allison of my unsafe patient care was that I could not identify fascial planes to perform the surgery. At one point during the surgery, Dr. Allison took over the case and had difficulty identifying surgical planes due to the patient's large hernia distorting the planes. If I am an unsafe surgeon because I could not identify surgical planes, and when Dr. Allison took over the case, she had the same difficulty, then is not Dr. Allison an unsafe surgeon?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians. Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

Dr. Allison made the operating room an uncomfortable environment to work. Operating room staff has to be comfortable doing their job. Surgery is a team sport and requires the participation of all involved to include the surgeon, anesthesia, scrub tech, circulating nurse, sterile processing department, environmental technicians and etc. If staff feel uncomfortable in the OR environment patients are at risk of being injured.

Additionally, Dr. Allison grabbed a needle driver holding a suture with a needle loaded in it from my hand. Assault is unwelcomed contact that places the victim in apprehension of injury. When Dr. Allison grabbed the needle driver from my hand, she committed assault. I was not injured; however, I was holding the needle driver over the patient and next to the scrub tech. What if I dropped the needle driver when Dr. Allison contacted my hand? What if the needle driver flew out of my hand and hit the scrub tech? The needle drive was holding a sharp, which could have injured someone. Dr. Allison's assault created a dangerous situation in which the patient or staff could have been injured.

The most severe infraction Dr. Allison committed, which is also disruptive physician behavior, is defamation of professional reputation. Defamation is the use of false and malicious statements to malign or damage a person's reputation. After the inguinal hernia repair case Dr. Allison and colleagues, communicated to ICON that I was an unsafe surgeon because I did not reverse the patient's Plavix and I could not identify proper surgical planes.

The statement that I was unsafe because I did not reverse the patient's Plavix is patently false. First, Plavix is irreversible, so there is no effective way to reverse it. Second, if reversal was possible, it would place the patient at risk of coronary artery stent thrombosis. Because inguinal hernia repair is a relatively bloodless surgery, the risk benefit of reversing Plavix, if Plavix could be reversed, is unjustified. Furthermore, the blood loss from the surgery was 75 ml, which for a 3-hour surgery in a patient on dual antiplatelet therapy is low. Therefore, the communication from Dr. Allison and colleagues to ICON was false and malicious.

Dr. Allison and colleagues told ICON that I also could not identify surgical planes and therefore I was unsafe. Surgical planes are a luxury to have. In many patients inflammation, distorted anatomy, and injury make planes difficult to identify. In this patient, his anatomy was distorted due to the large hernia. Dr. Allison had trouble identifying the correct plane to place the prolene patch. The case took 3 hours because the patient's anatomy was distorted, and proper planes were difficult to visualize. Therefore, Dr. Allison's communication that I am unsafe because I could not identify surgical planes is false and malicious.

Because of Dr. Allison's communications to ICON, my assignment with Salem Health Hospital was cancelled. I had assignments scheduled through Sept 2023. Also, because of Dr. Allison's communications to ICON I cannot work any of ICON's assignments at other facilities. Dr. Allison has falsely and maliciously labeled me as unsafe. Dr. Allison's defamation affects my ability to earn a living. Because of this, Salem Health Hospital has significant liability.

Salem Health Hospital is liable for Dr. Allison's behavior due to the principle of Respondent Superior. Dr. Allison committed the defamation during her employment at Salem Health Hospital. Because Dr. Allison committed the defamation as part of her employment at Salem Health Hospital, Salem Health Hospital is liable for Dr. Allison's conduct.

Dr. Allison made false and malicious statements about me to ICON. Dr. Allison's statements caused ICON to cancel my shifts at Salem Health Hospital and ICON will not present me for assignments at any other facility. Because ICON will not present me to any other facility, I am foreclosed upon to earn a living. Salem Health Hospital is liable for damages because Dr. Allison is an employee of Salem Health Hospital and committed the defamation as part of her job at Salem Health Hospital.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident. The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract and used as pretext for not paying the penalty for breach of contract.

The facts on the record are:

1) British Medical Journal stating that Plavix is irreversible. Therefore, I could not have effectively reversed the patient's Plavix.

2) The blood loss for the surgery was 75 ml. If I was an unsafe surgeon due to not reversing the patient's Plavix, how is blood loss of 75 ml unsafe?

3) The operative time was approximately 3 hours. If I could not identify surgical planes effectively, and Dr. Allison took over the case and had trouble identifying surgical planes, which made the case take a long time, how does that make me an unsafe surgeon?

All of the facts go against Dr. Allison's accusations that I am an unsafe surgeon. Furthermore, the facts show that Dr. Allison's statements to ICON were false and malicious.

How did I successfully complete surgical residency, cardiothoracic fellowship, surgical critical care fellowship, and pediatric congenital cardiac surgery fellowship if I am an unsafe surgeon? How did I become board certified in three surgical specialties if I am an unsafe surgeon? How did I get references, who operated with me, to say I am a good surgeon If I am an unsafe surgeon? How am I currently able to perform surgical locums work at a hospital in Kennewick, Washington if I am an unsafe surgeon.

Seems like a lot of people think I am a good surgeon, and one person, who is not familiar with the evidence-based guidelines regarding anticoagulation, believes I am an unsafe surgeon. It also seems like Salem Health is putting all of its eggs in one basket by relying on the opinion of one misinformed surgeon, which has opened Salem Health to significant liability.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation. However, it seems Salem Health does not desire to resolve this issue. On 6 Jun 2023, I called Dr. Yates and left him a message. Dr. Yates has not returned my phone call. On 7 Jun 2023, I set up a meeting with Dr. Boyles on 13 Jun 2023 at 1400 hrs. Today, Dr. Boyles canceled the meeting. On 6 Jun 2023 I sent Dr. Yates and Dr. Boyles the below e-mail. Neither Dr. Yates nor Dr. Boyles has responded to my e-mail.

While I would like to resolve the situation amicably, it does not appear Salem Health is interested in resolving the situation harmoniously. Therefore, I will initiate the process of litigation.

I hope you act opposite of the Salem Health employees I have contacted and do not ignore the issue.

Sincerely,

Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM

Surgeon and Attorney

Member Washington State Bar #59956

**Surgeon's guide to anticoagulant and antiplatelet medications par...** 

Begin forwarded message:

**From:** Jeremy Conklin <jhconklin@icloud.com>
**Subject: Breach of Contract**
**Date:** June 6, 2023 at 14:41:47 PDT
**To:** ralph.yates@salemhealth.org
**Cc:** matthew.boles@salemhealth.org

Dear Dr. Yates,

We met on 5 Jun 2023, via Zoom video conference during the new physician orientation at Salem Health Hospital. After attending the new physician orientation I worked a TRAC shift from 1900 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had

new physician orientation I worked a THAO shift from 1900 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia. The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction. Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised. The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery. During my history and physical of the patient, I learned that the patient had a significant cardiac history. The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia. Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin. The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications. I further explained that there was no effective way to reverse his antiplatelet medications, and even if there was, reversal of his antiplatelet medications would place the patient at risk of stent occlusion. Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils - bleeding or stent occlusion. I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery. I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding. I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis. The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023. Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison to proctor me. Dr. Allison agreed to proctor me. I began my case and Dr. Allison scrubbed in to assist me. I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large, and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair. It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix. I said "Plavix is irreversible, and I believed that reversing the patient's plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis. Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique. I learned how to perform an inguinal hernia repair in residency and I use the same technique today. Dr. Allison's technique is different than mine, and rather than observe me operating, Dr. Allison kept suggesting using her technique. The situation was uncomfortable. I did not want to say anything to Dr. Allison in front of the OR staff. Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia. While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length. Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it, dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient. Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

This afternoon, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine. I asked what the concerns were. I was told the concerns were that I did not reverse the patient's plavix and I could not suture fascia properly. With regards to reversal of plavix and aspirin, please find attached, an evidence based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two, antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, "There are no specific reversal agents for clopidogrel. Since its effects are irreversible, the resultant platelet inhibition lasts for the lifespan of the platelet, ~7-9 days."

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence based guidelines for the management of surgical patients administered anti-platelet medications. Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach. Therefore, Salem Health Hospital's breach of my contract is unjustified. Salem Health Hospital used the opinion of one surgeon, who is not following evidence based standards, to determine that my patient care places patients at risk. Salem Health Hospital used the opinion of one ill informed surgeon to justify Salem Health Hospital's decision to breach my contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision. It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care.

For argument's sake, let us assume that Dr. Allison was correct and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk. If that was the case shouldn't the patient have exsanguinated during surgery? Shouldn't there have been excessive blood loss? The recorded blood loss for the case was 75 ml. The recorded blood loss is a fact that cannot be disputed. Is a quarter of a can of Coca-Cola, in a 3 hour surgery, on a patient taking dual antiplatelet medication, an excessive amount of blood loss that places the patient at risk?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians. Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident. The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract, and used as pretext for not paying the penalty for breach of contract.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation.

I look forward to hearing from you, and speaking with you, to resolve this situation in good faith and fair dealing.
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
Member Washington State Bar #59956

1

2                                **Exhibit JJ**

3
                          **CONFIDENTIAL INFORMATION**
4

5                     **SEE STIPULATED PROTECTIVE ORDER**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 49

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

**From:** Jeremy Conklin jhconklin@icloud.com  📎
**Subject:** Fwd: Breach of Contract
**Date:** June 8, 2023 at 13:35
**To:** cheryl.wolfe@salemhealth.org

Dear Ms. Wolfe,

I am a surgeon and attorney. I practice both medicine and health law in Washington State. Recently, I signed a locum tenens contract with ICON Medical Network to perform surgery shifts at Salem Health Hospital. An unfortunate incident occurred on the evening of 5 Jun 2023 to 6 Jun 2023.

On 5 Jun 2023, I attended the new physician orientation, then I worked a TRAC shift from 1900 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia. The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction. Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised. The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery. During my history and physical of the patient, I learned that the patient had a significant cardiac history. The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia. Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin. The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement.

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications. I further explained that there was no effective way to reverse his antiplatelet medications, and even if there was, reversal of his antiplatelet medications would place the patient at risk of stent occlusion. Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils - bleeding or stent occlusion. I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery. I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding. I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis. The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023. Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison to proctor me. Dr. Allison agreed to proctor me. I began my case and Dr. Allison scrubbed in to assist me. I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair. It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs. A routine inguinal hernia repair usually takes an hour or less. Because of the patient's large hernia, which distorted normal surgical planes, the surgery was more difficult and took more time to complete.

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix. I said, "Plavix is irreversible, and I believed that reversing the patient's Plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis. Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique. I learned how to perform an inguinal hernia repair in residency, and I use the same technique today. Dr. Allison's technique is different than mine, and rather than observe me operating as a proctor, Dr. Allison kept suggesting using her technique. The situation was uncomfortable. I did not want to say anything to Dr. Allison in front of the OR staff. Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia. While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length. Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it; dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient. Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

On 6 Jun 2023, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine. I asked what the concerns were. I was told the concerns were that I did not reverse the patient's Plavix and I could not suture fascia properly. With regards to reversal of Plavix and aspirin, please find attached, an evidence-based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, **"There are no specific reversal agents for clopidogrel. Since its effects are irreversible, the resultant platelet inhibition lasts for the lifespan of the platelet, –7–9 days."**

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence-based guidelines for the management of surgical patients administered anti-platelet medications. Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach. Therefore, Salem Health Hospital's breach of my contract is unjustified. Salem Health Hospital used the opinion of one surgeon, who is not following evidence-based standards, to determine that my patient care places patients at risk. Salem Health Hospital used the opinion of one ill-informed surgeon to justify Salem Health Hospital's decision to breach my

contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision. It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care. To date, no one from Salem Health has contacted me regarding the incident.

For argument's sake, let us assume that Dr. Allison was correct, and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk. If that was the case shouldn't the patient have exsanguinated during surgery? Shouldn't there have been excessive blood loss? The recorded blood loss for the case was 75 ml. The recorded blood loss is a fact that cannot be disputed. Is a quarter of a can of Coca-Cola, in a 3-hour surgery, on a patient taking dual antiplatelet medication, an excessive amount of blood loss that places the patient at risk?

Another reason given by Dr. Allison of my unsafe patient care was that I could not identify fascial planes to perform the surgery. At one point during the surgery, Dr. Allison took over the case and had difficulty identifying surgical planes due to the patient's large hernia distorting the planes. If I am an unsafe surgeon because I could not identify surgical planes, and when Dr. Allison took over the case, she had the same difficulty, then is not Dr. Allison an unsafe surgeon?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians. Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

Dr. Allison made the operating room an uncomfortable environment to work. Operating room staff has to be comfortable doing their job. Surgery is a team sport and requires the participation of all involved to include the surgeon, anesthesia, scrub tech, circulating nurse, sterile processing department, environmental technicians and etc. If staff feel uncomfortable in the OR environment patients are at risk of being injured.

Additionally, Dr. Allison grabbed a needle driver holding a suture with a needle loaded in it from my hand. Assault is unwelcomed contact that places the victim in apprehension of injury. When Dr. Allison grabbed the needle driver from my hand, she committed assault. I was not injured; however, I was holding the needle driver over the patient and next to the scrub tech. What if I dropped the needle driver when Dr. Allison contacted my hand? What if the needle driver flew out of my hand and hit the scrub tech? The needle drive was holding a sharp, which could have injured someone. Dr. Allison's assault created a dangerous situation in which the patient or staff could have been injured.

The most severe infraction Dr. Allison committed, which is also disruptive physician behavior, is defamation of professional reputation. Defamation is the use of false and malicious statements to malign or damage a person's reputation. After the inguinal hernia repair case Dr. Allison and colleagues, communicated to ICON that I was an unsafe surgeon because I did not reverse the patient's Plavix and I could not identify proper surgical planes.

The statement that I was unsafe because I did not reverse the patient's Plavix is patently false. First, Plavix is irreversible, so there is no effective way to reverse it. Second, if reversal was possible, it would place the patient at risk of coronary artery stent thrombosis. Because inguinal hernia repair is a relatively bloodless surgery, the risk benefit of reversing Plavix, if Plavix could be reversed, is unjustified. Furthermore, the blood loss from the surgery was 75 ml, which for a 3-hour surgery in a patient on dual antiplatelet therapy is low. Therefore, the communication from Dr. Allison and colleagues to ICON was false and malicious.

Dr. Allison and colleagues told ICON that I also could not identify surgical planes and therefore I was unsafe. Surgical planes are a luxury to have. In many patients inflammation, distorted anatomy, and injury make planes difficult to identify. In this patient, his anatomy was distorted due to the large hernia. Dr. Allison had trouble identifying the correct plane to place the prolene patch. The case took 3 hours because the patient's anatomy was distorted, and proper planes were difficult to visualize. Therefore, Dr. Allison's communication that I am unsafe because I could not identify surgical planes is false and malicious.

Because of Dr. Allison's communications to ICON, my assignment with Salem Health Hospital was cancelled. I had assignments scheduled through Sept 2023. Also, because of Dr. Allison's communications to ICON I cannot work any of ICON's assignments at other facilities. Dr. Allison has falsely and maliciously labeled me as unsafe. Dr. Allison's defamation affects my ability to earn a living. Because of this, Salem Health Hospital has significant liability.

Salem Health Hospital is liable for Dr. Allison's behavior due to the principle of Respondent Superior. Dr. Allison committed the defamation during her employment at Salem Health Hospital. Because Dr. Allison committed the defamation as part of her employment at Salem Health Hospital, Salem Health Hospital is liable for Dr. Allison's conduct.

Dr. Allison made false and malicious statements about me to ICON. Dr. Allison's statements caused ICON to cancel my shifts at Salem Health Hospital and ICON will not present me for assignments at any other facility. Because ICON will not present me to any other facility, I am foreclosed upon to earn a living. Salem Health Hospital is liable for damages because Dr. Allison is an employee of Salem Health Hospital and committed the defamation as part of her job at Salem Health Hospital.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident. The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract and used as pretext for not paying the penalty for breach of contract.

The facts on the record are:

1) British Medical Journal stating that Plavix is irreversible. Therefore, I could not have effectively reversed the patient's Plavix.

2) The blood loss for the surgery was 75 ml. If I was an unsafe surgeon due to not reversing the patient's Plavix, how is blood loss of 75 ml unsafe?

3) The operative time was approximately 3 hours. If I could not identify surgical planes effectively, and Dr. Allison took over the case and had trouble identifying surgical planes, which made the case take a long time, how does that make me an unsafe surgeon?

All of the facts go against Dr. Allison's accusations that I am an unsafe surgeon. Furthermore, the facts show that Dr. Allison's statements to ICON were false and malicious.

How did I successfully complete surgical residency, cardiothoracic fellowship, surgical critical care fellowship, and pediatric congenital cardiac surgery fellowship if I am an unsafe surgeon? How did I become board certified in three surgical specialties if I am an unsafe surgeon? How did I get references, who operated with me, to say I am a good surgeon If I am an unsafe surgeon? How am I currently able to perform surgical locums work at a hospital in Kennewick, Washington if I am an unsafe surgeon.

Seems like a lot of people think I am a good surgeon, and one person, who is not familiar with the evidence-based guidelines regarding anticoagulation, believes I am an unsafe surgeon. It also seems like Salem Health is putting all of its eggs in one basket by relying on the opinion of one misinformed surgeon, which has opened Salem Heath to significant liability.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation. However, it seems Salem Health does not desire to resolve this issue. On 6 Jun 2023, I called Dr. Yates and left him a message. Dr. Yates has not returned my phone call. On 7 Jun 2023, I set up a meeting with Dr. Boyles on 13 Jun 2023 at 1400 hrs. Today, Dr. Boyles canceled the meeting. On 6 Jun 2023 I sent Dr. Yates and Dr. Boyles the below e-mail. Neither Dr. Yates nor Dr. Boyles has responded to my e-mail.

While I would like to resolve the situation amicably, it does not appear Salem Health is interested in resolving the situation harmoniously. Therefore, I will initiate the process of litigation.

I hope you act opposite of the Salem Health employees I have contacted and do not ignore the issue.

Sincerely,

Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM

Surgeon and Attorney

Member Washington State Bar #59956

**Surgeon's guide to anticoagulant and antiplatelet medications par...** 

Begin forwarded message:

**From:** Jeremy Conklin <jhconklin@icloud.com>
**Subject: Breach of Contract**
**Date:** June 6, 2023 at 14:41:47 PDT
**To:** ralph.yates@salemhealth.org
**Cc:** matthew.boles@salemhealth.org

Dear Dr. Yates.

We met on 5 Jun 2023, via Zoom video conference during the new physician orientation at Salem Health Hospital. After attending the new physician orientation I worked a TRAC shift from 1000 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had

new physician orientation I worked a THAC shift from 1900 hrs to 0700 hrs.  During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia.  The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction.  Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised.  The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery.  During my history and physical of the patient, I learned that the patient had a significant cardiac history.  The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia.  Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin.  The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement.

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications.  I further explained that there was no effective way to reverse his antiplatelet medications, and even if there was, reversal of his antiplatelet medications would place the patient at risk of stent occlusion.  Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils - bleeding or stent occlusion.  I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery.  I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding.  I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis.  The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023.  Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison to proctor me.  Dr. Allison agreed to proctor me.  I began my case and Dr. Allison scrubbed in to assist me.  I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large, and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair.  It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs.

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix.  I said, "Plavix is irreversible, and I believed that reversing the patient's plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis.  Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique.  I learned how to perform an inguinal hernia repair in residency and I use the same technique today.  Dr. Allison's technique is different than mine, and rather than observe me operating, Dr. Allison kept suggesting using her technique.  The situation was uncomfortable.  I did not want to say anything to Dr. Allison in front of the OR staff.  Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia.  While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length.  Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it; dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient.  Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

This afternoon, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine.  I asked what the concerns were.  I was told the concerns were that I did not reverse the patient's plavix and I could not suture fascia properly.  With regards to reversal of plavix and aspirin, please find attached, an evidence based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, " There are no specific reversal agents for clopidogrel. Since its effects are irreversible, the resultant platelet inhibition lasts for the lifespan of the platelet, ~7-9 days."

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence based guidelines for the management of surgical patients administered anti-platelet medications.  Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach.  Therefore, Salem Health Hospital's breach of my contract is unjustified.  Salem Health Hospital used the opinion of one surgeon, who is not following evidence based standards, to determine that my patient care places patients at risk.  Salem Health Hospital used the opinion of one ill informed surgeon to justify Salem Health Hospital's decision to breach my contract.  It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision.  It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care.

For argument's sake, let us assume that Dr. Allison was correct and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk.  If that was the case shouldn't the patient have exsanguinated during surgery?  Shouldn't there have been excessive blood loss?  The recorded blood loss for the case was 75 ml.  The recorded blood loss is a fact that cannot be disputed.  Is a quarter of a can of Coca-Cola, in a 3 hour surgery, on a patient taking dual antiplatelet medication, an excessive amount of blood loss that places the patient at risk?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians.  Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident.  The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract, and used as pretext for not paying the penalty for breach of contract.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation.

I look forward to hearing from you, and speaking with you, to resolve this situation in good faith and fair dealing.
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
Member Washington State Bar #59956



**Oregon**
Tina Kotek, Governor

**Medical Board**
1500 SW 1st Avenue, Suite 620
Portland, OR 97201-5847
(971) 673-2700
FAX (971) 673-2669
www.oregon.gov/omb

July 5, 2023

## PERSONAL AND CONFIDENTIAL

Jeremy Henry Conklin, DO
1414 10th Ave
Apt 734E
Seattle, WA 98122

RE: Henry Dutra; Mark Pack; Lolita Morgan; David Ansted

Dear Dr. Conklin:

The Oregon Medical Board (Board) has a responsibility to investigate complaints regarding medical care or conduct that may have violated the Oregon Medical Practice Act. The Board has received a complaint regarding unprofessional conduct and has opened an investigation (Case #23-0408).

Summary: Pursuant to ORS 677.320 (5), the matter under investigation is:
It has been alleged that the Licensee provided medically incompetent care and acted in an unprofessional and dishonorable manner while treating several patients at Salem Health between 1900 on 6/5/23 and 0700 on 6/6/23. The concerned patients are as follows: HENRY DUTRA (MRN 2277755); MARK PACK (MRN #826541); LOLITA MORGAN (MRN #2835538); and DAVID ANSTED (MRN #190886).

Response: To assist the Board's Investigative Committee in evaluating this matter, and pursuant to the Board's authority under ORS 677.320(2), **please provide a thorough and detailed response to the following:**

1) **A summary report on this matter, explaining in sufficient detail your response to the allegation.**
2) **Provide a treatment narrative for each patient.**
3) **Legible copies of ALL PATIENT RECORDS you maintain on these patients for the period (5/1/23) to (7/1/23), specifically for the timeframe indicated in the allegation, including but not limited to all Progress Notes, Consultations, Diagnostic Studies (including Lab Reports and Imaging (Films and Transcripts), Medication Flow Sheets, Telephone Logs, and other Provider records maintained in your chart.**
4) **If there are hospital records related to this claim that are not in your possession, please provide the hospital name and the dates of care.**
5) **An updated mailing address preference for future correspondence with the Board regarding this investigation.**
6) **The name and contact information for your attorney (if applicable) and whether you would like the attorney to be copied on correspondence from the Board regarding this investigation.**

Timeline: **A response by August 4, 2023,** is requested. You are encouraged to begin preparing your response to the allegation(s) as soon as possible. Adhering to this timeline helps the Board complete its investigation and arrive at a resolution as efficiently as possible. *Failure to provide a thorough, accurate, and honest response to this notice of investigation by the deadline may constitute a separate violation of unprofessional conduct and may be grounds for independent disciplinary action by the Board.*

Extensions: The Board understands that you may need an extension to the response timeline due to specific, unavoidable circumstances. The Board allows a one-week "grace period" from the required response date. If your response will be delayed beyond the grace period, you must include a reasonable explanation for the delay in your response to the Board.

Attorney Representation: If you choose to be represented by an attorney, please retain one promptly. Your malpractice carrier or employer may provide an attorney for you, or you may contact the Oregon State Bar for a referral.

Sign and Date: Whether the response is drafted by you or your representative, such as an attorney, the response must be signed and dated by you. Your signature is an attestation that all information provided in the response is truthful and accurate.

Transmittal: The Board prefers to receive all correspondence by mail, but if you do need to fax correspondence, please fax to (971) 673-2669. Enclosed is a HIPAA form to facilitate the release of your records. The Board prefers to receive medical records in an electronic format (CD) compatible with Adobe Acrobat® software. If you do supply the records in a paper form, please use 8.5 x 11 paper when practical and do not staple the pages. You are directed to not alter or destroy any records or materials related to the matter under investigation until such point that the Board has concluded the investigation.

Communication: For the duration of this investigation, you must notify the Investigations Section of any changes in your contact information, which includes any addresses, phone numbers, and e-mail addresses, within 10 business days. Please note that this notification is in addition to the regular notification that you are already required to make to the Board when you make such a change. Additionally, you must inform the Investigations Section of any and all practice sites, as well as any changes in your employment or practice status.

Confidentiality: Board investigations are **confidential** as outlined in ORS 677.425. Further, ORS 677.320(6) prohibits you or your representative from knowingly contacting the complainant. The Board will carry out this review with sensitivity for the issues involved.

Please contact me at **971-420-7977, michael.seidel@omb.oregon.gov**, if you have any questions.

Sincerely,

Michael Seidel
Investigator

# Frequently Asked Questions for Licensees under Investigation

The Oregon Medical Board (Board) provides this information to answer questions often asked by licensees under investigation. If you have other questions, please contact the Board or the investigator assigned to you.



Oregon Medical Board
(971) 673-2700
**www.oregon.gov/OMB**

Michael Seidel
Investigator
**971-420-7977**

## OVERVIEW

The Board receives hundreds of complaints each year, and each complaint is entered into the Board's electronic database. The Board only takes action if there has been a violation of state law (the Medical Practice Act). Some examples of violations are gross or repeated acts of negligence, conviction of certain crimes, boundary violations or other ethical violations. Each complaint goes through an initial review process. Complaints that do not indicate a violation of state law are closed with no further action.

Complaints that do not close during the initial screening process are assigned to a Board investigator to gather additional information. That additional information may include statements from the complainant, witnesses, other healthcare providers involved in the care of the patient, records related to the matter, or a consultant's opinion. Once all relevant information is collected, it is presented to the Investigative Committee, a sub-committee of the Board. The Investigative Committee may request additional investigation or may forward the investigation to the Board. The Board ultimately decides whether to proceed to discipline. Less than 10% of complaints result in formal action by the Board.

## FREQUENTLY ASKED QUESTIONS

### I am under investigation. What happens next?

You will receive (or have received) a letter that includes the allegation, contact information for the assigned investigator, and details on the investigation process. The letter explains what you are required to do. The investigator may also notify you directly by phone or in person. You must respond to the allegation and any specific questions. You may also need to provide records. Do not ignore due dates.

*Note: Investigations can be stressful. The Board, investigators, and staff understand this. Resources to help deal with the stress associated with an investigation are available on the Licensee Wellness web page found at http://www.oregon.gov/omb/Topics-of-Interest/Pages/Wellness.aspx*

### Should I hire an attorney?

You may find an attorney helpful during an investigation; however, you must decide whether hiring an attorney is the right choice for you. Your malpractice carrier may provide an attorney or the Oregon Bar Association can assist with finding one (503-684-3763 or 800-452-7636). If you should choose to hire an attorney understand that an attorney cannot assume responsibility for a Licensee's failure to comply with Board request, not responding to notices, or failing to comply with reporting requirements required by State Statue or Administrative Rules. The Board's authority is with the Licensee and not their attorney.

### Can I just call the complainant and straighten this out?

You should not attempt to contact the person you believe is the complainant. We cannot release information about the complainant because this information is confidential.

### *Can I contact one of the Board members to discuss my investigation?*

You should not contact a Board member about your investigation. If you would like the Board to consider specific information, please contact the assigned investigator.

### *How long will the investigation take?*

The length of an investigation varies greatly. Some investigations close within only a few months while others may take over a year. Investigations that are complex, have multiple patients or witnesses, require interviews or use consultants will take longer to resolve. You are encouraged to contact the investigator regarding the status of the investigation.

### *Who reviews the facts of my investigation?*

The investigator gathers your response, interviews witnesses and complainants, obtains medical records and collects other physical evidence. A subcommittee of the Board known as the Investigative Committee (IC) reviews the materials and, if needed, requests further information such as patient charts, consultant review or an interview with you. When the IC members have reviewed all of the necessary information, they recommend a course of action to the full Board. The Board members then review the complete investigation and make a determination.

### *What happens if the Board believes I violated the Medical Practice Act?*

If, after reviewing the investigation, the Board believes that a violation occurred, they may issue a "Notice of Proposed Disciplinary Action." The Notice of Proposed Disciplinary Action includes the allegations, the basis for the proposed disciplinary action, and instructions on how to request a hearing. Do not ignore the due date to request a hearing. If you do not request a hearing by the due date, you waive your right to a hearing, and the Board issues a Default Final Order. After requesting a hearing, you can work with the Board to negotiate a settlement. If you cannot reach an agreement with the Board, a hearing is held. Very few investigations result in a hearing.

### *What are the possible outcomes?*

Investigations resolve in a variety of ways:

- Most investigations close with no formal action taken by the Board. If this happens, the Board sends you a letter stating that the investigation is closed and no further action will be taken.

- In some investigations, the Board closes the investigation with a "Letter of Concern." A Letter of Concern is a confidential letter stating the Board's concerns about the matter under investigation. A Letter of Concern is not a disciplinary action and is not reported to the National Practitioner Data Bank. You will also receive a second letter stating that the investigation is closed with no disciplinary action. This gives you evidence of the investigation being closed with no formal action by the Board.

- Sometimes, the Board closes the investigation with an agreement known as a Corrective Action Agreement (CAA). A CAA is an agreement to fulfill certain terms and is often not disciplinary. These agreements may or may not be reportable to the National Practitioner Data Bank depending on the circumstances of the investigation. A common CAA requirement is that the licensee completes specific education.

- Other investigations may close with the Board issuing a Stipulated Order. This is an agreement to practice under certain terms. This agreement is disciplinary and is reportable to the National Practitioner Data Bank. Possible terms include suspension, fine, probation, reprimand or chaperone requirements.

## AUTHORITY TO REVIEW, USE OR DISCLOSE
## INDIVIDUALLY IDENTIFIABLE HEALTH INFORMATION
## AS A HEALTH OVERSIGHT AGENCY

TO: **Jeremy Henry Conklin, DO**

REGARDING: **David Ansted; Henry Dutra; Lolita Morgan; Mark Pack**

The **Oregon Medical Board** is responsible for exercising general supervision over the practice of medicine and podiatry in the State of Oregon. Pursuant to ORS 677.320, the Board is authorized to compel the production of documents and testimony, inspect records, and obtain information for the purpose of protecting the public from the practice of medicine by unauthorized or unqualified persons, unprofessional conduct, and other violations of the Medical Practice Act.

Consistent with 45 CFR Sec. 164.512(d), the Board and/or representatives identified below are authorized to review, use, or disclose individually identifiable health information as a Health Oversight Agency for oversight activities authorized by law, including audits; civil, administrative or criminal investigations; inspections; licensure or disciplinary actions; civil; administrative, or criminal proceedings or actions; or other activities necessary for appropriate oversight of individuals or entities subject to government regulation to determine compliance with program standards. The information requested constitutes the minimum necessary information for the health oversight purpose, function, or activity described above. This statement provides the authority for the Oregon Medical Boards' staff and/or representatives identified below to review, use, or disclose this information, pursuant to 45 CFR Sec. 164.512(f) and 164.514(h)(2).

*(If the space below is checked, then the law requires you to observe the following statutory requirement.\*)*

☐ **Notice of Confidential Investigation:** The Board requires that you temporarily suspend an individual's right to receive an accounting of disclosures made to the Board as a Health Oversight Agency. Revealing the protected health information that has been disclosed to the Board would be reasonably likely to impede the Board's investigation. This right to disclosure should be suspended from the date of receipt of this notice until **December 31, 2024**. As a covered entity, you must comply with this request, 45 CFR Sec. 164.528(a)(2)(i).

*\*The Health Insurance Portability and Accountability Act of 1996 (HIPAA) provides that individuals generally have a right to receive an accounting of disclosure of protected health information made by the covered entity. A covered entity, however, must temporarily suspend giving an individual an accounting of disclosures to health oversight agencies or law enforcement officials when such agency or official provides the covered entity with an oral or written statement that such an accounting would impede the agency's activities, 45 CFR 164.528(a)(2)(i). It should also be noted that investigatory information obtained by the Board in the course of conducting an investigation that includes review of medical records constitutes information that is exempt from public disclosure pursuant to ORS 676.165(5) and ORS 676.175(1).*

Name:_____    Date: _July 5, 2023_____

     Michael Seidel, Investigator
     Oregon Medical Board

1

2
                                **Exhibit KK**

3
                  **CONFIDENTIAL INFORMATION**

4

5
              **SEE STIPULATED PROTECTIVE ORDER**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 50

Jeremy Conklin
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

Jeremy Conklin
1414 10th Ave
Apt 734E
Seattle, WA  98122
jhconklin@icloud.com

July 16, 2023

Medical Board
1500 SW 1st Ave
Suite 620
Portland, OR  97201-5847
Attn: Michael Seidel
Michael.seidel@omb.oregon.gov

Transmitted Electronically via e-mail.

Re: Case #23-0408

Dear Mr. Seidel,

I am in receipt of complaint #23-0408, dated July 5, 2023.  I am unable to respond to the complaint as the complaint alleges vague and overbroad infractions.  The complaint alleges I provided medically incompetent care, I acted in an unprofessional and dishonorable manner while treating 4 patients at Salem Health from 1900 hrs on 5 Jun 2023 to 0700 hrs on 6 Jun 2023.  The complaint does not state any facts of what medical care was incompetent or what acts were conducted in an unprofessional and dishonorable manner.

Under the 14th Amendment of the United States Constitution, States shall not deprive any person of life, liberty, or property, without due process of law.  Courts have defined due process of law as consisting of notice of the proposed action, and the grounds asserted for it; opportunity to be heard and present reasons why the proposed action should not be taken; and for the proposed action to be heard before an unbiased tribunal.

The complaint I received does not provide sufficient notice of the proposed action and the grounds asserted for it.  Because the complaint does not provide sufficient notice, I am unable to exercise my right to present reasons for why the proposed action should not be taken.  Thus, I need more information regarding each accusation.

There are a few issues which may be playing a part in the complaint that the Oregon Medical Board should be aware.  First, Salem Health and I are involved in a breach of contract dispute.  Salem Health breached my employment contract.  The only way Salem Health can legally breach my contract is to terminate me for cause.  Salem Health has provided no reason to terminate me for cause.  Second, the complaint alleges that I provided incompetent care, acted

unprofessionally, and in a dishonorable manner regarding 4 patients on 5 Jun 2023. The complaint is dated 5 Jul 2023. If my actions were so egregious, why has it taken one month for someone to file a complaint? The complaint seems to coincide with the initiation of litigation for breach of contract. Third, why has not Salem Health, the hospital at which I allegedly committed the above-mentioned infractions, opened an investigation into my actions, and suspended my privileges while an investigation was conducted?

I attempted to log into Salem Health's electronic medical records system, Epic, to obtain the medical records for the patients listed in the complaint. My Salem Health Epic access has been de-activated, so I am unable to produce any of the patient records the Oregon Medical Board requested.

I am a Washington State Licensed attorney. My Washington State Bar number is 59956. I will be representing myself in this case.

Without more information regarding the specifics of each allegation, incompetent medical care, unprofessional behavior, and dishonorable manner, along with lack of access to Salem Health Medical Records, I am unable to respond to your complaint. Unless I receive the specifics of each allegation, and the medical records for each patient alleged to have been improperly cared, I am unable to respond to the complaint by 4 Aug 2023.


Very Respectfully,
/s/ Jeremy Conklin
Jeremy Conklin, DO

1

2

**Exhibit LL**

3

**CONFIDENTIAL INFORMATION**

4

**SEE STIPULATED PROTECTIVE ORDER**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 51

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

Jeremy Conklin
1414 10th Ave
Apt 734E
Seattle, WA 98122

November 7, 2023

Oregon Medical Board
1500 SW 1st Ave, Suite 620
Portland, OR 97201-5847

Re: Henry Dutra, Mark Pack, Lolita Morgan, David Ansted

Dear Mr. Seidel,

This letter contains the requested summary report for the four patients above listed. There are exhibits attached, which are referred to by capital letter.

Ansted, David:

Mr. Ansted was a 65 yo Caucasian male with a history coronary artery disease, his last coronary intervention was 14 Mar 2023, in which drug eluding stents were placed. Mr. Ansted has history of COPD, HTN, and schizophrenia. Mr. Ansted presented to the Salem Emergency Room on 5 Jun 2023 with a chief complaint of left groin pain. Mr. Ansted was moving furniture and developed a lump in his groin. The lump became larger and the Mr. Ansted's pain became more severe. Mr. Ansted presented to the Salem ER with nausea, vomiting, and pain in his abdomen. CT abd/pelvis showed a left inguinal hernia containing loops of small bowel with dilation of the proximal small bowel loops indicating an obstruction of Mr. Ansted's small bowel. The ER physician tried to reduce the small bowel back into Mr. Ansted's abdomen but was unsuccessful. Mr. Ansted was diagnosed with an incarcerated left inguinal hernia with possible strangulation of small bowel. The decision was made to take Mr. Ansted emergently to the operating room to reduce his small bowel and repair his left inguinal hernia.

Because Mr. Ansted had a history of CAD, with recent drug eluding stent placement, 14 Mar 2023, Mr. Ansted was on dual antiplatelet therapy of aspirin and Plavix. Mr. Ansted's most recent stent was placed less than 3 months before 5 Jun 2023. Please see my History and Physical 5 Jun 2023 (Exhibit A).

The Dual Antiplatelet Therapy (DAPT) Score was calculated for Mr. Ansted. The Dual Antiplatelet Therpay (DAPT) Score predicts which patients will benefit from prolonged DAPT after coronary artery stent placement. Mr. Ansted's DAPT score was calculated using the following factors: Age = 65 yo, Cigarette smoking = yes, Diabetes Mellitus = yes, MI at presentation = no, Prior PCI or Prior MI = yes, Drug eluting stent = yes, Stent diameter < 3 mm = no, and LVEF <= 30% = yes.

Continuation of Dual Antiplatelet Therapy:
Stent Thrombosis/MI            6.4%
GUSTO Mod-Severe Bleeding      3%


Risk if Dual Antiplatelet Therapy discontinued:
Stent Thrombosis/MI            12%
Gusto Mod-Severe Bleeding      1.8%

Mr. Ansted had a significant cardiac history with a CABG 10 years prior and multiple drug eluding coronary artery stents placed, the most recent on 14 Mar 2023.  Furthermore, Mr. Ansted had an ejection fraction less than 30%, so if Mr. Ansted suffered an MI due to stent occlusion the consequences could be detrimental.

Inguinal hernia repair surgery is not a bloody procedure.  There are no major blood vessels in the surgical field when performing inguinal hernia surgery.  When done electively inguinal hernia surgery is often performed under local anesthesia and patients are sent home the same day of the surgery.  Mr. Ansted's case was emergent and not elective, however I did not anticipate Mr. Ansted's surgery being bloody.

My operative note reflects that during Mr. Ansted's emergent left inguinal hernia repair surgery only 75 ml of blood were lost during the procedure.  (Exhibit B)

I was concerned that stopping Mr. Ansted's dual antiplatelet surgery could cause a worse complication than bleeding, which was myocardial infarction from coronary artery stent occlusion.  Stopping Mr. Ansted's dual antiplatelet therapy doubled his risk of stent occlusion (from 6.4% to 12%), while only reducing his risk of moderate to severe bleeding by 1%.  The risk benefit of continuing versus stopping Mr. Anstead's dual antiplatelet therapy favored continuing Mr. Ansted's dual antiplatelet therapy.

Additionally, Plavix is irreversible.  Plavix is within the thienopyridine class of drugs that blocks the P2Y12 receptor on platelets for adenosine diphosphate (ADP), thus irreversibly preventing platelet activation.  There are no specific reversal agents for Plavix. Since its effects are irreversible, the resultant platelet inhibition lasts for the lifespan of the platelet, ~7–9 days.[1]  There is no therapy to reverse Plavix.

---

[1] Yeung, L. Y., Sarani, B., Weinberg, J. A., McBeth, P. B., & May, A. K.(2016). Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and perioperative management of long-term anticoagulation. *Trauma surgery & acute care open, 1*(1), e000022.

Platelet transfusion does not restore platelet function in patients under Plavix but is efficient for patients under aspirin.[2] Mr. Ansted, had dual antiplatelet therapy, so he was taking both aspirin and Plavix. While a platelet transfusion would have been effective to deal with Mr. Ansted's aspirin antiplatelet therapy, the platelet transfusion would not be effective against Mr. Ansted's Plavix antiplatelet therapy. Because Mr. Ansted was taking both aspirin and Plavix, platelet transfusion would not have benefited Mr. Ansted. Actually, a platelet transfusion would have given Mr. Ansted the risk of a transfusion reaction or bloodborne infection without the benefit of the transfused platelets reversing Mr. Ansted's antiplatelet therapy. Additionally, transfusing Mr. Ansted platelets, which would not benefit Mr. Ansted, would deprive a patient who needs and would benefit from a platelet transfusion. It is unethical to propose a treatment when the risks outweigh the benefits.

My first shift at Salem Health was 5 Jun 2023, and Mr. Ansted was the first patient I operated on at Salem Health. Because it was my first time operating at Salem Heath, I was required to be observed by an attending surgeon at Salem Health. Dr. Carrie Allison was oncall for Trauma Surgery and I asked her to observe the left inguinal hernia repair surgery I was going to perform on Mr. Ansted.

Instead of observing my operative technique, Dr. Allison scrubbed into my case and immediately upon making my incision Dr. Allison took over my case and halfway through the case asked me to leave the Operating Room. I filed a disruptive physician complaint with Ms. Cheryl Wolfe, CEO of Salem Health, Dr. Ralph Yates, Medical Director of Salem Health, and Dr. Matthew Boles, Director of Surgical Services (Exhibits C and Exhibit D). None of the above-mentioned individuals contacted me regarding my complaint. The complaint I filed with Salem Health's CEO and Medical Director explains the issues I had in the Operating Room performing Mr. Ansted's left inguinal hernia repair surgery.

In summary, Mr. Ansted had an incarcerated left inguinal hernia with strangulated bowel requiring emergent surgery. Mr. Ansted had significant cardiac history, which included multiple drug eluding stents requiring dual antiplatelet therapy to maintain patency. Stent occlusion would have been catastrophic to Mr. Ansted given that Mr. Ansted had a low ejection fraction. Inguinal hernia repair surgery is not a bloody surgery. The DAPT risk calculator predicted a higher risk for stent occlusion by stopping dual antiplatelet therapy than major bleeding by continuing dual antiplatelet therapy. Based upon the DAPT risk calculator the decision was made to continue dual antiplatelet therapy. Furthermore, Plavix is irreversible. There is no therapy that can be rendered to reverse or reduce bleeding from Plavix platelet inhibition. There is no drug that reverses Plavix, and transfusion of platelets naïve to Plavix does not increase platelet function. Thus, even if the DAPT risk calculator provided a score in which discontinuing dual antiplatelet therapy was beneficial, there was no way to reverse Mr.

---

[2] Taylor, G., Osinski, D., Thevenin, A., & Devys, J. M. (2013). Is platelet transfusion efficient to restore platelet reactivity in patients who are responders to aspirin and/or clopidogrel before emergency surgery?. *Journal of Trauma and Acute Care Surgery*, *74*(5), 1367-1369.

Ansted's Plavix platelet inhibition.  Finally, I was not allowed to operate on the Mr. Ansted using my discretion, experience, and skill because Dr. Allison disrupted my case, and removed me from the operating room, thereby preventing me from completing Mr. Ansted's left inguinal hernia repair.

Dutra, Henry:

Mr. Dutra was a 61 yo Caucasian male with a history pulmonary fibrosis of unknown etiology, diabetes, and hypertension. Mr. Dutra was scheduled to undergo lung biopsy on 5 Jun 2023. The lung biopsy procedure was cancelled because on the morning of the procedure, Mr. Dutra complained of abdominal pain. Mr. Dutra underwent a CT abd/pelvis on 5 Jun 2023 at 1049 hrs, which was not read by a radiologist until 2032 hrs.

The initial radiology read was small amount of free air along paracolic gutters, possibly related to bowel perforation. These findings were verbally communicated to Mr. Dutra's attending physician, Dr. Webber at 2000 hrs. Due to the CT findings, Mr. Dutra's attending physician, Dr. Webber consulted the Trauma Acute Care Surgery service (TRACS). I was oncall for TRACS. Dr. Webber stated Mr. Dutra had obstipation with a large amount of stool in his colon. Dr. Webber was concern for bowel perforation from stool in colon. I asked Dr. Webber if Mr. Dutra had any abdominal pain. Dr. Webber stated Mr. Dutra's abdominal pain improved after he had a CT abd/pelvis and pain medication. I recommended a trial of GoLytely if Mr. Dutra's abdominal exam was benign, and Dr. Webber was worried Mr. Dutra's large amount of stool was the etiology of the his abd symptoms.

I told Dr. Webber I would examine Mr. Dutra and decide on whether GoLytely was appropriate. Dr. Webber ordered GoLytely (Exhibit E). I went and examined Mr. Dutra. Upon entry into Mr. Dutra's room, Mr. Dutra was in severe abd pain. Mr. Dutra had guarding during my abdominal examination and moving the bed as well as heel tap worsened his abdominal pain. I instructed Mr. Dutra's nurse to cancel Mr. Dutra's GoLytley (Exhibit F), which had been ordered but had not been given.

After examining Mr. Dutra, I reviewed the pt's CT abd/pelvic images and concluded that the free air seen on the CT abd/pelvis was not from a bowel perforation but likely a peptic ulcer perforation. After reviewing the CT abd/pelvis imaging the final read from radiology was filed at 2032 hrs. Radiology read the free air as a perforated ulcer (Exhibit G).

I explained to Mr. Dutra that he likely had a perforated gastric ulcer, which would require surgery to save his life. I further explained that given Mr. Dutra's pulmonary fibrosis, and Jehovah Witness beliefs that his risk of surgical complications was high. Mr. Dutra agreed to proceed with surgery.

I went to the Operating Room Control desk and spoke to the OR Charge Nurse and Anesthesiologist. I told the OR Charge Nurse and Anesthesiologist I had two emergent cases I needed to add to the OR schedule. The first case was David Anstead for incarcerated and possibly strangulated inguinal hernia. The second case was Henry Dutra for perforated gastric ulcer. Anesthesia told me all the OR teams were busy with other cases, so my cases would have to wait. I asked if there was a backup OR team that could be called into assist with emergent cases. Anesthesia said that the backup team was in the OR assisting with the current cases. Anesthesia further stated that the Mr. Dutra's perforated gastric ulcer could wait until the

morning. I told anesthesia that the CT abd/pelvis, which diagnosed Mr. Dutra's perforated gastric ulcer, had been performed at 1049 hrs, but not read until 2032 hrs, so Mr. Dutra had been sitting around for 12 hours with a perforated gastric ulcer. Anesthesia repeated that Mr. Dutra's perforated gastric ulcer could wait until the morning.

Dr. Patrick O'Herron was the surgeon on the TRACS service during the day. My first shift at Salem Health was a night shift starting on 5 Jun 2023. Because 5 Jun 2023, was my first shift, Dr. O'Herron gave me his phone number and told me to call or text him with any questions. I texted Dr. O'Herron regarding Anesthesia and the OR's refusal to do my cases emergently. Salem Health has a classification for how soon a patient needs the OR.

| Class | Time to OR |
|-------|------------|
| Class A | Now |
| Class B | 1-6 hours |
| Class C | 6-12 hours |
| Class D | 12-24 hours |
| Class E | 24 hours or longer |

The OR Charge Nurse and Anesthesia classified Mr. Dutra as a Class D (Exhibit H). Surgical delay is a critical determinant of survival in patients with perforated peptic ulcers. Every hour of surgical delay is associated with a 2-4 percent increase in 30-day mortality.[3] Therefore, delaying care because of a lack of resources contributed to increased mortality for Mr. Dutra.

The standard of care for perforated peptic ulcer is emergent surgery. Treating Mr. Dutra with antibiotics, proton pump inhibitor, and or nasogastric tube (NGT) with suction are not the standard of care. Placing an NGT blind in a patient with a perforated peptic ulcer could cause the NGT to exit the perforation and enter the peritoneal cavity where the NGT would be of no benefit. NGT's are placed for perforated peptic ulcers in the OR under direct vision and positioned by the surgeon.

Because Salem Health did not have adequate resources, and because transferring Mr. Dutra to a larger medical center was impractical (OHSU did not have bed), Salem Health contributed to the increased 30-day mortality for Mr. Dutra.

In fact, Mr. Dutra was re-admitted to Salem Health on 24 Jun 2023, with a GI bleed from an ulcer in his duodenum. On 26 Jun 2023, Mr. Dutra died due to complications from his bleeding duodenal ulcer. The 20+ hour delay in Mr. Dutra's initial peptic ulcer surgery on 5 Jun 2023, likely contributed to Mr. Dutra's death at 21 days post perforated gastric ulcer surgery.

---

[3] Buck, D. L., Vester-Andersen, M., & Møller, M. H. (2013). Surgical delay is a critical determinant of survival in perforated peptic ulcer. *Journal of British Surgery*, 100(8), 1045-1049.

Pack, Mark Daniel:

Mr. Pack is a 65 yo Caucasian male who was homeless. Mr. Pack has a history of a reducible left inguinal hernia and previous abdominal surgery for mesenteric ischemia. Mr. Pack presented to the Salem Health Emergency Room with a chief complaint of abdominal pain. Mr. Pack stated he had been having abdominal pain for the last 24 hours. Mr. Pack admitted to anorexia due to his abdominal pain. Mr. Pack was taking ibuprofen and aspirin for alleviation of his abdominal pain.

I was consulted by the ER Physician, Dr. Amanda Johnston around 0600 hrs. Dr. Johnston consulted me regarding Mr. Pack's abdominal pain and CT abd/pelvis findings suggesting small bowel necrosis, with perforation, free intraperitoneal air, and pneumatosis intestinalis suggesting necrotic bowel. Furthermore, Dr. Johnston told me Mr. Pack had a creatinine of 4.16, potassium of 6.8 and a blood pH of 7.27 suggesting that Mr. Pack was under resuscitated. Dr. Johnston informed me she had started antibiotics and was giving Mr. Pack the recommended bolus of intravenous fluids recommended by the surviving sepsis guidelines (30 ml/kg).

I examined Mr. Pack and determined that Mr. Pack needed emergent exploratory laparotomy to diagnose and repair his bowel. I went to the OR control desk and again spoke with the OR Charge Nurse and Anesthesiologist informing them I had another patient who required emergent surgery. Anesthesia informed me that Mr. Pack could follow Mr. Dutra in the OR. Thus, it would be 4-5 hours prior to Mr. Pack having surgery.

After speaking to the OR Control Desk, I returned to the ER and spoke with Dr. Johnston and told her Mr. Pack had one case in front of him before Mr. Pack could go to the OR. Dr. Johnston and the ER nurse said it would be better to keep Mr. Pack in the ER until he could go to the OR. Because the ER already knew Mr. Pack it made more sense to keep Mr. Pack in the ER for 4-5 more hours than transfer him to the floor, have new nurses see him, and then Mr. Pack go to the OR.

I completed my examination of Mr. Pack, explained what the plan was to Mr. Pack, and started placing orders and my notes into the computer. At 0630 hrs, I had to sign out my patients to the day team taking over care of all the patients I saw during the evening.

At sign out, I told the day team about Mr. Pack and that Mr. Pack was going to the OR for possible exploratory laparotomy for dead bowel. I explained that Mr. Pack was under resuscitated because he was hypotensive, tachycardic, had elevated creatinine, elevated potassium, elevated lactic acid, and a metabolic acidosis. I further explained that Mr. Pack was receiving his initial fluid bolus per the surviving sepsis guidelines but would likely require further fluid therapy. Additionally, I stated that fluid therapy would dilute Mr. Pack's elevated potassium thereby reducing Mr. Pack's potassium level. Furthermore, I stated that Mr. Pack's potassium was likely elevated because dead bowel spills potassium, which elevates serum potassium. Thus, taking Mr. Pack to surgery emergently and removing the dead bowel was the

best treatment for Mr. Pack's hyperkalemia.  Again, emergent surgery was delayed due to inadequate Salem Health OR resources.

| Time 24 hours | Medication Given |
|---|---|
| 0015 | 1 Liter NS IV |
| 0032 | 1 Liter NS IV |
| 0116 | Calcium Gluconate IV for hyperkalemia |
| 0135 | 10 units Insulin for hyperkalemia |
| 0135 | Lokelma for hyperkalemia |
| 0140 | D50 - 25 gm Dextrose for hyperkalemia |
| 0143 | 1 Liter NS IV |
| 0143 | Calcium Gluconate IV for hyperkalemia |
| 0205 | Zosyn |
| 0220 | 1 Liter NS IV |
| 0608 | 1 Liter NS IV |

My management of Mr. Pack's condition was not completed when my shift ended at 0700 hrs. I handed Mr. Pack off to the day team and advised the day team to continue care of Mr. Pack. The ER had addressed Mr. Pack's hyperkalemia with calcium gluconate, insulin, dextrose, and Lokelma (medication to reduce potassium).  The ER had also resuscitated Mr. Pack with 5 liters of IV fluid and antibiotics, which I advised the day team to reassess and continue.

Nephrology noted that Mr. Pack's acute kidney injury was due to a combination of factors, dehydration, Ibuprofen use, and hypotension from Mr. Pack's dead bowel. Mr. Pack's AKI resolved with fluid therapy.

Morgan, Lolita:

Ms. Morgan was a 28 yo otherwise healthy female who presented to the Salem ER with periumbilical abdominal pain. Ms. Morgan stated her pain worsened and radiated to her RLQ. The ER physician, Dr. Henry Truong, asked me to see Ms. Morgan for an acute appendicitis. I examined Ms. Morgan on 6 Jun 2023 and recommended laparoscopic with possible conversion to open appendectomy.

Ms. Morgan received IV fluid and pain medication in the ER. Ms. Morgan also received antibiotics in the ER, 2 grams of Rocephin, and 500 mg of Flagyl IV. Ms. Morgan underwent laparoscopic appendectomy on 6 Jun 2023 and was discharged in the morning on 7 Jun 2023.

The Surgical Care Improvement Project:[4]

| Set Measure ID | Measure Short Name |
|---|---|
| SCIP-Inf-1 | Prophylactic Antibiotic within 1 hr surgery |
| SCIP-Inf-2 | Prophylactic Antibiotic Selection |
| SCIP-Inf-3 | Prophylactic Antibiotic d/c within 24 hrs |
| SCIP-Inf-4 | Cardiac Surgery pt w/ controlled glucose |
| SCIP-Inf-6 | Surgery pt with appropriate hair removal |
| SCIP-Inf-7 | Colorectal surgery pt with normothermia |
| SCIP-venous-thromboembolism-1 | Surgery pt with VTE ordered |
| SCIP-venous-thromboembolism-2 | Surgery pt receive VTE within 24 hrs prior to surgery and 24 hours after surgery |

According to the Joint Commission Surgical Care Improvement Project (SCIP) recommendations, surgical patients should receive appropriate antibiotics at least 1 hour prior to incision. Ms. Morgan received Rocephin and Flagyl at 0532 hrs. Ms. Morgan underwent surgery between 1400 hrs and 1643 hrs. Rocephin has a half-life of 12 hours, so it was effective until 1732 hrs. Thus, the Ms. Morgan had antibiotic coverage appropriate for an appendicitis at least 1 hour prior to incision per SCIP guideline. Furthermore, the Rocephin was discontinued within 24 hours of surgery in compliance with SCIP guidelines.

Additionally, Ms. Morgan was ordered to receive 5000 units of heparin prior to surgery per SCIP guidelines.

"**Rationale:** There are over 30 million surgeries performed in the United States each year. Despite the evidence that VTE is one of the most common postoperative complications and prophylaxis is the most effective strategy to reduce morbidity and mortality, it is often underused. The frequency of venous thromboembolism (VTE), that includes deep vein thrombosis and pulmonary embolism, is related to the type and duration of surgery, patient risk factors, duration and extent of postoperative immobilization, and use or nonuse of

---

[4] https://manual.jointcommission.org/releases/archive/TJC2010B/SurgicalCareImprovementProject.html

prophylaxis. According to Heit et al, 2000, surgery was associated with over a twenty-fold increase in the odds of being diagnosed with VTE. Studies have shown that appropriately used thromboprophylaxis has a positive risk/benefit ratio and is cost effective. Prophylaxis recommendations for this measure are based on selected surgical procedures from the 2004 American College of Chest Physicians guidelines."[5]

Post-operative fluids, post-operative pain management, and post-operative medications are the purview of the surgeon who operated on Ms. Morgan. I did not perform Ms. Morgan's surgery, so it was not my obligation to order Ms. Morgan's post-operative diet, IV Fluids, or analgesia.

Ms. Morgan received appropriate IV fluid prior to surgery, and appropriate anti-nausea and analgesia prior to surgery. Ms. Morgan received properly selected prophylactic antibiotics prior to surgery, which were given at least 1 hour prior to surgical incision according to SCIP guidelines. Finally, Ms. Morgan was ordered appropriate VTE prophylaxis prior to surgery according to SCIP protocols.

The surgeon who performed Ms. Morgan's laparoscopic appendectomy, Dr. Nicole Vanderheyden, cancelled the 5000 units of heparin I ordered to be given prior to Ms. Morgan's surgery. Therefore, Dr. Vanderheyden was non-compliant with SCIP guidelines and exposed Ms. Morgan to increased risk of venous thromboembolism.


Conclusion:

Salem Health places patients at risk through non-compliance with the standard of care. The standard of care for coronary drug eluding stents is to consider the risk of occlusion from stopping antiplatelet therapy versus bleeding through continuation of antiplatelet therapy. No risk benefit analysis was performed for Mr. Ansted's drug eluding coronary artery stents.

Plavix is irreversible. Giving platelets or medications such as DDAVP to reverse Plavix is futile. Not only will transfused platelets not reverse Plavix, but transfusing blood products unnecessarily places patients at risk of transfusion reaction or infection with a bloodborne pathogen.

Salem Health's allocation of inadequate resources places the public at risk. Patient's with abdominal catastrophe's, peptic ulcer perforation, strangulated hernias, or ischemic bowel, must be intervened upon emergently. Delaying operation for an abdominal catastrophe increases the patient's 30-day mortality by 2-4 percent for each hour of delay. In 3 cases, Mr. Ansted, Mr. Dutra, and Mr. Pack, Salem Health significantly delayed operative intervention. Not having adequate resources for patients is a leadership problem and Dr. Yates (Salem Health Medical Director) and Ms. Cheryl Wolf (CEO of Salem Health) are responsible for ensuring

---

[5] https://manual.jointcommission.org/releases/archive/TJC2010B/MIF0060.html

adequate facilities, adequate staffing, and adequate equipment are available for Salem Health to perform the services for which it is licensed by the State of Oregon.

In three cases inadequate resources delayed patient care. It was clear that there was a lack of staff overnight, which delayed surgical treatment. The lack of staff needs to be investigated to ensure that economic pressures are not outweighing patient care. Mr. Dutra's delay of surgical intervention likely contributed to his death 24 days after his perforated peptic ulcer repair.

Salem Health is not following evidence based Surgical Care Improvement Project guidelines. Prophylactic antibiotics and prophylactic venous thromboembolism treatment are the cornerstones for reducing surgical complications. If the individual(s) who made complaints to the OMB have asserted that Heparin or Lovenox should not be given prior to surgical procedures those individuals need to explain to the OMB why they are not administering VTE prophylaxis prior to surgery.

Oregon law provides individuals who make good faith reports to the Oregon Medical Board limited immunity. Individuals who do not make good faith reports can be subject to sanction. In all four cases, no good faith exists in the complaints.

Each complaint made did not follow the standard of care. The complaint about Mr. Ansted's antiplatelet medication was not evidence based. If individuals at Salem Health are advocating reversing the effects of Plavix, which is irreversible, then the individuals making that complaint need to be investigated themselves. Advocating for reversal of Plavix, when Plavix is irreversible shows that individuals at Salem Health are not following the standard of care.

Complaints that Mr. Dutra was ordered GoLytely inappropriately, when I never ordered GoLytely, and I discontinued it prior to the patient receiving it, but not mentioning the delay in radiology reading Mr. Dutra's CT abd/pelvis scan or mentioning the delay in Mr. Dutra's surgery is disingenuous. The delay in reporting critical radiology results for 10 hours and the delay of Mr. Dutra's emergent abdominal surgery does not comport with the standard of care and should be investigated.

Ms. Morgan was ordered antibiotics and VTE prophylaxis medications prior to surgery in compliance with the SCIP guidelines. Individuals at Salem Health cancelled Ms. Morgan's VTE prophylaxis and complained that VTE prophylaxis prior to surgery is inappropriate. Individuals that made the assertion that pre-surgical VTE prophylaxis is inappropriate need to be investigated as to why they are not following SCIP guidelines, which are the standard of care.

Responding to unfounded complaints from the OMB, made by individuals from Salem Health has taken a great deal of my time. I have supported my treatment of the four patients I took care of with evidence-based medicine. The individuals who made the complaint to the OMB did NOT support their complaint with evidence-based medicine, which is required for a good faith complaint.

The OMB should be investigating the practices at Salem Health by individuals who made the complaints against me because Salem Health is not following the standard of care.

Sincerely,

Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM

# Exhibit A



**Salem Health**
**Hospitals & Clinics**
SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Ansted, David Lee
MRN: 190886, DOB: 8/22/1957, Sex: M

## 06/05/2023 - ED to Hosp-Admission (Discharged) in A3 East (continued)

**ED Care Timeline (continued)**

| | | | |
|---|---|---|---|
| 22:07:54 | Orders Acknowledged | New - Patient to Sign Consent for Blood Products The pt was informed that left inguinal repair surgery was necessary to preserve his bowel from becoming ischemic and necrotic. The pt was informed that the surgery would be an open surgical procedure, m...; VITAL SIGNS; INTERMITTENT DEVICE; NaCl injection 0.9 % 3-40 mL 3-40 mL; NaCl injection 0.9 % 3-40 mL 3-40 mL; INITIATE C-DIFF PROTOCOL IF PATIENT MEETS CRITERIA; EDUCATE AND ENCOURAGE PULMONARY HYGIENE AND INITIATE INCENTIVE SPIROMETER AS APPROPRIATE; INITIATE GLYCEMIC MANAGEMENT POLICY; Hypoglycemia Protocol; ONGOING DIABETES EDUCATION TO BE INITIATED AND PROVIDED BY BEDSIDE RN FOR DIABETIC PATIENTS; INSULIN ADMINISTRATION EDUCATION INITIATED AND PROVIDED BY BEDSIDE RN FOR DIABETIC PATIENTS; NOTIFY PHYSICIAN IF CBG IS > THAN 250 MG/DL X2 CONSECUTIVELY; Complete currently hanging bag of IV fluid before starting new IV order; ADMIT TO INPATIENT; Telemetry; ECG 12 LEAD - PRN; AMBULATE PATIENT - Low Risk VTE Score; heparin injection 5,000 Units; Full Code; SPECIFY DIABETES TYPE - TYPE 2; CAPILLARY BLOOD SUGAR CHECKS; NUTRITION SERVICES COMMUNICATION - Patient Requires CBG Checks; CONTINUE PRE-HOSPITAL DIABETES MEDICATIONS PER PRIOR TO ADMISSION LIST<br>Modified - fentaNYL (Sublimaze) 0.05 mg/mL injection 50 mcg (Comment: Modified from fentaNYL (Sublimaze) 0.05 mg/mL injection 50 mcg); DIET NPO - Keep patient NPO (Comment: Modified from DIET NPO - Keep patient NPO); Patient to Sign Consent for Blood Products The pt was informed that left inguinal repair surgery was necessary to preserve his bowel from becoming ischemic and necrotic. The pt was informed that the surgery would be an open surgical procedure, m... (Comment: Modified from Patient to Sign Consent for Blood Products The pt was informed that left inguinal repair surgery was necessary to preserve his bowel from becoming ischemic and necrotic. The pt was informed that the surgery would be an open surgical procedure, m...)<br>Discontinued - propofol (Diprivan) injection (10 mg/mL) 200 mg 20 mL | Hopp, Michael R, RN |
| 22:08:32 | Orders Placed | Medications - ANTIBIOTIC DOSE PER PHARMACY | Conklin, Jeremy H. DO |
| 22:08:59 | Orders Acknowledged | New - ANTIBIOTIC DOSE PER PHARMACY | Hopp, Michael R, RN |

| 6/6/2023 | Event | Details | User |
|---|---|---|---|
| 00:40 | Timeout: Pre Induction | Verified by Tanker, Kianalee C, RN at 06/06/2023 0125 | Tanker, Kianalee C, RN |
| 01:19 | Timeout: Fire Safety | Verified by Tanker, Kianalee C, RN at 06/06/2023 0120 | Tanker, Kianalee C. RN |
| 01:19 | Timeout: Physician Led | Verified by Tanker, Kianalee C, RN at 06/06/2023 0125 | Tanker, Kianalee C. RN |
| 03:43:34 | Timeout: Post Procedure | Verified by Agra, Gino Carlo C., RN at 06/06/2023 0343 | Agra, Gino Carlo C., RN |

**H&P Notes**

**H&P by Conklin, Jeremy H, DO at 6/5/2023 2007**

TRACS Trauma & Acute Care Surgery
Admission History & Physical

Chief Complaint:
Left groin and abd pain

History of Present Illness
David Lee Ansted is a 65 y.o. who presents the the ER with a 3 day history of left groin pain. Pt states he was



**Salem Health** SALEM HOSPITAL
890 OAK ST SE
**Hospitals & Clinics** SALEM OR 97301-3905

Ansted, David Lee
MRN: 190886, DOB: 8/22/1957, Sex: M

**06/05/2023 - ED to Hosp-Admission (Discharged) in A3 East (continued)**

**H&P Notes (continued)**

moving furniture 2 days ago and noticed a lump in is left groin. The pt also had pain in his left groin. Over the next day the lump grew larger and the pt's pain became more severe. The pt presented to the ER today due to severe abd pain, large lump in groin with scrotal mass, as well as nausea and anorexia.


History
Past Medical History:
01/22/2018: Abnormal result of other cardiovascular function study (CODE)
    Comment: RCL coronary angiogram
No date: Asthma
No date: Bronchitis
No date: Chest pain
No date: Herpes
No date: Hiatal hernia
No date: Hypertension
No date: Pneumonia
No date: Schizophrenia (CMS/HCC)
No date: Unspecified mental or behavioral problem Past Surgical History:
12/4/2022: ANG CORONARY
    Comment: ANG CORONARY 12/4/2022 CATH LAB
3/14/2023: ANG CORONARY
    Comment: ANG CORONARY 3/14/2023 CATH LAB
No family history on file.
 Social History
 Socioeconomic History
  Marital status: Single
 Tobacco Use
  Smoking status: Every Day
   Packs/day: 1.00
   Years: 34.00
   Pack years: 34
   Types: Cigarettes
 Substance and Sexual Activity
  Drug use: Yes
   Types: Marijuana
   Comment: once a month


Outpatient Medications as of 6/5/2023:
albuterol (PROVENTIL) (2.5 MG/3ML) 0.083% Inhalation nebule
albuterol HFA (PROVENTIL,VENTOLIN) 108 (90 Base) MCG/ACT Inhalation Aero Soln
amLODIPine (NORVASC) 10 MG Oral Tablet
ascorbic acid (VITAMIN C) 250 MG Oral Capsule
aspirin EC 81 MG Oral Tablet Delayed Response
atorvastatin (LIPITOR) 80 MG Oral Tab
b complex-vitamin B12 (VITAMIN B COMPLEX) Oral Tablet
budesonide-formoterol (SYMBICORT) 160-4.5 MCG/ACT Inhalation Aerosol
clopidogrel -ANTIPLATELET- (PLAVIX) 75 MG Oral Tablet
Coenzyme Q10 (CO Q 10) 100 MG Oral Capsule
cyanocobalamin (VITAMIN B-12) 500 MCG Oral Tablet
docusate sodium (COLACE) 250 MG Oral Capsule
Empagliflozin (JARDIANCE) 25 MG Oral Tablet

 **Salem Health** SALEM HOSPITAL
890 OAK ST SE
**Hospitals & Clinics** SALEM OR 97301-3905

Ansted, David Lee
MRN: 190886, DOB: 8/22/1957, Sex: M

## 06/05/2023 - ED to Hosp-Admission (Discharged) in A3 East (continued)

**H&P Notes (continued)**

ferrous sulfate 325 (65 Fe) MG Oral Tablet
gabapentin (NEURONTIN) 300 MG Oral Capsule
hydrOXYzine HCl (ATARAX) 50 MG Oral Tablet
insulin detemir (LEVEMIR) 100 UNIT/ML Subcutaneous Solution Pen-injector
isosorbide mononitrate CR (IMDUR) 30 MG Oral Tablet Sustained Release 24 HR
metFORMIN (GLUCOPHAGE) 1000 MG Oral Tablet
metoprolol XL (TOPROL XL) 25 MG Oral Tablet Sustained Release 24 HR
multivitamin-mineral (THERAGRAN-M, OCUVITE, CENTRUM) Oral Tablet
nitroglycerin (NITROSTAT) 0.4 MG Sublingual ta
omega-3 fatty acids (FISH OIL) 1000 MG Oral Cap
omeprazole (PRILOSEC) 20 MG Oral CAPSULE DELAYED RELEASE
quetiapine (SEROQUEL) 100 MG Oral Tab
valsartan (DIOVAN) 40 MG Oral Tablet
vilazodone (VIIBRYD) 40 MG Oral Tab
vitamin D, cholecalciferol, 1000 units Oral Tab
vitamin E 400 units Oral Capsule


Allergies:Patient has no known allergies.


Objective
Last Recorded Vitals
Blood pressure 124/75, pulse (!) 93, temperature 98.4 °F (36.9 °C), resp. rate 19, height 5' 10" (1.778 m), weight 165
lb (74.8 kg), SpO2 99 %.Body mass index is 23.68 kg/m².
@PHYSEXAM@
GENERAL: Awake, alert, pt is uncomfortable in bed
PSYCHIATRIC: Normal mood and affect
EYES/HENT: Anicteric, oropharynx dry.
CARDIOVASCULAR: Regular rate and rhythm, with warm and well perfused extremities
PULMONARY: Normal respiratory pattern without accessory muscle use.
ABDOMEN: Tender to palpation, soft, non-distended, pt has large mass in left scrotum and groin which is painful to
palpation and not movable.
MUSCULOSKELETAL: Moves all extremities, no obvious deformities.
NEUROLOGICAL: No lateralizing deficits noted, no facial asymmetry.
INTEGUMENT: Warm and dry, no rashes or jaundice.
INCISIONS/WOUNDS: None


IMAGING
I reviewed and personally interpreted the CT abd/pelvis. Pertinent findings discussed in the assessment and plan.
CT ABDOMEN/ PELVIS W IV CONTRAST ONLY

incarceration.

Result Date: 6/5/2023
IMPRESSION: 1.    Large, obstructive or partially obstructive left inguinal hernia containing several loops of small
bowel. Dilatation of the upstream small bowel and relatively decompressed appearance of the distal bowel is noted.
Fluid within the herniated sac and increased attenuation of the herniated mesentery raises concern for incarceration.
Surgical consultation is advised. 2.    Circumferential urinary bladder wall thickening, possibly related to muscular
hypertrophy in the setting of prostatomegaly. Correlation for cystitis is advised. 3.    Small volume ascites 4.
Additional chronic and incidental findings, as detailed above. Final Reading Dr.: Cullen, Tom This report has been
electronically signed by: Cullen, Tom

 SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Ansted, David Lee
MRN: 190886, DOB: 8/22/1957, Sex: M

## 06/05/2023 - ED to Hosp-Admission (Discharged) in A3 East (continued)

**H&P Notes (continued)**

LABORATORY:
Reviewed available labs, pertinent findings discussed in assessment and plan.

EMR Review: I reviewed the patient's medical records and noted the pt is taking Plavix for coronary artery stents placed in Jan 2023. The pt has a history of CABG x4 about 10 yrs ago.


Assessment and Plan
David Lee Ansted is a 65 y.o. with an incarcerated and likely strangulated left inguinal or femoral hernia, which is causing a bowel obstruction as the pt has dilated loops of bowel proximal to the hernia. The pt needs surgical intervention to return bowel to abdomen and repair hernia. The pt is at high risk due to emergent surgery, cardiac history, currently taking Plavix, history of smoking, asthma, and diabetes.

The pt was informed that the surgery was necessary to preserve his bowel from becoming ischemic and necrotic. The pt was informed that the surgery would be an open surgical procedure, much different than his prior right inguinal hernia repair. Due to the severity of the pt's left hernia, the pt was advised that the surgery may involve resection of bowel, a counter incision in his midline abdomen, and possible colostomy. The pt was advised that because he is taking Plavix for his coronary stents that he has a higher risk of bleeding, and it is possible that the pt may need blood products. The pt was also advised that he has a risk of infection due to his smoking and diabetes, which increase his risk of surgical site infection. The pt understood all the risks. The benefit of the procedure would be to reduce incarcerated bowel and repair the hernia defect. The pt understood the benefits. The pt agreed to proceed with surgery.

This procedure has been fully reviewed with the patient, and written informed consent has been obtained.


Active Problems:
 * No active hospital problems. *

Incarcerated left inguinal hernia.


Code Status: Full Prior
Care Coordination: I discussed the patient with Dr. Clothier regarding surgery and admission.

Attestations




Review of Systems

Physical Exam

Electronically signed by Conklin, Jeremy H, DO at 06/05/23 2046

# Exhibit B

 **Salem Health** SALEM HOSPITAL
Hospitals & Clinics 890 OAK ST SE
SALEM OR 97301-3905

Ansted, David Lee
MRN: 190886, DOB: 8/22/1957, Sex: M

**06/05/2023 - ED to Hosp-Admission (Discharged) in A3 East (continued)**

All Notes (group 2 of 2) (continued)

**Date:** 6/6/2023
**Postoperative Note**

**Name of Procedure:**  Left inguinal hernia repair with mesh.

**Brief History/Indication(s) for Surgery:** This is a 61 year old male with a painful left inguinal hernia.

**Preoperative Diagnosis:** Incarcerated left inguinal hernia

**Postoperative Diagnosis:** Same

**Surgeon:** Jeremy Conklin, DO

**Anesthesia/Anesthesiologist:** GETA, Dr. Logan

**Assistant(s):** Carrie Allison, MD

**Technical Description of Procedure:** The patient was identified, taken to the operating room, and prepped and draped in a sterile fashion. After a preoperative briefing and pause an incision was made on the left groin between the anterior superior iliac spine and the pubic tubercle. This was taken down through scarpa's fasica to the fascia of the external oblique which nicked with a 10 blade and then incised along the fibers. A large hernia sac was noted exiting the external ring and was isolated with a penrose drain. Dissection of the sac revealed small bowel contents, which were pink and viable. The small bowel was placed back into the peritoneum and the hernia sac was closed with 2-0 vicryl. The remainder of the sac contents were inspected. The remainder of the hernia consisted of a large amount of pre-peritoneal fat. Due to the large size of the hernia it was difficult to identify normal anatomy. The spermatic cord was dissected out and isolated with a penrose drain. The hernia defect was noted to be an indirect hernia sac. A prolene mesh was fashioned into a patch. The patch was secured with 2-0 Prolene. The patch was secured inferiorly with 2-0 prolene starting at the pubic tubercle and then it was run along the shelving edge of the inguinal ligament. The superior portion of the patch was secured with running 2-0 Prolene to the conjoint tendon. A notch was made for the spermatic cord in the patch to recreate the internal ring. The external oblique was closed with running 2-0 vicryl. Running 3-0 vicryls reapproximated scarpas fascia and the deep dermis. The skin was closed with 4-0 monocryl subcuticular. A sterile dressing was applied.
**Description of Specific Procedure Findings:** Left indirect inguinal hernia

**Specimens Removed:** Pre-peritoneal fat and hernia sac.

**Implants** (Devices, Tissue, Grafts, etc): Prolene mesh

**Patient's Condition Post Procedure:** Stable

**Estimated Blood Loss:** 75

**Postoperative plan/concerns:** no heavy lifting for 6 weeks, avoid abdominal strain, constipation and straining to urinate

Electronically signed by Conklin, Jeremy H, DO at 06/06/23 0427

Outside Documentation

# Exhibit C

From: **Jeremy Conklin** jhconklin@icloud.com
Subject: **Fwd: Breach of Contract**
   Date: **Jun 8, 2023 at 13:35:26**
     To: cheryl.wolfe@salemhealth.org

Dear Ms. Wolfe,

I am a surgeon and attorney. I practice both medicine and health law in Washington State. Recently, I signed a locum tenens contract with ICON Medical Network to perform surgery shifts at Salem Health Hospital. An unfortunate incident occurred on the evening of 5 Jun 2023 to 6 Jun 2023.

On 5 Jun 2023, I attended the new physician orientation, then I worked a TRAC shift from 1900 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia. The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction. Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised. The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery. During my history and physical of the patient, I learned that the patient had a significant cardiac history. The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia. Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin. The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement.

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications. I further explained that there was no effective way to reverse his antiplatelet medications, and even if there was, reversal of his antiplatelet medications would place the patient at risk of stent occlusion. Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils – bleeding or stent occlusion. I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery. I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding. I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis. The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023. Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison to proctor me. Dr. Allison agreed to proctor me. I began my case and Dr. Allison scrubbed in to assist me. I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair. It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs. A routine inguinal hernia repair usually takes an hour or less. Because of the patient's large hernia, which distorted normal surgical planes, the surgery was more difficult and took more time to complete.

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix. I said, "Plavix is irreversible, and I believed that reversing the patient's Plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis.

Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique. I learned how to perform an inguinal hernia repair in residency, and I use the same technique today. Dr. Allison's technique is different than mine, and rather than observe me operating as a proctor, Dr. Allison kept suggesting using her technique. The situation was uncomfortable. I did not want to say anything to Dr. Allison in front of the OR staff. Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia. While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length. Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it; dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient. Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

On 6 Jun 2023, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine. I asked what the concerns were. I was told the concerns were that I did not reverse the patient's Plavix and I could not suture fascia properly. With regards to reversal of Plavix and aspirin, please find attached, an evidence-based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, **"There are no specific reversal agents for clopidogrel. Since its effects are irreversible, the resultant platelet inhibition lasts for the**

**lifespan of the platelet, ~7–9 days."**

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence-based guidelines for the management of surgical patients administered anti-platelet medications. Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach. Therefore, Salem Health Hospital's breach of my contract is unjustified. Salem Health Hospital used the opinion of one surgeon, who is not following evidence-based standards, to determine that my patient care places patients at risk. Salem Health Hospital used the opinion of one ill-informed surgeon to justify Salem Health Hospital's decision to breach my contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision. It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care. To date, no one from Salem Health has contacted me regarding the incident.

For argument's sake, let us assume that Dr. Allison was correct, and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk. If that was the case shouldn't the patient have exsanguinated during surgery? Shouldn't there have been excessive blood loss? The recorded blood loss for the case was 75 ml. The recorded blood loss is a fact that cannot be disputed. Is a quarter of a can of Coca-Cola, in a 3-hour surgery, on a patient taking dual antiplatelet

medication, an excessive amount of blood loss that places the patient at risk?

Another reason given by Dr. Allison of my unsafe patient care was that I could not identify fascial planes to perform the surgery. At one point during the surgery, Dr. Allison took over the case and had difficulty identifying surgical planes due to the patient's large hernia distorting the planes. If I am an unsafe surgeon because I could not identify surgical planes, and when Dr. Allison took over the case, she had the same difficulty, then is not Dr. Allison an unsafe surgeon?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians. Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

Dr. Allison made the operating room an uncomfortable environment to work. Operating room staff has to be comfortable doing their job. Surgery is a team sport and requires the participation of all involved to include the surgeon, anesthesia, scrub tech, circulating nurse, sterile processing department, environmental technicians and etc. If staff feel uncomfortable in the OR environment patients are at risk of being injured.

Additionally, Dr. Allison grabbed a needle driver holding a suture with a needle loaded in it from my hand. Assault is unwelcomed contact that places the victim in apprehension of injury. When Dr. Allison grabbed the needle driver from my hand,

she committed assault. I was not injured; however, I was holding the needle driver over the patient and next to the scrub tech. What if I dropped the needle driver when Dr. Allison contacted my hand? What if the needle driver flew out of my hand and hit the scrub tech? The needle drive was holding a sharp, which could have injured someone. Dr. Allison's assault created a dangerous situation in which the patient or staff could have been injured.

The most severe infraction Dr. Allison committed, which is also disruptive physician behavior, is defamation of professional reputation. Defamation is the use of false and malicious statements to malign or damage a person's reputation. After the inguinal hernia repair case Dr. Allison and colleagues, communicated to ICON that I was an unsafe surgeon because I did not reverse the patient's Plavix and I could not identify proper surgical planes.

The statement that I was unsafe because I did not reverse the patient's Plavix is patently false. First, Plavix is irreversible, so there is no effective way to reverse it. Second, if reversal was possible, it would place the patient at risk of coronary artery stent thrombosis. Because inguinal hernia repair is a relatively bloodless surgery, the risk benefit of reversing Plavix, if Plavix could be reversed, is unjustified. Furthermore, the blood loss from the surgery was 75 ml, which for a 3-hour surgery in a patient on dual antiplatelet therapy is low. Therefore, the communication from Dr. Allison and colleagues to ICON was false and malicious.

Dr. Allison and colleagues told ICON that I also could not identify surgical planes and therefore I was unsafe. Surgical planes are a luxury to have. In many patients inflammation, distorted anatomy, and injury make planes difficult to identify. In this patient, his anatomy was distorted due to the large hernia. Dr. Allison had trouble

identifying the correct plane to place the prolene patch. The case took 3 hours because the patient's anatomy was distorted, and proper planes were difficult to visualize. Therefore, Dr. Allison's communication that I am unsafe because I could not identify surgical planes is false and malicious.

Because of Dr. Allison's communications to ICON, my assignment with Salem Health Hospital was cancelled. I had assignments scheduled through Sept 2023. Also, because of Dr. Allison's communications to ICON I cannot work any of ICON's assignments at other facilities. Dr. Allison has falsely and maliciously labeled me as unsafe. Dr. Allison's defamation affects my ability to earn a living. Because of this, Salem Health Hospital has significant liability.

Salem Health Hospital is liable for Dr. Allison's behavior due to the principle of Respondent Superior. Dr. Allison committed the defamation during her employment at Salem Health Hospital. Because Dr. Allison committed the defamation as part of her employment at Salem Health Hospital, Salem Health Hospital is liable for Dr. Allison's conduct.

Dr. Allison made false and malicious statements about me to ICON. Dr. Allison's statements caused ICON to cancel my shifts at Salem Health Hospital and ICON will not present me for assignments at any other facility. Because ICON will not present me to any other facility, I am foreclosed upon to earn a living. Salem Health Hospital is liable for damages because Dr. Allison is an employee of Salem Health Hospital and committed the defamation as part of her job at Salem Health Hospital.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident. The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract and used as pretext for not paying the penalty for breach of contract.

The facts on the record are:

British Medical Journal stating that Plavix is irreversible. Therefore, I could not have effectively reversed the patient's Plavix.

The blood loss for the surgery was 75 ml. If I was an unsafe surgeon due to not reversing the patient's Plavix, how is blood loss of 75 ml unsafe?

The operative time was approximately 3 hours. If I could not identify surgical planes effectively, and Dr. Allison took over the case and had trouble identifying surgical planes, which made the case take a long time, how does that make me an unsafe surgeon?

All of the facts go against Dr. Allison's accusations that I am an unsafe surgeon. Furthermore, the facts show that Dr. Allison's statements to ICON were false and malicious.

How did I successfully complete surgical residency, cardiothoracic fellowship, surgical critical care fellowship, and pediatric congenital cardiac surgery fellowship if I am an unsafe surgeon? How did I become board certified in three surgical

specialties if I am an unsafe surgeon? How did I get references, who operated with me, to say I am a good surgeon If I am an unsafe surgeon? How am I currently able to perform surgical locums work at a hospital in Kennewick, Washington if I am an unsafe surgeon.

Seems like a lot of people think I am a good surgeon, and one person, who is not familiar with the evidence-based guidelines regarding anticoagulation, believes I am an unsafe surgeon. It also seems like Salem Health is putting all of its eggs in one basket by relying on the opinion of one misinformed surgeon, which has opened Salem Health to significant liability.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation. However, it seems Salem Health does not desire to resolve this issue. On 6 Jun 2023, I called Dr. Yates and left him a message. Dr. Yates has not returned my phone call. On 7 Jun 2023, I set up a meeting with Dr. Boyles on 13 Jun 2023 at 1400 hrs. Today, Dr. Boyles canceled the meeting. On 6 Jun 2023 I sent Dr. Yates and Dr. Boyles the below e-mail. Neither Dr. Yates nor Dr. Boyles has responded to my e-mail.

While I would like to resolve the situation amicably, it does not appear Salem Health is interested in resolving the situation harmoniously. Therefore, I will initiate the process of litigation.

I hope you act opposite of the Salem Health employees I have contacted and do

not ignore the issue.

Sincerely,

Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM

Surgeon and Attorney

Member Washington State Bar #59956

pdf **Surgeon's guide to anticoagulant and**
418 KB

Begin forwarded message:

**From:** Jeremy Conklin <jhconklin@icloud.com>
**Subject: Breach of Contract**
**Date:** June 6, 2023 at 14:41:47 PDT
**To:** ralph.yates@salemhealth.org
**Cc:** matthew.boles@salemhealth.org

Dear Dr. Yates,

We met on 5 Jun 2023, via Zoom video conference during the new physician orientation at Salem Health Hospital.  After attending the new physician orientation I worked a TRAC shift from 1900 hrs to 0700 hrs.  During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia.

The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction. Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised. The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery. During my history and physical of the patient, I learned that the patient had a significant cardiac history. The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia. Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin. The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement.

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications. I further explained that there was no effective way to reverse his antiplatelet medications, and even if there was, reversal of his antiplatelet medications would place the patient at risk of stent occlusion. Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils – bleeding or stent occlusion. I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery. I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding. I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis. The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023. Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison

to proctor me. Dr. Allison agreed to proctor me. I began my case and Dr. Allison scrubbed in to assist me. I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large, and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair. It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs.

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix. I said, "Plavix is irreversible, and I believed that reversing the patient's plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis. Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique. I learned how to perform an inguinal hernia repair in residency and I use the same technique today. Dr. Allison's technique is different than mine, and rather than observe me operating, Dr. Allison kept suggesting using her technique. The situation was uncomfortable. I did not want to say anything to Dr. Allison in front of the OR staff. Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length. Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it; dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient. Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

This afternoon, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine. I asked what the concerns were. I was told the concerns

were that I did not reverse the patient's plavix and I could not suture fascia properly. With regards to reversal of plavix and aspirin, please find attached, an evidence based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, " There are no specific reversal agents for clopidogrel. Since its effects are irreversible, the resultant platelet inhibition lasts for the lifespan of the platelet, ~7–9 days."

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence based guidelines for the management of surgical patients administered anti-platelet medications. Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach. Therefore, Salem Health Hospital's breach of my contract is unjustified. Salem Health Hospital used the opinion of one surgeon, who is not following evidence based standards, to determine that my patient care places patients at risk. Salem Health Hospital used the opinion of one ill informed surgeon to justify Salem Health Hospital's decision to breach my contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision. It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care.

For argument's sake, let us assume that Dr. Allison was correct and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk. If that was the case shouldn't the patient have exsanguinated during surgery? Shouldn't there have been excessive blood loss? The recorded blood loss for the case was 75 ml. The recorded blood loss is a fact that cannot be disputed. Is a quarter of a can of Coca-Cola, in a 3 hour surgery, on a patient taking dual antiplatelet

medication, an excessive amount of blood loss that places the patient at risk?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians. Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident. The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract, and used as pretext for not paying the penalty for breach of contract.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation.


I look forward to hearing from you, and speaking with you, to resolve this situation in good faith and fair dealing.
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
Member Washington State Bar #59956


pdf **Surgeon's guide to anticoagulant and**
418 KB


Sent from my iPad

# Exhibit D

From: **Jeremy Conklin** jhconklin@icloud.com  📎
Subject: Breach of Contract
Date: June 6, 2023 at 14:41
To: ralph.yates@salemhealth.org
Cc: matthew.boles@salemhealth.org

Dear Dr. Yates,

We met on 5 Jun 2023, via Zoom video conference during the new physician orientation at Salem Health Hospital. After attending the new physician orientation I worked a TRAC shift from 1900 hrs to 0700 hrs. During my shift I encountered a 65 yo male patient who had an incarcerated left inguinal hernia. The patient had a loop of small bowel incarcerated in his hernia, which resulted in a small bowel obstruction. Due to the incarcerated left inguinal hernia containing small bowel, there was a concern that the bowel could become compromised. The threat of bowel compromise resulted in the patient being emergently scheduled for left inguinal hernia repair surgery.

I examined the patient, and explained to the patient, that he would require surgery. During my history and physical of the patient, I learned that the patient had a significant cardiac history. The patient had a decreased ejection fraction from multiple cardiac events to include: CABGx4 in 2015, 4 coronary artery stents placed in Jan/Feb 2023, current and significant smoking history (45+ pack years), COPD, diabetes, and hyperlipidemia. Because the patient had coronary artery stents placed in Jan/Feb 2023, the patient was on Plavix and Aspirin. The standard of care is to continue dual antiplatelet therapy for at least 6 months, and commonly 1 year after coronary artery stent placement.

I explained to my patient that he was at higher risk of bleeding during his surgery due to his antiplatelet medications. I further explained that there was no effective way to reverse his antiplatelet medications, and even if there was, reversal of his antiplatelet medications would place the patient at risk of stent occlusion. Given the patients complicated cardiac history, I believed the risk of bleeding was the lessor of the two evils - bleeding or stent occlusion. I further explained to the patient that the surgery, left inguinal hernia repair, was not a vascular surgery, and was typically not a bloody surgery. I assured the patient that I would control hemostasis meticulously to ensure there was no excessive bleeding. I even wore my surgical loupes, used for vascular surgery, so I could see any small bleeders, to ensure meticulous hemostasis. The patient stated he understood the risk of the surgery and agreed to proceed.

The patient was taken to OR 24 at approximately 0100 hrs on 6 Jun 2023. Because this was my first case at Salem Health Hospital, I asked Dr. Carrie Allison to proctor me. Dr. Allison agreed to proctor me. I began my case and Dr. Allison scrubbed in to assist me. I was happy to have Dr. Allison's assistance because the patient's left inguinal hernia was large, and distorted all the normal planes surgeons use to identify anatomy and perform surgical repair. It was good to have a second set of eyes to perform the complex left inguinal hernia repair, which took approximately 3 hrs.

Prior to the case Dr. Allison asked me why I did not reverse the patient's Plavix. I said, "Plavix is irreversible, and I believed that reversing the patient's plavix would place the patient at an unacceptable risk for coronary artery stent thrombosis. Given the patient's cardiac history I did not want the patient to have stent thrombosis."

At the beginning of the case Dr. Allison made several comments about my operative technique. I learned how to perform an inguinal hernia repair in residency and I use the same technique today. Dr. Allison's technique is different than mine, and rather than observe me operating, Dr. Allison kept suggesting using her technique. The situation was uncomfortable. I did not want to say anything to Dr. Allison in front of the OR staff. Dr. Allison treated me like an intern, and at one point grabbed the needle driver and suture out of my hand exclaiming I did not know how to close fascia  While suturing in the prolene mesh to repair the hernia defect, Dr. Allison's prolene suture developed a knot in its length. Rather than tie the suture and get a new suture without a knot in it, Dr. Allison kept suturing with prolene that had a knot in it; dragging the knot through the patient's tissue which resulted in more oozing of blood from the patient. Dr. Allison then took over my case and directed me to leave the OR and complete the patient's charting.

This afternoon, ICON locum company called me to tell me that Salem Health Hospital was canceling my assignment because there were concerns with my practice of medicine. I asked what the concerns were. I was told the concerns were that I did not reverse the patient's plavix and I could not suture fascia properly. With regards to reversal of plavix and aspirin, please find attached, an evidence based article from the British Medical Journal titled, "Surgeon's guide to anticoagulant and antiplatelet medications part two: antiplatelet agents and peri operative management of long term anti coagulation." Please note that the article specifically states, " There are no specific reversal agents for clopidogrel. Since its effects are irreversible. the resultant platelet inhibition lasts for the lifespan of the platelet, ~7–9 days."

It would seem that Dr. Allison is not familiar with the standard of care regarding anti-platelet medications and coronary artery stents or the evidence based guidelines for the management of surgical patients administered anti-platelet medications. Additionally, Dr. Allison's lack of understanding regarding the management of antiplatelet medications was one of the reasons Salem Health Hospital gave to breach my contract without having to pay for the breach. Therefore. Salem Health Hospital's breach of my contract is unjustified. Salem Health Hospital used the opinion of one surgeon, who is not following evidence based standards, to determine that my patient care places patients at risk. Salem Health Hospital used the opinion of one ill informed surgeon to justify Salem Health Hospital's decision to breach my contract. It is unfortunate that Salem Health Hospital relied upon one individual with a misunderstanding of the standard of care to be the basis for such an impacting decision. It is even more unfortunate that no one from the Salem Health Hospital contacted me to gather more details of the event, so that Salem Health Hospital could improve its performance and provide better quality care.

For argument's sake, let us assume that Dr. Allison was correct and the patient's antiplatelet medications should have been "reversed", and because I did not "reverse" the patient's antiplatelet therapy I placed the patient at risk. If that was the case

shouldn't the patient have exsanguinated during surgery? Shouldn't there have been excessive blood loss? The recorded blood loss for the case was 75 ml. The recorded blood loss is a fact that cannot be disputed. Is a quarter of a can of Coca-Cola, in a 3 hour surgery, on a patient taking dual antiplatelet medication, an excessive amount of blood loss that places the patient at risk?

The incident highlights a more significant problem at Salem Health Hospital, which is the disruptive physician behavior exhibited by Salem Health Hospital physicians. Dr. Allison's conduct was unprofessional and does not comport with the organizational culture of Salem Health Hospital, which I learned all about on 5 Jun 2023, at new physician orientation.

This is a very unfortunate incident, which I believe could have been averted had the facts on record been reviewed and proper due process afforded to all involved in the incident. The facts on record were not reviewed and the erroneous opinion of one surgeon was used to breach my contract, and used as pretext for not paying the penalty for breach of contract.

I would endeavor to resolve this issue amicably, and I hope Salem Health Hospital will engage in constructive and productive dialogue to remedy the situation.

I look forward to hearing from you, and speaking with you, to resolve this situation in good faith and fair dealing.
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
Member Washington State Bar #59956


PDF

**Surgeon's guide
to anti...en.pdf**

Sent from my iPad

# Exhibit F

 **Salem Health** SALEM HOSPITAL
**Hospitals & Clinics** 890 OAK ST SE
SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

## 06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)

### Other Orders (group 3 of 8)

#### Medications

##### polyethylene glycol 3350 (Miralax) powder 17 g (Discontinued)

Electronically signed by: **Webber, Sarah N, MD on 06/02/23 1859**                                    Status: **Discontinued**
Ordering user: **Webber, Sarah N, MD** 06/02/23 1859                        Ordering provider: Webber, Sarah N, MD
Authorized by: Webber, Sarah N, MD                                         Ordering mode: Standard
Frequency: daily 06/02/23 1900 - 06/05/23 2221                             Class: Normal
Discontinued by: Conklin, Jeremy H, DO 06/05/23 2221
Acknowledged: Ryland, Camille, RN 06/02/23 1949 for Placing Order Lyon, Gisselle, RN 06/05/23 2222 for D/C Order
Admin instructions: Mix powder in 240 ml (8 oz) of water before administration. NOTE: 1 packet
= 1 tablespoonful = 17 g

Do not administer by jejunostomy tube.

Administration Hierarchy: Constipation Medications (for PRN orders only).
This is NOT a protocol; a Provider has to individually order each
medications (for constipation).
If multiple medications are ordered PRN simultaneously for constipation,
the order of administration is:

If ordered, start docusate as soon as constipation is noted.

Start with #1 (if ordered) or the highest listed medication at the same
time as docusate. For continued constipation after reassessment (~ 24
hours later), add the next ordered medication on the list. If ANY
questions, clarify intent with provider.
1. Senna
2. Polyethylene glycol packets (Miralax)
3. Bisacodyl (use tablets if both tabs & suppository ordered unless
patient not tolerating oral meds)
4. Magnesium hydroxide (MoM)
5. Lactulose
6. Fleet's Enema
Package: 62559-157-10

##### Ordering & Authorizing Provider Audit Trail

| Date/Time | Ordering provider | Authorizing Provider | User |
|---|---|---|---|
| 06/05/23 2221 | Conklin, Jeremy H, DO | Conklin, Jeremy H, DO | Conklin, Jeremy H, DO |
| 06/02/23 1859 | Webber, Sarah N, MD | Webber, Sarah N, MD | Webber, Sarah N, MD |

##### bisacodyl (Dulcolax) suppository 10 mg (Discontinued)

Electronically signed by: **Webber, Sarah N, MD on 06/02/23 1859**                                    Status: **Discontinued**
Ordering user: Webber, Sarah N, MD 06/02/23 1859                           Ordering provider: Webber, Sarah N, MD
Authorized by: Webber, Sarah N, MD                                         Ordering mode: Standard
Frequency: ONCE 06/02/23 1945 - 1 occurrence                               Class: Normal
Discontinued by: Nguyen, Viet Q, PharmD 06/03/23 1257 [Duplicate Medication Order]
Acknowledged: Ryland, Camille, RN 06/02/23 1949 for Placing Order Friend, Erynn M, RN 06/03/23 1259 for D/C Order
Admin instructions: FOR RECTAL USE.

Administration Hierarchy: Constipation Medications (for PRN orders only).
This is NOT a protocol; a Provider has to individually order each
medications (for constipation).
If multiple medications are ordered PRN simultaneously for constipation,
the order of administration is:

If ordered, start docusate as soon as constipation is noted.

Start with #1 (if ordered) or the highest listed medication at the same
time as docusate. For continued constipation after reassessment (~ 24
hours later), add the next ordered medication on the list. If ANY
questions, clarify intent with provider.
1. Senna

# Exhibit E

 **Salem Health**
**Hospitals & Clinics**
SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

## 06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)

### Progress Notes (group 1 of 4) (continued)

Electronically signed by Close, Malinda B, RN CWON at 06/05/23 1237

**Webber, Sarah N, MD at 6/5/2023 2042**

Following up on CT scan, was not yet read when I checked a couple times today, still not read around 8pm. Called radiology on call for STAT read. Reviewed with radiology there was some small free air at the RUQ and a defect near the pylorus, possible ulcer although appearance seemed possibly consistent with microperforation, either colon or pyloric. With his constipation and impaction colon may be possible. Lactate now normalized. He remains NPO and on IVF.

- Discussed with Dr. Conklin of TRACs. Imaging reviewed. For now due to co-morbidities and clinical stability conservative management with PPI, IV zosyn and golytely was recommended (slow intake as tolerated) to help with right colon impaction and Dr. Conklin will evaluate the patient, greatly appreciated
- Monitor for any evidence of sepsis or peritonitis overnight
- Called and discussed with nightshift bedside nurse.
- Steroids changed to IV
- Hold other non-essential oral medications

Electronically signed by Webber, Sarah N, MD at 06/05/23 2046

**Lyon, Gisselle, RN at 6/5/2023 2044**

Spoke with Dr. Webber, new orders received for Zosyn, Golytely to be sipped on as tolerated, IV solu-medrol for CT results showing possible bowel perforation. Per MD, TRACS to come by and assess pt but not further plan yet. WCTM pt for worsening symptoms.

Electronically signed by Lyon, Gisselle, RN at 06/05/23 2049

**Nye, Linda, RN at 6/6/2023 0629**

Admission Note

Data:
Henry William Dutra admitted to PREP/RECOVERY from 5065 via bed for Procedure(s):
EXPLORATORY LAPAROTOMY (GEN) repair of perforated gastric ulcer by Vanderheyden, Nicole M, MD.

Response:
Patient tolerated transfer.

This patient is considered to be at a high risk for fall. Therefore, the Fall Prevention Plan is being initiated according to our departments standard work.

Electronically signed by Nye, Linda, RN at 06/06/23 0702

# Exhibit G

 **Salem Health** SALEM HOSPITAL
Hospitals & Clinics 890 OAK ST SE
SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

### 06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)

**Progress Notes (group 1 of 4) (continued)**

Electronically signed by Close, Malinda B, RN CWON at 06/05/23 1237

**Webber, Sarah N, MD at 6/5/2023 2042**

Following up on CT scan, was not yet read when I checked a couple times today, still not read around 8pm. Called radiology on call for STAT read. Reviewed with radiology there was some small free air at the RUQ and a defect near the pylorus, possible ulcer although appearance seemed possibly consistent with microperforation, either colon or pyloric. With his constipation and impaction colon may be possible. Lactate now normalized. He remains NPO and on IVF.

- Discussed with Dr. Conklin of TRACs. Imaging reviewed. For now due to co-morbidities and clinical stability conservative management with PPI, IV zosyn and golytely was recommended (slow intake as tolerated) to help with right colon impaction and Dr. Conklin will evaluate the patient, greatly appreciated
- Monitor for any evidence of sepsis or peritonitis overnight
- Called and discussed with nightshift bedside nurse.
- Steroids changed to IV
- Hold other non-essential oral medications

Electronically signed by Webber, Sarah N, MD at 06/05/23 2046

**Lyon, Gisselle, RN at 6/5/2023 2044**

Spoke with Dr. Webber, new orders received for Zosyn, Golytely to be sipped on as tolerated, IV solu-medrol for CT results showing possible bowel perforation. Per MD, TRACS to come by and assess pt but not further plan yet. WCTM pt for worsening symptoms.

Electronically signed by Lyon, Gisselle, RN at 06/05/23 2049

**Nye, Linda, RN at 6/6/2023 0629**

Admission Note

Data:
Henry William Dutra admitted to PREP/RECOVERY from 5065 via bed for Procedure(s):
EXPLORATORY LAPAROTOMY (GEN) repair of perforated gastric ulcer by Vanderheyden, Nicole M, MD.

Response:
Patient tolerated transfer.

This patient is considered to be at a high risk for fall. Therefore, the Fall Prevention Plan is being initiated according to our departments standard work.

Electronically signed by Nye, Linda, RN at 06/06/23 0702

# Exhibit H



15:46

OP

Patrick ›

iMessage
Mon, Jun 5 at 12:50

Dr. O'Herron, this Jeremy Conklin, the locums. I am finished with orientation. Did you have time to show me around.

Yes. Where should I meet you?

I am in the basement of the B building in the Epic training classroom.

I'll be there soon

Mon, Jun 5 at 18:55

Ok, I am in the lobby. How do I get to the sign out room?

Sent as Text Message

Take the elevator to the 6th floor on the B building. I just finished a case. I'll meet you there in 5

Mon, Jun 5 at 20:56

You jinxed me!

Sorry! Murphy's law

Are you still here?

Yes

Rads initially thought colon as source

iMessage



15:47

OP
Patrick ›

Take the elevator to the 6th floor on the B building. I just finished a case. I'll meet you there in 5

Mon, Jun 5 at 20:56

You jinxed me!

Sorry! Murphy's law

Are you still here?

Yes

Rads initially thought colon as source of air, but final read says posterior prepyloric wall.

Of course his abd exam is terrible

That sucks!

If it gets late you could put him on for a 730am start tomorrow with Dr VanDerHeyden. Make sure to get the OR to promise you it will be first case

He is on for 1st case with VanDerHeyden. Apparently, a perforated gastric/pyloric ulcer is a class D.

Delivered

Seems like a good plan

+     sage

1

2                                **Exhibit MM**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 52

Jeremy Conklin
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



Tina Kotek, Governor

**Medical Board**
1500 SW 1st Avenue, Suite 620
Portland, OR 97201-5847
(971) 673-2700
FAX (971) 673-2669
www.oregon.gov/omb

June 7, 2024

PERSONAL AND CONFIDENTIAL
SENT VIA CERTIFIED RETURN RECEIPT MAIL
ARTICLE NO. #9589 0710 5270 0300 4482 40

Jeremy Henry Conklin DO
1414 10th Ave
Apt 734E
Seattle, WA 98122

Re: Order for Evaluation and Qualified Protective Order

Dear Dr. Conklin:

Enclosed is a copy of an Order for Evaluation and Qualified Protective Order that was issued by the
Oregon Medical Board on June 7, 2024. The Order states that Licensee shall undergo a CPEP evaluation
to assess whether any conduct, practice, or condition does or might affect Licensee's ability to safely and
skillfully practice medicine. This must be completed within 150 days from the date this Order is signed
and scheduled within 30 days.

Enclosed with this Order is a CPEP release of information form. Complete this form and return it to the
Board prior to scheduling your appointment. Please inform the Board of your appointment date at least
two weeks prior to the appointment.

The Order further states that Licensee shall undergo an Acumen evaluation to assess whether any
conduct, practice, or condition does or might affect Licensee's ability to safely and skillfully practice
medicine. This must be completed within 90 days from the date this Order is signed, and scheduled
within 30 days.

Please contact me or Investigator Seidel at 971-673-2700 if you have any questions.

Sincerely,

Walter Frazier
Investigations Manager
Investigations/Compliance Unit

cc:     Lindsay Byrne, JD, Board Counsel

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

BEFORE THE
OREGON MEDICAL BOARD

| | |
|---|---|
| In the Matter of: | Agency Case No. 23-0408 |
| JEREMY HENRY CONKLIN, DO LICENSE NO. DO190014 | ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING USE AND DISCLOSURE |

**ORDER FOR EVALUATION**

1.     The Oregon Medical Board (Board) is the state agency responsible for licensing, regulating and disciplining certain health care providers, including physicians, in the state of Oregon. JEREMY HENRY CONKLIN, DO (Licensee) holds an osteopathic medical license in the state of Oregon.

2.     Under ORS 677.420, the Board has the authority to direct and order a mental, physical, or medical competency examination to assist the Board in determining whether Licensee is fit to practice medicine with reasonable skill or safety. Licensee is deemed to have consented to the competency examination hereby ordered.

3.     Licensee must obtain the following evaluation(s) as further described in Attachments A and B:

        _X_ Center for Personalized Education for Professionals in Colorado, specific to: General Surgery with emphasis on trauma and other acute presentations.

        _X_ Acumen Assessments in Kansas

        ____ Psychiatric Assessment

        ____ Neurocognitive Assessment

        ____ Substance Use Evaluation

        ____ Substance Testing (hair, nails, and/or urine)

        ____ Other _____

4.     The parties understand that this Order for Evaluation is not a disciplinary action, is not a public document, and is not to be disclosed to the public.

Page 1 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING USE AND DISCLOSURE –Jeremy Henry Conklin, DO

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1  **QUALIFIED PROTECTIVE ORDER**

2      5.    The Oregon Medical Board (Board), pursuant to ORS 677.265(10), 676.175(1)

3  and OAR 847-001-0015(1)(a), to the extent necessary to conduct a full and proper investigation,

4  now issues this Qualified Protective Order to limit disclosure of information that is confidential

5  or privileged. The following is HEREBY ORDERED:

6      5.1    "Protected information" means all information pertaining to protected

7      health information and confidential investigatory information in the current case,

8      including any evaluation of Licensee, as well as any notes or reports related to such

9      evaluation. This is pursuant to ORS 676.175 and 677.425.

10      5.2    The protected information referenced in this order may be disclosed by the

11      Board pursuant to ORS 676.175(1), only as necessary for the Board to conduct a full and

12      proper investigation. This protected information may be used in connection with this case

13      only, and the Licensee and evaluator are restrained from using protected information, or

14      information obtained from such material, for any purpose other than this case. Licensee

15      and evaluator are further restrained from disclosing such protected information to anyone

16      other than Board staff.

17  **VIOLATIONS**

18      Failure to comply with the terms of this Order for Evaluation and Qualified Protective Order will

19  be considered a violation of ORS 677.190(17) and may result in disciplinary action by the Board.

20

21      DATED this 7th day of June , 2024.

22

23      NICOLE KRISHNASWAMI, JD

24      Executive Director
    for the

25      Oregon Medical Board

26

27
    Page 2 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
    USE AND DISCLOSURE –Jeremy Henry Conklin, DO

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1          ATTACHMENT A - CPEP

2

3          Pursuant to ORS 677.420, the Board orders Licensee to undergo a comprehensive

4    evaluation for the purpose of determining Licensee's fitness to practice medicine with reasonable

5    skill and safety to patients as follows:

6          1.    Licensee shall successfully complete an evaluation at the Center for Personalized

7                Education for Professionals in Colorado to assess whether any conduct, practice, or

8                condition does or might affect Licensee's ability to safely and skillfully practice

9                medicine.  Licensee shall enroll within 30 days of the date that this Order is signed

10               by the Board's Executive Director.

11         2.    Licensee shall sign any and all releases to allow for complete communication

12               between the Board and evaluators.  Releases must be in place at least two weeks

13               prior to the evaluation date.

14         3.    The costs of such an evaluation, including travel, lodging and all testing expenses,

15               shall be borne by Licensee.

16         4.    Licensee shall complete the evaluation within 150 days of the date that this Order

17               is signed by the Board's Executive Director.  The report resulting from the

18               evaluation shall be sent directly to the Board.

19         5.    Failure to comply with this Order by the dates specified will be considered a

20               violation of ORS 677.190(17) and may result in disciplinary action by this Board.

21

22

23

24

25

26

27

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1      ATTACHMENT B - ACUMEN

2

3          Pursuant to ORS 677.420, the Board orders Licensee to undergo a comprehensive

4   evaluation for the purpose of determining Licensee's fitness to practice medicine with reasonable

5   skill and safety to patients as follows:

6      1.    Licensee must successfully complete a Multidisciplinary Clinical and Forensic

7            Fitness to Practice Assessment at Acumen Assessments to assess whether any

8            conduct, practice, or condition does or might affect Licensee's ability to safely and

9            skillfully practice medicine.  Licensee shall enroll within 30 days of the date that

10           this Order is signed by the Board's Executive Director.

11     2.    Licensee shall sign any and all releases to allow for complete communication

12           between the Board and evaluators.  Releases must be in place at least two weeks

13           prior to the evaluation date.

14     3.    The costs of such an evaluation, including travel, lodging and all testing expenses,

15           shall be borne by Licensee.

16     4.    Licensee shall complete the evaluation within 90 days of the date that this Order is

17           signed by the Board's Executive Director.  The report resulting from the evaluation

18           shall be sent directly to the Board.

19     5.    Failure to comply with this Order by the dates specified will be considered a

20           violation of ORS 677.190(17) and may result in disciplinary action by this Board.

21

22

23

24

25

26

27

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1

**CERTIFICATE OF MAILING**

2

3

4   On June 7, 2024, I mailed the foregoing Order for Evaluation and Qualified Protective Order
    Limiting Use and Disclosure regarding Jeremy Henry Conklin, DO, to the following parties:

5

6

7

8   **By: First Class Certified/Return Receipt U.S. Mail**
    **Certified Mail Receipt # 9589 0710 5270 0300 4482 40**

9
    Jeremy Henry Conklin DO
10  1414 10th Ave
    Apt 734E
11  Seattle, WA 98122

12

13
     Joshua Paul
14  Joshua Paul
    Compliance Coordinator
15  Oregon Medical Board

16

17

18

19

20

21

22

23

24

25

26

27
    Page 5 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
    USE AND DISCLOSURE –Jeremy Henry Conklin, DO



# OREGON MEDICAL BOARD

## CONSENT FOR THE
## RELEASE OF CONFIDENTIAL INFORMATION

I, __Jeremy Henry Conklin, DO_____, hereby authorize the Oregon Medical Board and

_____

(Name of person / entity / facility disclosing information)

_____

(Street address of person / entity / facility)

_____

(City, State Zip)                                          (Phone)

to share, communicate and disclose the following information about my health:
- Medical Records
- Mental health records
- Evaluations and/or treatment records from this and/or other programs

for the purpose of allowing documentation of my status for licensing, legal, or credentialing purposes, and to facilitate collection of collateral information.

This consent is subject to revocation at any time, except to the extent that the program which is to make the disclosure has already taken action in reliance upon it. If not previously revoked, this consent will terminate two years from the date of my signature.

Information disclosed is protected by Federal confidentiality rules (42 CFR part 2). The federal rules prohibit further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

**I have read this authorization and I understand it.**

By: _____          Date_____
        (Signature of individual)

**Oregon Medical Board** | 1500 SW 1st Ave, Suite 620 | Portland, Oregon 97201
971.673.2700 or 877.254.6263 | Fax: 971.673.2669 | **www.Oregon.gov/OMB**

Level 3 - Restricted



# OREGON MEDICAL BOARD

## CONSENT FOR THE
## RELEASE OF CONFIDENTIAL INFORMATION

I, ___Jeremy Henry Conklin, DO_____, hereby authorize the Oregon Medical Board and

_____

(Name of person / entity / facility disclosing information)

_____

(Street address of person / entity / facility)

_____

(City, State Zip)                                        (Phone)

to share, communicate and disclose the following information about my health:
- Medical Records
- Mental health records
- Evaluations and/or treatment records from this and/or other programs

for the purpose of allowing documentation of my status for licensing, legal, or credentialing purposes, and to facilitate collection of collateral information.

This consent is subject to revocation at any time, except to the extent that the program which is to make the disclosure has already taken action in reliance upon it. If not previously revoked, this consent will terminate two years from the date of my signature.

Information disclosed is protected by Federal confidentiality rules (42 CFR part 2). The federal rules prohibit further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

**I have read this authorization and I understand it.**

By: _____        Date_____
      (Signature of Individual)

**Oregon Medical Board** | 1500 SW 1st Ave, Suite 620 | Portland, Oregon 97201
971.673.2700 or 877.254.6263 | Fax: 971.673.2669 | **www.Oregon.gov/OMB**

Level 3 - Restricted

1

2

**Exhibit NN**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 53

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

**From: Jeremy Conklin** jhconklin@icloud.com
**Subject:** Re: Oregon Medical Board interview-JC
**Date:** September 9, 2024 at 18:44
**To:** GOETCHIUS Kimberly * OMB Kimberly.GOETCHIUS@omb.oregon.gov
**Cc:** SEIDEL Michael * OMB michael.seidel@omb.oregon.gov

Ms. Goetchius,

Thank you for responding so quickly. According to ORS 677.320 I may be compelled to appear for an interview. However, appearance does not require me to be in-person. Appearance may be via phone or Zoom. If an in-person interview is important to the Oregon Medical Board, then I would suggest an interview be scheduled in Seattle, WA. I would attend an in-person interview in Seattle, WA.

Courts have held that video conferencing can be used without violating due process rights. Courts have conducted various proceedings, including suppression hearings and trials via video conferencing. If courts and juries can use video conferencing for trials, then I am flummoxed as to why the Oregon Medical Board cannot use video conferencing for interviews.

The Oregon Medical Board can issue a subpoena per ORS 677.320, which I will oppose via a court hearing, which would be conducted by video conference. If a court can hear my opposition to a subpoena via video conferencing, then why cannot the Oregon Medical Board conduct an interview via video conferencing? Again, ORS 677.320 only provides the ability to compel appearance. ORS 677.320 does not compel travel to an interview.

Please note that I have provided you with two options for an interview - in-person in Seattle, WA or via Zoom. I have been extremely flexible with your request for an interview. Flexibility is one of the elements a judge will consider when ruling on quashing a subpoena.

If the board would like to interview me, please schedule a location, date, and time in Seattle, WA. Otherwise, please provide me a Zoom link to a scheduled interview.

Thank you,
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
WSBA # 59956

On Sep 5, 2024. at 14:49, GOETCHIUS Kimberly * OMB <Kimberly.GOETCHIUS@omb.oregon.gov> wrote:

Dr. Conklin,
This is an in person interview. There is not a Zoom option.
Please let me know if this date and time work out for in person at the Oregon Medical Board.
I have scheduled you for 1015 am on Thursday, December 5, 2024.
Thank you,

<image001.png>

**_Kimberly Goetchius_**
Investigative Coordinator
**Oregon Medical Board**
1500 SW 1st Ave, Suite 620, Portland, OR 97201
**Desk:** 971-673-2700  |  **OMB:** 971-673-2700

<image002.png>   <image003.png>   <image004.png>
<image005.png>

**OUR MISSION: _To protect the health, safety, and wellbeing of Oregon citizens by regulating the practice of medicine in a manner that promotes access to quality care._**

**Your opinion matters! Please take two minutes to complete our customer satisfaction survey. Survey responses guide our continuous improvement efforts.**

<image006.png>

Data Classification Level 2 - Limited

*****CONFIDENTIALITY NOTICE*****

This email may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system.

**From:** Jeremy Conklin <jhconklin@icloud.com>
**Sent:** Wednesday, September 4, 2024 11:59 AM
**To:** GOETCHIUS Kimberly * OMB <Kimberly.GOETCHIUS@omb.oregon.gov>
**Subject:** Re: Oregon Medical Board interview-JC

Ms. Goetchius,

I received the e-mail and would be happy to appear for an interview via Zoom.  As
the board knows, I do not live in Oregon, and was afforded a Locum Tenens
Oregon Medical License, because I am not a resident of Oregon.  Please provide
me a Zoom link so I may attend an interview.

Thank you,
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
Washington State Bar # 59956

> On Sep 5, 2024, at 09:29, GOETCHIUS Kimberly * OMB
> <Kimberly.GOETCHIUS@omb.oregon.gov> wrote:
>
> Dr. Conklin,
>
> The Investigative Committee has requested that you appear for an interview
> before the Committee.  Interviews are conducted in person at the Board's
> office in downtown Portland.
>
> I have scheduled you for 1015 am on Thursday, December 5, 2024.  **Please
> confirm that you received this email.**
>
> Please let me know if you have any questions.
>
> Thank you,

<image001.png>

***Kimberly Goetchius***
Investigative Coordinator
**Oregon Medical Board**
1500 SW 1st Ave, Suite 620, Portland, OR 97201
**Desk:** 971-673-2700  I  **OMB:** 971-673-2700

<image002.png>   <image003.png>   <image004.png>
<image005.png>

OUR MISSION: *To protect the health, safety, and wellbeing of Oregon citizens by
regulating the practice of medicine in a manner that promotes access to quality care.*

**Your opinion matters! Please take two minutes to complete our customer satisfaction survey. Survey responses guide our continuous improvement efforts.**

<u><image006.png></u>

Data Classification Level 2 - Limited

*****CONFIDENTIALITY NOTICE*****

This email may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system.

*********************************************

1

2

3

4                              **Exhibit OO**
                        **CONFIDENTIAL INFORMATION**

5

6                      **SEE STIPULATED PROTECTIVE ORDER**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

**From: Jeremy Conklin** jhconklin@icloud.com
**Subject:** Re: Oregon Medical Board interview-JC
**Date:** September 9, 2024 at 18:44
**To:** GOETCHIUS Kimberly * OMB Kimberly.GOETCHIUS@omb.oregon.gov
**Cc:** SEIDEL Michael * OMB michael.seidel@omb.oregon.gov

Ms. Goetchius,

Thank you for responding so quickly. According to ORS 677.320 I may be compelled to appear for an interview. However, appearance does not require me to be in-person. Appearance may be via phone or Zoom. If an in-person interview is important to the Oregon Medical Board, then I would suggest an interview be scheduled in Seattle, WA. I would attend an in-person interview in Seattle, WA.

Courts have held that video conferencing can be used without violating due process rights. Courts have conducted various proceedings, including suppression hearings and trials via video conferencing. If courts and juries can use video conferencing for trials, then I am flummoxed as to why the Oregon Medical Board cannot use video conferencing for interviews.

The Oregon Medical Board can issue a subpoena per ORS 677.320, which I will oppose via a court hearing, which would be conducted by video conference. If a court can hear my opposition to a subpoena via video conferencing, then why cannot the Oregon Medical Board conduct an interview via video conferencing? Again, ORS 677.320 only provides the ability to compel appearance. ORS 677.320 does not compel travel to an interview.

Please note that I have provided you with two options for an interview - in-person in Seattle, WA or via Zoom. I have been extremely flexible with your request for an interview. Flexibility is one of the elements a judge will consider when ruling on quashing a subpoena.

If the board would like to interview me, please schedule a location, date, and time in Seattle, WA. Otherwise, please provide me a Zoom link to a scheduled interview.

Thank you,
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
WSBA # 59956

On Sep 5, 2024, at 14:49, GOETCHIUS Kimberly * OMB <Kimberly.GOETCHIUS@omb.oregon.gov> wrote:

Dr. Conklin,
This is an in person interview. There is not a Zoom option.
Please let me know if this date and time work out for in person at the Oregon Medical Board.
I have scheduled you for 1015 am on Thursday, December 5, 2024.
Thank you,

<image001.png>          **Kimberly Goetchius**
                        Investigative Coordinator
                        **Oregon Medical Board**
                        1500 SW 1st Ave, Suite 620, Portland, OR 97201
                        **Desk:** 971-673-2700  |  **OMB:** 971-673-2700

                        <image002.png>    <image003.png>    <image004.png>
                        <image005.png>

**OUR MISSION:** *To protect the health, safety, and wellbeing of Oregon citizens by regulating the practice of medicine in a manner that promotes access to quality care.*

**Your opinion matters! Please take two minutes to complete our customer satisfaction survey. Survey responses guide our continuous improvement efforts.**

<image006.png>

Data Classification Level 2 - Limited

*****CONFIDENTIALITY NOTICE*****

This email may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system.

....................................................

**From:** Jeremy Conklin <jhconklin@icloud.com>
**Sent:** Wednesday, September 4, 2024 11:59 AM
**To:** GOETCHIUS Kimberly * OMB <Kimberly.GOETCHIUS@omb.oregon.gov>
**Subject:** Re: Oregon Medical Board interview-JC

Ms. Goetchius,

I received the e-mail and would be happy to appear for an interview via Zoom.  As
the board knows, I do not live in Oregon, and was afforded a Locum Tenens
Oregon Medical License, because I am not a resident of Oregon.  Please provide
me a Zoom link so I may attend an interview.

Thank you,
Jeremy Conklin, DO, JD, LLM, MBA, MPH, FACOS, FCLM
Surgeon and Attorney
Washington State Bar # 59956


> On Sep 5, 2024, at 09:29, GOETCHIUS Kimberly * OMB
> <Kimberly.GOETCHIUS@omb.oregon.gov> wrote:
>
> Dr. Conklin,
>
> The Investigative Committee has requested that you appear for an interview
> before the Committee.  Interviews are conducted in person at the Board's
> office in downtown Portland.
>
> I have scheduled you for 1015 am on Thursday, December 5, 2024.  **Please
> confirm that you received this email.**
>
> Please let me know if you have any questions.
>
> Thank you,
>
>
> <image001.png>          ***Kimberly Goetchius***
>                          Investigative Coordinator
>                          **Oregon Medical Board**
>                          1500 SW 1st Ave, Suite 620, Portland, OR 97201
>                          **Desk:** 971-673-2700  |  **OMB:** 971-673-2700
>
>                          <image002.png>   <image003.png>   <image004.png>
>                          <image005.png>
>
> **OUR MISSION:** *To protect the health, safety, and wellbeing of Oregon citizens by
> regulating the practice of medicine in a manner that promotes access to quality care.*

**Your opinion matters! Please take two minutes to complete our customer satisfaction survey. Survey responses guide our continuous improvement efforts.**

<u><image006.png></u>

Data Classification Level 2 - Limited

\*\*\*\*CONFIDENTIALITY NOTICE\*\*\*\*

This email may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



890 Oak St SE
PO Box 14001
Salem, OR 97309-5014

**CONFIDENTIAL AND PRIVILEGED**
**UNDER ORS 41.675 AS PEER REVIEW DATA**

October 6, 2023

Jeremy Conklin, DO
1414 10th Ave Apt 734E
Seattle, WA 98122

      Re:    Peer Review Case Outcome – Case No. 48666

Dear Dr. Conklin,

The Multidisciplinary Peer Review Committee (MPRC), with the expertise of the General Surgery Specialty Peer Review Committee, has completed their review of the following case in which you were involved in patient care:

      **MRN:** 190886
      **Date of service:** 06-06-2023
      **Brief case summary:** 65 yo M on Plavix undergoing monitored emergent repair of incarcerated inguinal hernia. Multiple concerns raised about surgical care including the peri-operative management of anti-coagulation, technical skills such as hemostasis control, recognition of tissue planes, and tissue dissection, and documentation.

After careful consideration, the MPRC agreed that this review highlighted educational opportunities for improving surgical technique for inguinal hernia repair and the management of peri-operative anti-coagulation.

The MPRC acknowledged that open inguinal hernia repair can be a technically challenging procedure, particularly in cases such as this with a large and incarcerated hernia containing bowel, with the well-recognized potential for bleeding during dissection of the hernia sac which can make it difficult to recognize tissue planes and proceed safely. The committee respectfully reminds you that increased bleeding would have been expected in this patient on chronic Plavix and aspirin therapy and felt that it would have been advisable to have mitigated the risk of intra-operative bleeding and optimized surgical conditions by reversing the anti-platelet treatment with pre-operative platelet transfusion and DDAVP.

The MPRC also noted that you documented pre-operatively that the patient was on dual anti-platelet therapy but did not discuss how this risk factor would be addressed. The committee

encourages you to document the rationale for your medical decisions such as not to reverse anti-coagulation prior to surgery.

Thank you for participating in the peer review process and helping to ensure quality care for our patients. This letter is sent in the spirit of education and performance improvement, and to inform you of the MPRC's determination. There is no requirement for you to respond to this letter.

Sincerely,

Jennifer Williams, MD
Multidisciplinary Peer Review Committee

cc:    Catherine Boulay, MD, Section Chief of General Surgery
       Christine Clarke, MD, Chief Medical Officer, Salem Health Medical Group



890 Oak St SE
PO Box 14001
Salem OR 97309-5014

**CONFIDENTIAL AND PRIVILEGED**
**UNDER ORS 41.675 AS PEER REVIEW DATA**

October 6, 2023

Jeremy Conklin, DO
1414 10th Ave Apt 734E
Seattle, WA 98122

Re:    Peer Review Case Outcome – Case No. 48726

Dear Dr. Conklin,

The Multidisciplinary Peer Review Committee (MPRC), with the expertise of the General
Surgery Specialty Peer Review Committee, has completed their review of the following case in
which you were involved in patient care:

> **MRN:** 2277755
> **Date of service:** 06-05-2023
> **Brief case summary:** 61 yo M Jehovah's Witness with pulmonary fibrosis on chronic
> steroids admitted with likely perforated gastric ulcer and colonic constipation for whom
> Dr. Conklin was consulted. Concerns raised that multiple issues were not addressed in the
> consult note including the patient's oxygen requirement, malnourishment, leukocytosis,
> Hgb level, and other routine pre-op labs such as INR, Cr, platelets. Concern also raised
> that Golytely bowel prep was ordered for this patient with possible bowel perforation.

After careful consideration, the MPRC agreed that this review highlighted educational
opportunities for improving pre-operative surgical evaluation and management particularly of
patients with possible gastric perforation.

The MPRC agreed that you appropriately ordered broad-spectrum IV antibiotics and proton
pump inhibitors for this patient with suspected perforated pre-pyloric ulcer. However, the
committee was concerned that you did not recommend nasogastric tube decompression, which
would have been indicated in this situation, and did recommend an oral bowel prep, which would
have been considered contraindicated for a patient with evidence of gastric perforation. The
MPRC also noted a lack of documentation acknowledging and addressing the patient's many
serious co-morbidities and that surgery should probably have been scheduled with greater
urgency. Finally, the committee respectfully reminds you of the importance clear and thorough
hand off communication with oncoming team members particularly to alert them about high risk
and urgent patient care responsibilities being passed on.

Thank you for participating in the peer review process and helping to ensure quality care for our patients. This letter is sent in the spirit of education and performance improvement, and to inform you of the MPRC's determination. There is no requirement for you to respond to this letter.

Sincerely,

Jennifer Williams, MD
Multidisciplinary Peer Review Committee

cc:    Catherine Boulay, MD, Section Chief of General Surgery
       Christine Clarke, MD, Chief Medical Officer, Salem Health Medical Group

 **Salem Health**®
Hospitals & Clinics

890 Oak St SE
PO Box 14001
Salem. OR 97309-5014

## CONFIDENTIAL AND PRIVILEGED
## UNDER ORS 41.675 AS PEER REVIEW DATA

October 6, 2023

Jeremy Conklin, DO
1414 10th Ave Apt 734E
Seattle. WA 98122

      Re:    Peer Review Case Outcome – Case No. 48725

Dear Dr. Conklin,

The Multidisciplinary Peer Review Committee (MPRC), with the expertise of the General
Surgery Specialty Peer Review Committee, has completed their review of the following case in
which you were involved in patient care:

> **MRN:** 826541
> **Date of service:** 06-06-2023
> **Brief case summary:** 65 yo M admitted through the ED by Dr. Conklin with possible
> bowel perforation. Multiple concerns raised about failure to document or address multiple
> medical problems associate with sepsis due to bowel perforation, such as acute renal
> failure. lactic acidosis, and hyperkalemia: to recognize the severity of the patient's illness
> or the need for urgent surgery: to order fluids, follow up labs, or pain or nausea
> medication: and to provide appropriate hand off of patient care to the oncoming surgeon.

After careful consideration, the MPRC agreed that this review highlighted educational
opportunities for improving the management of acute surgical problems. sepsis, and metabolic
abnormalities. The committee noted that this patient had a complex surgical history, and that the
abdominal CT was challenging to read but did show evidence of bowel perforation requiring
urgent surgical intervention. The MPRC respectfully reminds you that patients with life
threatening surgical conditions such as intestinal perforation with sepsis should be booked
promptly for urgent or emergent surgery and appropriately handed off to the oncoming call
partner as requiring immediate attention in order to expedite surgical care.

The MPRC also noted that the patient was septic and in acute, oliguric renal failure with
hyperkalemia and lactic acidosis. However, these critical problems as well as other patient care
matters such as oxygenation, pain, and nausea did not appear to have been treated or addressed in
your admission note. The committee respectfully reminds you to address all acute metabolic and
electrolyte abnormalities promptly with appropriate therapy, monitoring, and follow up, to

document these issues clearly and thoroughly in your chart notes, and to discuss them with your colleagues during hand off communication.

Thank you for participating in the peer review process and helping to ensure quality care for our patients. This letter is sent in the spirit of education and performance improvement, and to inform you of the MPRC's determination. There is no requirement for you to respond to this letter.

Sincerely,

Jennifer Williams, MD
Multidisciplinary Peer Review Committee

cc:    Catherine Boulay, MD, Section Chief of General Surgery
       Christine Clarke, MD, Chief Medical Officer, Salem Health Medical Group

1

2
                                  **Exhibit PP**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 55

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

**From:** Byrd, Deborah dbyrd@osteopathic.org  🖉
**Subject:** AOBS Longitudinal Assessment Results Q2
**Date:** October 6, 2023 at 12:34
**To:** jhconklin@icloud.com





## AMERICAN OSTEOPATHIC
## BOARD OF **SURGERY**

Well done Dr. Conklin!

You have <u>passed and completed</u> the American Osteopathic Board of Surgery's (AOBS)
**General Surgery Longitudinal Assessment** (LA), fulfilling the Osteopathic Continuous
Certification (OCC) <u>Component 3</u> requirement for the 2022-2024 OCC cycle.

All other components of the OCC process (licensure, CME, and Practice Performance
Assessment) must be met prior to the end of the 2022-2024 OCC cycle on December 31,
2024. Once **each** OCC component is verified as complete, your credentials will be
submitted to the AOA Bureau of Osteopathic Specialists by the AOBS advising the
completion of the OCC process, including Component 3: Longitudinal Assessment. You
will receive official notification of osteopathic continuous certification from the AOA at the
conclusion of the 2022-2024 OCC cycle.

Congratulations on successfully completing your AOBS **General Surgery Longitudinal
Assessment** for the 2022-2024 OCC cycle. A total of 15.0 AOA Category 1-B credits will
be awarded to you at the end of the calendar year.

Visit your <u>AOA Physician Portal</u> to check your progress for each of the four OCC
Components.

**Questions?** Contact AOBS directly at (312) 202-8078 or <u>aobs@osteopathic.org</u>, weekdays
9:00 a.m. – 5:00 p.m. Central Time.

Sincerely,

David Dellinger DFACS

David Dellinger, DO FACOS

cc: Chair, AOBS General Surgery & Surgical Critical Care
    Diplomate's File

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit QQ**

**CONFIDENTIAL INFORMATION**

**SEE STIPULATED PROTECTIVE ORDER**

COMPLAINT FOR DAMAGES – 56

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



**Salem Health**
**Hospitals & Clinics**
SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Ansted, David Lee
MRN: 190886, DOB: 8/22/1957, Sex: M

**06/05/2023 - ED to Hosp-Admission (Discharged) in A3 East (continued)**

All Notes (group 1 of 2) (continued)

---

**Salem Health**
Informed Consent

**Salem Health**
**Hospitals & Clinics**



| PATIENT INFORMATION | |
|---|---|
| Patient Name: Ansted, David | Date of Birth: 08 / 22 / 1957 |

Name of Procedure(s) (Do Not Use Abbreviations)
Open Hernia Repair Inguinal, Possible orghdectomy, laparotomy

Dr. __Conklin__ will perform the procedure(s). Other practitioners may assist with the procedure(s) as necessary.

The physician/credentialed provider has explained the procedure(s), the anticipated benefits, risks and alternatives to me, and I understand the risks involved. I had the opportunity to ask questions and all of my questions about the procedure(s), risks and alternatives were answered to my satisfaction. I understand that, during the course of the procedure(s), unforeseen conditions may necessitate additional or different procedures than those listed above or discussed with me. I authorize the physician/credentialed provider and/or other practitioners to perform such other procedures as are, in their judgment, necessary and appropriate. I acknowledge that no warranty or guarantee was made to me as to result or cure.

It was also explained to me that there are possible risks involved with blood/blood product transfusion. I understand these risks and consent to the administration of blood/blood products if medically necessary and ordered by my physician.

☐ I refuse administration of part or all blood and blood products as documented on the Refusal of Blood Transfusions Release of Liability Form.

In the event that my treatment involves the implanting of a medical device, I authorize the release of information involving the procedure and any patient identification information required for medical device tracking purposes in accordance with federal and state law and regulations.

I authorize the use of x-rays, imaging studies, lasers, photographs or other modalities of treatment or documentation as determined appropriate by my physician.

I authorize Salem Health, in the manner it routinely follows, to dispose of any tissue or body parts removed except:

Authorized healthcare students may be assisting or performing parts of the procedure under direct supervision of my physician.

| I CONSENT TO THE ABOVE PROCEDURE(S) | | | |
|---|---|---|---|
| Patient's Signature | Ansted David (Printed Name) | 06/05/23 Date | 23:41 Time ☐a.m. ☑p.m. |

*Patient is unable to consent because: _____ - I therefore consent for the patient.

| | | | ☐a.m. ☐p.m. |
|---|---|---|---|
| Authorized Consentor's Signature | Printed Name | Date | Time |
| Michon R Johnwell | Michon R Johnwell | 06/05/23 | 23:41 ☐a.m. ☑p.m. |
| Witness's Signature | Printed Name | Date | Time |

☐ Mark this box if Telephone Consent (2nd witness signature required)

| | | | ☐a.m. ☐p.m. |
|---|---|---|---|
| 2nd Witness' Signature | Printed Name | Date | Time |
| Interpreter's Signature if applicable | Printed Name | Date | Time ☐a.m. ☐p.m. |

65 Yrs. M
DOB 8/22-1957  MRN  190886
Jeremy H Conklin, DO
CSN# 89926518  REG 6/5/2023
ANSTED, DAVID L

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit RR**

**CONFIDENTIAL INFORMATION**

**SEE STIPULATED PROTECTIVE ORDER**

Jeremy Conklin
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconkli1@icloud.com



**SALEM HOSPITAL**
890 OAK ST SE
SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

## 06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)

### Medication Administrations (continued)

| | | | |
|---|---|---|---|
| Performed 06/12/23 Paused 1712<br>Documented:<br>06/13/23 1304 | 0 mg<br>0 mL/hr<br>— | Intravenous | Performed by: Minami, Nathan, RN |
| Performed 06/12/23 Paused 1642<br>Documented:<br>06/13/23 1304 | 0 mg<br>0 mL/hr<br>— | Intravenous | Performed by: Minami, Nathan, RN |
| Performed 06/12/23 New Bag 1307<br>Documented:<br>06/12/23 1307 | 3.375 g<br>25 mL/hr<br>4 Hours | Intravenous | Performed by: Minami, Nathan, RN<br>Scanned Package: 60505-6157-0,<br>0338-0553-18 |
| Performed 06/12/23 New Bag 0405<br>Documented:<br>06/12/23 0405 | 3.375 g<br>25 mL/hr<br>4 Hours | Intravenous | Performed by: Batyrkanova,<br>Mariyam, RN<br>Scanned Package: 60505-6157-0 |
| Performed 06/11/23 New Bag 2054<br>Documented:<br>06/11/23 2054 | 3.375 g<br>25 mL/hr<br>4 Hours | Intravenous | Performed by: Batyrkanova,<br>Mariyam, RN<br>Scanned Package: 60505-6157-0 |
| Performed 06/11/23 Stopped 1700<br>Documented:<br>06/11/23 1749 | 0 mg<br>0 mL/hr<br>— | Intravenous | Performed by: Carter, Aerie, RN |
| Performed 06/11/23 New Bag 1300<br>Documented:<br>06/11/23 1300 | 3.375 g<br>25 mL/hr<br>4 Hours | Intravenous | Performed by: Carter, Aerie, RN<br>Scanned Package: 60505-6157-0,<br>0338-0553-18 |

### polyethylene glycol 3350 (Miralax) powder 17 g [211060653]

| | |
|---|---|
| Ordering Provider: Webber, Sarah N, MD<br>Ordered On: 06/02/23 1859<br>Ordered Dose (Remaining/Total): 17 g (—/—)<br>Frequency: DAILY | Status: Discontinued (Past End Date/Time)<br>Starts/Ends: 06/02/23 1900 - 06/05/23 2221<br>Route: Oral<br>Ordered Rate/Order Duration: — / — |

Admin Instructions: Mix powder in 240 ml (8 oz) of water before administration. NOTE: 1 packet = 1 tablespoonful = 17 g
Do not administer by jejunostomy tube.

Administration Hierarchy: Constipation Medications (for PRN orders only).
If multiple medications are ordered PRN simultaneously for constipation, the order of administration is:
If ordered, start docusate as soon as constipation is noted.
Start with #1 (if ordered) or the highest listed medication at the same time as docusate. For continued constipation after reassessment (~ 24 hours later), add the next ordered medication on the list. If ANY questions, clarify intent with provider.
2. Polyethylene glycol packets (Miralax)

This is NOT a protocol; a Provider has to individually order each medications (for constipation).

1. Senna

3. Bisacodyl (use tablets if both tabs & suppository ordered unless



**Salem Health**
Hospitals & Clinics

SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

## 06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)

### Medication Administrations (continued)

patient not tolerating oral meds)
5. Lactulose

4. Magnesium hydroxide (MoM)
6. Fleet's Enema

| Timestamps | Action / Reason | Dose | Route | Other Information |
|---|---|---|---|---|
| Performed 06/05/23 0900<br>Documented:<br>06/05/23 0824 | Held<br>NPO | 0 g | Oral | Performed by: Bitzer, Kirstin S, SN |
| Performed 06/04/23 0816<br>Documented:<br>06/04/23 0819 | Given | 17 g | Oral | Performed by: Bitzer, Kirstin S, SN<br>Scanned Package: 0904-6931-86 |
| Performed 06/03/23 0800<br>Documented:<br>06/03/23 0800 | Given | 17 g | Oral | Performed by: Modzelewska,<br>Alexandra, RN<br>Scanned Package: 0904-6931-86 |
| Performed 06/02/23 2144<br>Documented:<br>06/02/23 2144 | Given | 17 g | Oral | Performed by: Ryland, Camille, RN<br>Scanned Package: 0904-6931-86 |

### polyethylene glycol 3350 (Miralax) powder 17 g [211688308]

Ordering Provider: Carr, Kaylee A, DO

Ordered On: 06/14/23 2147
Ordered Dose (Remaining/Total): 17 g (—/—)
Frequency: DAILY
Admin Instructions: Mix powder in 240 ml (8 oz) of water before
administration. NOTE: 1 packet = 1 tablespoonful = 17 g
Do not administer by jejunostomy tube.
Administration Hierarchy: Constipation Medications (for PRN
orders only).
If multiple medications are ordered PRN simultaneously for
constipation, the order of administration is:
If ordered, start docusate as soon as constipation is noted.
Start with #1 (if ordered) or the highest listed medication at the
same time as docusate. For continued constipation after
reassessment (~ 24 hours later), add the next ordered medication
on the list. If ANY questions, clarify intent with provider.
2. Polyethylene glycol packets (Miralax)

4. Magnesium hydroxide (MoM)
6. Fleet's Enema

Status: Discontinued (Past End Date/Time), Reason: Patient
Discharge
Starts/Ends: 06/15/23 0900 - 06/16/23 2337
Route: Oral
Ordered Rate/Order Duration: — / —

This is NOT a protocol; a Provider has to individually order each
medications (for constipation).

1. Senna

3. Bisacodyl (use tablets if both tabs & suppository ordered unless
patient not tolerating oral meds)
5. Lactulose

| Timestamps | Action | Dose | Route | Other Information |
|---|---|---|---|---|
| Performed 06/16/23 0832<br>Documented:<br>06/16/23 0835 | Given | 17 g | Oral | Performed by: Carter, Aerie, RN<br>Scanned Package: 0904-6931-86 |
| Performed 06/15/23 0914<br>Documented:<br>06/15/23 0915 | Given | 17 g | Oral | Performed by: Carter, Aerie, RN<br>Scanned Package: 0904-6931-86 |



**Salem Health**
**Hospitals & Clinics**

SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

### 06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)

**Medication Administrations (continued)**

#### polyethylene glycol-electrolyte (Golytely) oral liquid 4,000 mL [211240475]

| | |
|---|---|
| Ordering Provider: Webber, Sarah N, MD | Status: Discontinued (Past End Date/Time) |
| Ordered On: 06/05/23 2038 | Starts/Ends: 06/05/23 2130 - 06/05/23 2221 |
| Ordered Dose (Remaining/Total): 4,000 mL (1/1) | Route: Oral |
| Frequency: ONCE | Ordered Rate/Order Duration: — / — |

Admin Instructions: Have patient drink as tolerated gradually over time, do not force over a certain period of time per surgery.

| Timestamps | Action / Reason | Dose | Route | Other Information |
|---|---|---|---|---|
| Performed 06/05/23 2130<br>Documented: 06/05/23 2129 | Held<br>Other (add comment) | 0 mL | Oral | Performed by: Lyon, Gisselle, RN<br>Comments: TRACS MD at bedside, per MD hold Golytely |

#### potassium chloride IVPB (0.08 mEq/mL) 40 mEq in NS (simple) 500 mL [211489912]

| | |
|---|---|
| Ordering Provider: Velivela, Sarat K, MD | Status: Completed (Past End Date/Time) |
| Ordered On: 06/10/23 0619 | Starts/Ends: 06/10/23 0900 - 06/10/23 1300 |
| Ordered Dose (Remaining/Total): 40 mEq (0/1) | Route: Intravenous |
| Frequency: ONCE | Ordered Rate/Order Duration: 125 mL/hr / 4 Hours |
| Note to pharmacy: (simple) | |

| Line | Med Link Info | Comment |
|---|---|---|
| Peripheral IV 06/06/23 Right Arm | 06/10/23 1058 by Carter, Aerie, RN | — |

| Timestamps | Action | Dose / Rate / Duration | Route | Other Information |
|---|---|---|---|---|
| Performed 06/10/23 1300<br>Documented: 06/10/23 1325 | Stopped | 0 mEq<br>0 mL/hr<br>4 Hours | Intravenous | Performed by: Carter, Aerie, RN<br>Comments: Only give half the bag (20meq) |
| Performed 06/10/23 1058<br>Documented: 06/10/23 1058 | New Bag | 40 mEq<br>125 mL/hr<br>4 Hours | Intravenous | Performed by: Carter, Aerie, RN<br>Scanned Package: 9999-1940-20 |

#### potassium phosphate 15 mmol in 250 mL D5W (0.06 mmol/mL) IVPB [211433948]

| | |
|---|---|
| Ordering Provider: Carr, Kaylee A, DO | Status: Discontinued (Past End Date/Time) |
| Ordered On: 06/09/23 1057 | Starts/Ends: 06/09/23 1230 - 06/09/23 1058 |
| Ordered Dose (Remaining/Total): 15 mmol (1/1) | Route: Intravenous |
| Frequency: ONCE | Ordered Rate/Order Duration: 41.67 mL/hr / 6 Hours |
| Admin Instructions: *Refrigerate* | |

(No admins scheduled or recorded for this medication in the specified date/time range)

#### potassium phosphate 15 mmol in 250 mL NS (0.06 mmol/mL) IVPB [211433949]

| | |
|---|---|
| Ordering Provider: Carr, Kaylee A, DO | Status: Completed (Past End Date/Time) |
| Ordered On: 06/09/23 1059 | Starts/Ends: 06/09/23 1300 - 06/09/23 1953 |
| Ordered Dose (Remaining/Total): 15 mmol (0/1) | Route: Intravenous |
| Frequency: ONCE | Ordered Rate/Order Duration: 41.67 mL/hr / 6 Hours |
| Admin Instructions: *Refrigerate* | |

| Line | Med Link Info | Comment |
|---|---|---|
| Peripheral IV 06/02/23 Left Forearm | 06/09/23 1353 by Kaestner, Janet B, RN | — |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit SS**

**CONFIDENTIAL INFORMATION**

**SEE STIPULATED PROTECTIVE ORDER**

COMPLAINT FOR DAMAGES – 58

Jeremy Conklin
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



**Salem Health** SALEM HOSPITAL
890 OAK ST SE
**Hospitals & Clinics** SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

**06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)**

**All Notes (group 3 of 3) (continued)**

**Therapeutic Interventions**: bed mobility, functional transfer training, therapeutic exercise, balance training, wheelchair training, endurance training, ADL retraining, patient and family education, modalities, vision, and cognition
**Current Frequency:** (6 visits)        **Duration:** Length of stay
**Goals:** Therapy goals located in care plan.
**Patient and Family Goals:** Home eventually

Time In: 1420   Time Out: 1453
Total Treatment Time: 33
Time in timed codes: 0

Electronically signed by Sheldon, Cora C, OT at 06/11/23 1519

**Operative Note**

**Vanderheyden, Nicole M, MD at 6/6/2023 1026**

OPERATIVE / INVASIVE PROCEDURE NOTE

DATE OF SURGERY / INVASIVE PROCEDURE: 6/6/2023

SURGEON: Nicole M. VanDerHeyden, M.D.

ASSISTANT(S): Jacob Nicholson, NP, Samuel Hough, MSIII

ANESTHESIOLOGIST: Steinhardt, David J, MD

TYPE OF ANESTHESIA/PREMEDICATION(S): General endotracheal anesthesia plus local TAPP blocks with 0.25% marcaine with epinephrine.
.
PREOPERATIVE DIAGNOSIS: Perforated gastric ulcer

POSTOPERATIVE DIAGNOSIS: Same

TITLE OF PROCEDURE: Exploratory laparotomy, washout, closure of gastric ulcer with omental flap

BRIEF HISTORY / INDICATION(S) FOR SURGERY/PROCEDURE: The patient is a 61 y.o. male with pulmonary fibrosis who presented with worsening hypoxic respiratory failure and abdominal pain. CT demonstrated perforated viscus most likely due to a gastric ulcer.

DESCRIPTION OF SPECIFIC PROCEDURE FINDINGS: 5cm wide prepyloric anterior perforation with large amount of clear yellow fluid and fibrinopurulent peritonitis

TECHNICAL DESCRIPTION OF PROCEDURE: The patient was identified, consented, and brought to the operating room and placed in supine position where general anesthesia was induced. The abdomen was prepped and draped in a standard fashion with chloroprep. A surgical time out including the patients name, identification, procedure, allergies, estimated blood loss, equipment readiness and concerns was completed.



**Salem Health** SALEM HOSPITAL
890 OAK ST SE
**Hospitals & Clinics** SALEM OR 97301-3905

Dutra, Henry William
MRN: 2277755, DOB: 8/18/1961, Sex: M

**06/01/2023 - ED to Hosp-Admission (Discharged) in A5 East (continued)**

All Notes (group 3 of 3) (continued)

A midline incision was made  from the xiphoid to the pubis and carried through to the fascia in a routine fashion. Upon entry a large amount of fluid and gas was encountered, this was suctioned out.  The ulcer was almost immediately visualized and succus was pouring out so an NGT was placed with suctioning of 500 ml of clear yellow fluid.  The ulcer was packed with a lap and the remaining abdomen explored and no other abnormalities noted.  There was a large amount of fibrinoupurulent debris below the diaphragm bilaterally and in the pelvis.

An Alexis ring and Bookwalter retractor were placed and the small bowel was packed inferiorly.  The ulcer edges were cleared of adherent fat and debris.  This resulted in some bleeding from some large crossing veins in the perigastric fat.  The ulcer was closed with 2-0 PDS and oversewn with 2-0 vicryl.  An omental flap was created and sutured over the repaired ulcer.

The abdomen was then irrigated, all bleeding points cauterized or ligated and all lap sponges were accounted for. 60 ml of 0.25% marcaine with epinephrine was infiltrated bilaterally into Petit's triangle laterally. The fascia was then closed in a routine fashion using #1 PDS in a simple continuous pattern. The skin and subcutaneous tissues were irrigated, all bleeding points were cauterized and the skin was closed with staples.  The incision was then covered with a Prevena dressing.   The patient tolerated the procedure well and there were no intraoperative complications.

Jacob Nicholson assisted with exposure, ulcer debridement and control of bleeding.

SPECIMENS REMOVED (If Applicable): peritoneal fluid

ESTIMATED BLOOD LOSS (If Applicable): 100 ml.

POST-OPERATIVE PLAN: NGT X 3 days then upper GI.

Electronically signed by Vanderheyden, Nicole M, MD at 06/07/23 1706

**Outside Documentation**

**Filed on 6/1/2023 1600**

Medication List - Scan on 6/1/2023 1600 by Reyes, Jody L, CPhT (below)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit UU**

**CONFIDENTIAL INFORMATION**

**SEE STIPULATED PROTECTIVE ORDER**

COMPLAINT FOR DAMAGES – 60

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com

 **Salem Health** Hospitals & Clinics   SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Morgan, Lolita
MRN: 2835538, DOB: 9/24/1994, Sex: F

## 06/27/2023 - Telephone in Surgery Clinic (continued)

### Reason for Visit (continued)

#### Chief Complaint

• Discharge Follow-up, onset date 6/27/2023

---

## Visit Information

### Nursing Assessment

No Nursing Assessment available for this encounter.

---

## Medication List

### Medication List

ⓘ **This report is for documentation purposes only. The patient should not follow medication instructions within. For accurate instructions regarding medications, the patient should instead consult their physician or after visit summary.**

#### Active at the End of Visit

Medications last reviewed by Schulte, Samantha, RN on 6/6/2023 0918

**sertraline (ZOLOFT) 25 MG Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 25 mg by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

**melatonin 5 MG Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 5 mg by mouth at bedtime . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

**Magnesium Bisglycinate (MAG GLYCINATE) 100 MG Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 200 mg by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

**fluticasone (FLONASE ALLERGY RELIEF) 50 MCG/ACT Intranasal Suspension** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Instill 1 spray into each nostril daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

**drospirenone-ethinyl estradiol (YAZ) 3-0.02 MG Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 1 tablet by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |
| Start date: 5/12/2023 | |

**cyanocobalamin (VITAMIN B12) 1000 MCG Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 1,000 mcg by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

**Cholecalciferol 25 MCG (1000 UT) Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 1,000 Units by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

**buPROPion XL (WELLBUTRIN XL) 300 MG Oral Tablet Sustained Release 24 HR** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 300 mg by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |
| Start date: 5/9/2023 | |

**ascorbic acid 500 MG Oral Tablet** *[reconciled by Borden, Kary L, CPhT on 6/6/2023 0745]*

| | |
|---|---|
| Instructions: Take 500 mg by mouth daily . | |
| Entered by: Borden, Kary L, CPhT | Entered on: 6/6/2023 |

1

**Exhibit VV**

2

**CONFIDENTIAL INFORMATION**

3

**SEE STIPULATED PROTECTIVE ORDER**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DAMAGES – 61

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



**Salem Health** SALEM HOSPITAL
890 OAK ST SE
**Hospitals & Clinics** SALEM OR 97301-3905

Morgan, Lolita
MRN: 2835538, DOB: 9/24/1994, Sex: F

**06/06/2023 - ED to Hosp-Admission (Discharged) in 5NW (continued)**

**ED Care Timeline (continued)**

| 08:18:44 | Orders Discontinued | ondansetron orally disintegrating (ZOFRAN ODT) tablet 4 mg ; morphine (PF) (Astramorph) (2 mg/mL) injection 4 mg ; ondansetron (Zofran) (2 mg/mL) injection 4 mg ; promethazine (Phenergan) IVPB 0.125 mg/mL 12.5 mg in NS (simple) 100 mL | Automated, Action |
|---|---|---|---|
| 08:18:44 | Orders Completed | ADMIT TO OBSERVATION | Vela Perfecto, Yarely N |
| 08:18:45 | Orders Discontinued | metroNIDAZOLE (Flagyl) IVPB 500 mg in NS (premix) 100 mL | Automated, Action |
| 14:37 | Timeout: Pre Induction | Verified by Sylvia, Rebecca A, RN at 06/06/2023 1506 | Sylvia, Rebecca A, RN |
| 14:57 | Timeout: Fire Safety | Verified by Sylvia, Rebecca A, RN at 06/06/2023 1500 | Sylvia, Rebecca A, RN |
| 14:57 | Timeout: Physician Led | Verified by Sylvia, Rebecca A, RN at 06/06/2023 1507 | Sylvia, Rebecca A, RN |
| 15:16 | Timeout: Hand-off | Verified by Sylvia, Rebecca A, RN at 06/06/2023 1516 | Sylvia, Rebecca A, RN |
| 15:31 | Timeout: Post Procedure | Verified by Napier, James, RN at 06/06/2023 1538 | Napier, James, RN |

**H&P Notes**

H&P by Conklin, Jeremy H, DO at 6/6/2023 0631

**TRACS Trauma & Acute Care Surgery**
**Admission History & Physical**

**Chief Complaint:**
ABDOMINAL PAIN

**History of Present Illness**
Lolita Morgan is a 28 y.o. female who started having periumbilical abd pain at 2000 hrs on 5 Jun 2023. Pt states the pain worsened and radiated to her RLQ. Pt also developed nausea and anorexia. Pt presented to ER for evaluation because pt was severe. Pt describes the pain as 10/10, stabbing pain, that is worse with movement and made better by lying still.

**History**

| No past medical history on file. | No past surgical history on file. |
|---|---|
| No family history on file. | Social History |
| | Socioeconomic History<br>• Marital status: Married |

No current outpatient medications on file as of 6/6/2023.

**Allergies:** Azithromycin and Penicillins

**Objective**
**Last Recorded Vitals**
Blood pressure (!) 128/90, pulse (!) 91, temperature 98.9 °F (37.2 °C), resp. rate 18, height 5' 4.5" (1.638 m), weight 204 lb (92.5 kg), SpO2 99 %.Body mass index is 34.48 kg/m².
Physical Exam
GENERAL: Awake, alert, no acute distress
PSYCHIATRIC: Normal mood and affect
EYES/HENT: Anicteric, oropharynx moist.



**Salem Health** SALEM HOSPITAL
890 OAK ST SE
**Hospitals & Clinics** SALEM OR 97301-3905

Morgan, Lolita
MRN: 2835538, DOB: 9/24/1994, Sex: F

### 06/06/2023 - ED to Hosp-Admission (Discharged) in 5NW (continued)

**H&P Notes (continued)**

CARDIOVASCULAR: Regular rate and rhythm, with warm and well perfused extremities
PULMONARY: Normal respiratory pattern without accessory muscle use.
ABDOMEN: Tender to palpation and percussion, soft, non-distended
MUSCULOSKELETAL: Moves all extremities, no obvious deformities.
NEUROLOGICAL: No lateralizing deficits noted, no facial asymmetry.
INTEGUMENT: Warm and dry, no rashes or jaundice.
INCISIONS/WOUNDS: None

**IMAGING**
Reviewed, pertinent findings discussed in assessment and plan.

**LABORATORY**:
Reviewed available labs, pertinent findings discussed in assessment and plan.

**EMR Review**: I reviewed the patient's medical records and noted pt's WBC elevated.

**Assessment and Plan**
Lolita Morgan is a 28 y.o. female who presented with RLQ abd pain, anorexia, and nausea. CT abd/pelvis showed an acute appendicitis and pt's wbc was elevated at 15. Pt has acute appendicitis. Appendectomy surgery was explained to the pt. The pt understands that surgeons will attempt to perform laparoscopic appendectomy, but there is a chance that the laparoscopic appendectomy may be converted to an open appendectomy. The risks and benefits of appendectomy were explained to include risks of injury to bowel, bleeding, infection, and abd scar. The benefit of the procedure, removing inflamed appendix was also explained to the pt. The pt elected to undergo surgery.

Active Problems:
 * No active hospital problems. *

**Code Status:** Full No Order
**Care Coordination**: I discussed the patient with the patient and her husband regarding surgery and observation.

**Attestations**

Electronically signed by Conklin, Jeremy H, DO at 06/06/23 0640

**H&P Notes Legal**

No documentation.

**Progress Notes**

**Progress Notes**

Kauffman, Deseree R, RN at 6/6/2023 1016

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit WW**

**CONFIDENTIAL INFORMATION**

**SEE STIPULATED PROTECTIVE ORDER**

COMPLAINT FOR DAMAGES – 62

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



**Salem Health**
**Hospitals & Clinics**
SALEM HOSPITAL
890 OAK ST SE
SALEM OR 97301-3905

Morgan, Lolita
MRN: 2835538, DOB: 9/24/1994, Sex: F

## 06/06/2023 - ED to Hosp-Admission (Discharged) in 5NW (continued)

### Medication Administrations (continued)

perphenazine, etc.)
4.      Other agents ordered for agitation

clonazepam, chlordiazepoxide, etc.)

(No admins scheduled or recorded for this medication in the specified date/time range)

### heparin injection 5,000 Units [211248334]

| | |
|---|---|
| Ordering Provider: Conklin, Jeremy H, DO | Status: Discontinued (Past End Date/Time), Reason: Patient Discharge |
| Ordered On: 06/06/23 0642 | Starts/Ends: 06/06/23 0845 - 06/07/23 1651 |
| Ordered Dose (Remaining/Total): 5,000 Units (—/—) | Route: Subcutaneous |
| Frequency: EVERY 8 HOURS | Ordered Rate/Order Duration: — / — |

| Question | Answer | Comment |
|---|---|---|
| Presumed Indication:: | VTE Prophylaxis | — |
| When should this start?: | now | — |

| Timestamps | Action / Reason | Dose | Route / Site | Other Information |
|---|---|---|---|---|
| Performed 06/07/23 1645 Documented: 06/07/23 1651 | Canceled Entry — | | — | Performed by: User, Discharge Auto Process Comments: Automatically canceled at discontinue of medication order |
| Performed 06/07/23 0906 Documented: 06/07/23 0906 | Given | 5,000 Units | Subcutaneous Abdomen-Left Lower Quadrant | Performed by: Caballero, Mari A, RN Scanned Package: 71288-403-01 |
| Performed 06/07/23 0044 Documented: 06/07/23 0045 | Given | 5,000 Units | Subcutaneous Abdomen-Left Lower Quadrant | Performed by: Rangel, Luis, RN Scanned Package: 71288-403-01, 71288-403-01 |
| Performed 06/06/23 1704 Documented: 06/06/23 1704 | MAR Resume — | | — | Performed by: Automated, Action |
| Performed 06/06/23 1645 Documented: 06/06/23 1356 | Automatically Held | — | — | Performed by: Automated, Action |
| Performed 06/06/23 1356 Documented: 06/06/23 1356 | MAR Hold Patient in Surgical Services | — | — | Performed by: Automated, Action |
| Performed 06/06/23 0845 Documented: 06/06/23 1033 | Held Held for procedure | 0 Units | Subcutaneous — | Performed by: Yonally, Lucie, RN |

### hydrALAZINE (Apresoline) (20 mg/mL) injection 5 mg [211252135]

| | |
|---|---|
| Ordering Provider: Steinhardt, David J, MD | Status: Discontinued (Past End Date/Time), Reason: Patient Transfer |
| Ordered On: 06/06/23 1446 | Starts/Ends: 06/06/23 1445 - 06/06/23 1704 |
| Ordered Dose (Remaining/Total): 5 mg (2/2) | Route: Intravenous |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit XX**
**CONFIDENTIAL INFORMATION**

**SEE STIPULATED PROTECTIVE ORDER**

COMPLAINT FOR DAMAGES – 63

**Jeremy Conklin**
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



Tina Kotek, Governor

**Medical Board**
1500 SW 1st Ave, Suite 620
Portland, OR 97201-5847
(971) 673-2700
Fax: (971) 673-2670
www.oregon.gov/omb

June 3, 2025

PERSONAL AND CONFIDENTIAL
SENT VIA CERTIFIED RETURN RECEIPT MAIL
*ARTICLE NO. 9589 0710 5270 1740 0722 93*

Jeremy Henry Conklin, DO
1414 10th Ave, Apt 734E
Seattle, WA 98122

Dear Dr. Conklin:

The Oregon Medical Board (Board) issued the enclosed **Notice of Proposed Disciplinary Action (Notice)** dated June 3, 2025. Also enclosed is a proposed settlement offer in the form of a Stipulated Order.

Request for Hearing: You have a right to request a hearing in this matter. Should you wish to request a hearing, the Board must receive your written request within **21 calendar days** from the date this Notice was mailed. Therefore, your request for a hearing must be received by the Board on or before **June 24, 2025**. A request for a hearing preserves your right to a hearing in the event settlement discussions fail. Following a hearing request, you must file a written answer to the Notice within the timelines in Oregon Administrative Rule 847-001-0005 (enclosed).

Settlement Options: A settlement offer is enclosed. If you agree to accept its terms, you may sign and return the enclosed Stipulated Order by **June 24, 2025**. If you do not accept the enclosed settlement offer but wish to enter into settlement discussions with the Board, please submit a counter-offer or indicate when a counter-offer will be submitted to the Board. Even if you wish to enter into a settlement, you may also submit a hearing request to preserve your right to a hearing in the event the Board does not approve the settlement terms.

Failure to Respond: The Board will issue a Final Order Upon Default if you fail to respond by **June 24, 2025**. Such an Order could include up to the proposed sanctions in paragraph two of the Notice.

**Please read all enclosures thoroughly.** If you have any questions, please contact Investigator Seidel or me at 971-673-2700.

Sincerely,

Walt Frazier

Walter Frazier
Investigations Manager

WF: ms
Encl.: Notice of Proposed Discipline
       Proposed Settlement
       Notice of Rights and Procedures
       OAR 847-001-0005

cc:    Lindsay Byrne, Board Counsel, *via electronic transmission*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

BEFORE THE

OREGON MEDICAL BOARD

STATE OF OREGON

In the Matter of                              )
                                             )
JEREMY HENRY CONKLIN, DO        )    NOTICE OF PROPOSED
LICENSE NO. DO190014              )    DISCIPLINARY ACTION
                                             )

1.

**Parties**

The Oregon Medical Board (Board) is the state agency responsible for licensing,

regulating and disciplining certain health care providers, including physicians, in the State of

Oregon.  Jeremy Henry Conklin, DO, (Licensee) is a physician licensed in the State of Oregon.

2.

**Proposed Sanctions**

Based on the facts and violations below, the Board proposes to take disciplinary action

against Licensee pursuant to ORS 677.205(2), including revocation of license; a $10,000 civil

penalty per violation; reprimand; and assessment of costs of any contested case hearing on the

matter not to exceed $100,000.  The Board proposes to take this disciplinary action for violations

of the Medical Practice Act, specifically: ORS 677.190(1)(a) unprofessional or dishonorable

conduct, specifically ORS 677.188(4)(a) (any practice or conduct that might constitute a danger

to the health or safety of a patient) and ORS 677.188(4)(a) (inability to safely and skillfully

practice medicine); ORS 677.190(13) gross and repeated negligence in the practice of medicine;

ORS 677.190(17) failure to comply with a board order and failure to comply with a board

request pursuant to ORS 677.320; and ORS 677.190(22) refusing an invitation for an informal

interview with the board requested under ORS 677.415(9).

/ / /

/ / /

Page 1 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1                                           3.

2                                     **Jurisdiction**

3          3.1      Under ORS chapter 677, the Board has the duty to protect the public and the

4    authority to exercise general supervision over the practice of medicine.

5          3.2      Licensees of the Oregon Medical Board are subject to the laws, rules, and

6    standards established by the Oregon Medical Board, including but not limited to Oregon Revised

7    Statutes chapters 676 and 677 and Oregon Administrative Rules chapter 847.

8                                           4.

9                                         **Facts**

10         4.1      At all relevant times, Licensee was licensed to practice medicine in the State of

11   Oregon, practicing general surgery in Salem, Oregon, and board certified in general surgery,

12   cardiothoracic surgery, and critical care surgery. Licensee was initially granted a license at

13   Locum Tenens status on October 12, 2018.  His license status was changed to Inactive on

14   February 8, 2024.

15         4.2      On the evening of June 5, 2023, through the morning of June 6, 2023, Licensee

16   worked as a locum tenens surgeon at Salem Health.

17         4.3      <u>Patient A.</u> Patient A was a 65-year-old male who presented to the Emergency

18   Department with an incarcerated left inguinal hernia containing bowel during Licensee's shift on

19   June 5, 2023.  Patient A was being treated with Plavix and aspirin for a recent history of STEMI

20   and placement of drug-eluting coronary stent three months prior to his presentation.  Patient A

21   was taking dual anti-platelet therapy (DAPT) as well as vitamin E and fish oil at the time of

22   presentation, all of which increase the perioperative risk of bleeding.  While Licensee did note

23   the increased risk of bleeding and the possible need for blood transfusion, he did not consent the

24   patient for blood transfusion or prepare blood products by obtaining a type and screen or cross

25   for blood products. Intraoperatively, the proctoring surgeon had to intervene to take over the

26   hernia surgery as primary surgeon in order to safely complete the procedure.  Immediately

27   postoperatively, Licensee placed Patient A on heparin every eight or twelve hours.

1             4.3.1   A reasonably prudent, careful, and skillful surgeon who recognizes and

2        discusses the risk for blood transfusion would have further counseled the patient on

3        transfusion, consented for blood transfusion, and typed and screened or crossed

4        preoperatively for blood transfusion. If the patient did not want to consent to blood

5        transfusion, a reasonably prudent, careful, and skillful surgeon would have documented

6        any contraindication to blood transfusion including the patient not giving their consent.

7        By failing to counsel and consent Patient A regarding blood transfusion, and failing to

8        document the same, Licensee's treatment of Patient A fell below the standard of care. By

9        failing to prepare blood products by obtaining a type and screen or cross for blood

10       products in the context of Patient A's increased risk of bleeding, Licensee's conduct fell

11       below the standard of care. By failing to document any contraindication to blood

12       transfusion, including lack of consent, Licensee's conduct fell below the standard of care.

13            4.3.2   A reasonably prudent, careful, and skillful surgeon would recognize the

14       increased risk of bleeding from antiplatelet therapy and the additional risk of bleeding

15       related to the effects of vitamin E and fish oil, and they would not order heparin in the

16       immediate post-operative period. Licensee's failure to recognize the increased risk of

17       bleeding from antiplatelet therapy and the additional risk of bleeding relating to vitamin

18       E and fish oil fell below the standard of care for a reasonably prudent, careful, and

19       skillful surgeon, in violation of ORS 677.190(13). Furthermore, Licensee's conduct in

20       ordering heparin in the immediate post-operative period in this context fell below the

21       standard of care for a reasonably prudent, careful, and skillful surgeon, in violation of

22       ORS 677.190(13).

23            4.3.3   A reasonably prudent, careful, and skillful surgeon approaches an inguinal

24       hernia surgery in a manner which would allow successful completion of the surgery,

25       including successful placement of the initial incision. A reasonably prudent, careful and

26       skillful surgeon can reasonably alter the approach to surgery given unexpected

27       intraoperative findings, which would allow successful completion of the surgery without

Page 3 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1    the intervention of a proctoring surgeon.  Licensee's inability to adequately perform such

2    a common operation represents gross negligence, in violation of ORS 677.190(13).

3        4.4    Patient B.  Patient B was a 61-year-old male patient who was admitted to Salem

4    Hospital and found to have free air on CT scan consistent with a diagnosis of perforated gastric

5    ulcer. Patient B had multiple comorbidities and was receiving steroid treatment.  Licensee

6    consulted on Patient B during his shift and recommended IV PPI, antibiotics, and GoLytely oral

7    prep.  On a subsequent physical examination, Licensee found Patient B to have an acute

8    abdomen and recommended exploratory laparotomy to be performed the following day by the

9    day shift surgeon.  When surgery was performed the next day, the peritoneal space was fluid-

10    filled with GoLytely.

11        4.4.1   A reasonably prudent, careful, and skillful surgeon would not order a

12        hyperosmotic bowel prep to be administered orally to a patient with a perforated gastric

13        ulcer.  By doing so, Licensee demonstrated a willful indifference to the wellbeing of the

14        Patient B, which constitutes gross negligence in violation of ORS 677.190(13).

15        4.4.2   A reasonably prudent, careful, and skillful surgeon would treat a patient

16        with an acute abdomen as an emergent surgical case and take the patient directly to the

17        operating room immediately once a decision was made to proceed with surgery,

18        especially in a patient with peritoneal signs of rebound tenderness and guarding on exam.

19        By delaying Patient B's surgery until the following day, Licensee's conduct fell below

20        the standard of care for a reasonably prudent, careful, and skillful surgeon.

21        4.4.3   A reasonably prudent, careful, and skillful surgeon decompresses the

22        stomach with a nasogastric tube or uses imaging such as fluoroscopy if there are concerns

23        for blind nasogastric tube placement.  Failing to decompress the stomach with a

24        nasogastric tube falls below the standard of care for a reasonably prudent, careful, and

25        skillful surgeon.

26        4.4.4   A reasonably prudent, careful, and skillful surgeon communicates with

27        members of the care team who will be assuming a patient's care, especially in a setting

1    where the patient requires urgent or emergent surgery.  By failing to do so, Licensee

2    demonstrated a willful indifference to the wellbeing of Patient B, which constitutes gross

3    negligence in violation of ORS 677.190(13).

4        4.5    Patient C.  Patient C was a 65-year-old male patient who presented to Salem

5    Hospital with worsening pain after reducing large inguinal hernias three days prior.  The

6    patient's abdomen was firm and tender, and CT demonstrated a small bowel obstruction with

7    perforation, ischemic bowel, and bowel-containing inguinal hernias.  The patient had

8    leukocytosis with acute renal failure and hyperkalemia consistent with ischemia and sepsis.

9    Licensee saw and admitted Patient C on June 6, 2023, with a stated diagnosis of a reducible

10    inguinal hernia.  Licensee failed to address the acute kidney failure, acidosis, sepsis,

11    hyperkalemia, perforated small bowel obstruction, and small bowel ischemia and necrosis clearly

12    identified on labs and imaging.  Licensee did not take Patient C to the operating room

13    emergently despite clear indications.  Licensee did not notify the oncoming surgeon of Patient

14    C's admission or urgent or emergent need for surgery.

15        4.5.1    A reasonably prudent, careful, and skillful surgeon performs a complete

16    physical exam and identifies acutely incarcerated inguinal hernias.  By failing to perform

17    a complete physical exam and identify acutely incarcerated inguinal hernias, Licensee's

18    treatment of Patient C fell below the standard of care.

19        4.5.2    A reasonably prudent, careful, and skillful surgeon performs a complete

20    assessment and documents acute and severe conditions such as renal failure, lactic

21    acidosis, sepsis, hyperkalemia, perforated bowel obstruction, and small bowel ischemia

22    and necrosis.  By failing to perform a complete assessment and document acute and

23    severe conditions, Licensee's treatment of Patient C fell below the standard of care.

24        4.5.3    A reasonably prudent, careful, and skillful surgeon develops a treatment

25    plan for acute and severe conditions such as renal failure, lactic acidosis, sepsis,

26    hyperkalemia, perforated bowel obstruction, and small bowel ischemia and necrosis.  By

27    ///

1    failing to develop a treatment plan for Patient C's acute and severe conditions, Licensee's

2    treatment of Patient C fell below the standard of care.

3         4.5.4   A reasonably prudent, careful, and skillful surgeon develops an urgent

4    operative plan for a patient with bilateral incarcerated hernias and bowel perforation,

5    including taking the patient directly to the operating room.  By failing to take Patient C to

6    the operating room emergently despite clear indications, Licensee demonstrated a willful

7    indifference to the wellbeing of Patient C and was grossly negligent, in violation of ORS

8    677.190(13).

9         4.5.5   A reasonably prudent, careful, and skillful surgeon communicates with

10   members of the care team who will be assuming a critical patient's care.  By failing to

11   communicate with the members of Patient C's care team, Licensee demonstrated a willful

12   indifference to the wellbeing of the patient and is grossly negligent, in violation of ORS

13   677.190(13).

14   4.6      Patient D.  Patient D was a 28-year-old female patient who was seen by Licensee

15   in the Emergency Department at Salem Hospital.  Licensee consulted on Patient D for acute

16   appendicitis in the early morning hours on June 6, 2023.  Licensee's chart notes indicate a plan

17   for surgery, but Licensee did not schedule the procedure or communicate the plan with the

18   oncoming surgeon.  Despite the plan for surgery, Licensee ordered DVT prophylaxis,

19   subcutaneous heparin.  Licensee did not order IVF, pain medication, or antibiotics.

20        4.6.1   A reasonably prudent, careful, and skillful surgeon develops a treatment

21   plan for a patient with acute appendicitis.  By failing to develop a treatment plan for

22   Patient D, Licensee's treatment of Patient D fell below the standard of care for a

23   reasonably prudent, careful, and skillful surgeon.

24        4.6.2   If surgery is planned, a reasonably prudent, careful, and skillful surgeon

25   does not order DVT prophylaxis with subcutaneous heparin in a patient who is not

26   otherwise considered high-risk for thromboembolic disease.  By ordering DVT

27   prophylaxis with heparin for patient D, a patient who was not otherwise considered high-

Page 6 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1    risk for thromboembolic disease, Licensee's conduct fell below the standard of care for a

2    reasonably prudent, careful, and skillful surgeon.

3        4.6.3    A reasonably prudent, careful, and skillful surgeon communicates with

4    members of the care team who will be assuming a patient's care. By failing to

5    communicate with members of Patient D's care team regarding who will be assuming

6    Patient D's care, Licensee's conduct fell below the standard of care for a reasonably

7    prudent, careful, and skillful surgeon.

8    4.7    On June 7, 2024, pursuant to ORS 677.420, the Board issued an Order for

9    Evaluation to determine Licensee's fitness to practice medicine with reasonable skill and safety.

10    The Order required Licensee to successfully enroll in two evaluations within 30 days. The Order

11    required the evaluations to be successfully completed at Acumen Assessments in Kansas within

12    90 days and at the Center for Personalized Education for Physicians (CPEP) in Colorado within

13    150 days.

14        As of the date of this Notice, Licensee has not undergone these evaluations. In

15    correspondence with the Board, Licensee has acknowledged the Board Order for Evaluation and

16    communicated that he does not intend to comply. By communicating that he does not intend to

17    comply with the Board for Evaluation, Licensee has demonstrated that his non-compliance is

18    willful.

19        4.7.1    Licensee's failure to comply with the Board's Order for Evaluation is a

20        violation of ORS 677.190(17), which is grounds for disciplinary action.

21    4.8    Pursuant to ORS 677.320(5) and ORS 677.415(9), the Board requested Licensee

22    to appear for an interview with members of the Board's Investigative Committee on December 5,

23    2024. Licensee failed to appear for this interview. His failure to appear violated ORS

24    677.190(17) failing to comply with a board investigation under ORS 677.320. His failure to

25    appear also violated ORS 677.190(22) refusing an invitation for an informal interview with the

26    board requested under ORS 677.415(9).

27    ///

Page 7 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1                                      5.

2                              **Applicable Law**

3        5.1    ORS 677.190(1)(a) authorizes the Board to discipline a licensee for

4   unprofessional or dishonorable conduct, which is defined as "conduct unbecoming a person

5   licensed to practice medicine, or detrimental to the best interests of the public," which is further

6   defined.

7              5.1.1   Under ORS 677.188(4)(a), "unprofessional or dishonorable conduct"

8              includes "any conduct or practice which does or might constitute a danger to the health or

9              safety of a patient or the public."

10             5.1.2   Under ORS 677.188(4)(a), "unprofessional or dishonorable conduct" is

11             defined, in pertinent part, as "any [conduct, practice, or] * * * condition which does or

12             might adversely affect a physician's and surgeon's ability to safely and skillfully to

13             practice medicine."

14       5.3    ORS 677.190(13) authorizes the Board to discipline a licensee for gross

15   negligence or repeated acts of negligence in the practice of medicine.  Professional negligence in

16   Oregon occurs when a professional breaches the standard of care.

17             5.3.1   ORS 677.095(1) and ORS 677.265(1)(c) define the standard of care as

18             "that degree of care, skill and diligence that is used by ordinarily careful physicians in the

19             same or similar circumstances in the community of the physician or a similar

20             community."

21             5.3.2   In Oregon, "the standard of care is that of a reasonably prudent, careful

22             and skillful practitioner of that discipline in the community or a similar community under

23             the same or similar circumstances." *Creasey v. Hogan*, 292 Or 154, 163, 637 P2d 114

24             (1981) (omitted) (malpractice claim against podiatrist); *see also Getchell v. Mansfield*,

25             260 Or 174, 179, 489 P2d 953 (1971) (recognizing that a professional acts negligently by

26             failing to follow "the reasonable practice * * * in the community").

27    ///

Page 8 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1                5.3.3   ORS 677.097(2) provides the standard of care specific to the informed

2       consent process, which is "the standards of practice of reasonable medical * * *

3       practitioners in the same or a similar community under the same or similar

4       circumstances."

5                5.3.4   Professional gross negligence in Oregon is an error "of such magnitude or

6       recurrence" that a willful indifference to the consequences of the act may be inferred.

7       *Hambleton v. Bd. of Engineering Examiners*, 40 Or App 9, 12, 594 P2d 416 (1979).

8       5.4     ORS 677.190(17) authorizes the Board to discipline a licensee for, among other

9    things, willful violation of a Board statute, rue, or order, or failing to comply with a board

10   request pursuant to ORS 677.320.

11            5.4.1   ORS 677.320 provides the Board's authority to investigate complaints and

12      suspected violations.

13            5.4.2   ORS 677.415(9) authorizes the Board to require a licensee to participate in

14      an investigative interview subject to the requirements of ORS 677.320.

15            5.4.3   Under ORS 677.420(1), the Board has the authority to direct and order a

16      mental, physical, or medical competency examination to assist the board in determining

17      whether Licensee is fit to practice medicine with reasonable skill or safety.

18            5.4.4   Under ORS 677.420(3) any licensee by practicing or by filing a

19      registration to practice medicine shall be deemed to have given consent to submit to

20      mental or physical examination when so directed by the board, and, further, have waived

21      all objection to the admissibility of evidence derived from such mental or physical or

22      medical competency examination on the grounds of privileged communications.

23       5.5     ORS 677.205(1)(a) and (b) and (2)(b) to (f) authorize the Board to take

24    disciplinary action for each of the violations listed in the foregoing paragraphs.  In issuing

25    discipline, the Board may refuse to grant, place conditions on, suspend, revoke, or limit a license

26    to practice, order probation, and issue other such disciplinary action as the Board in its discretion

27    / / /

Page 9 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1    finds proper, including assessment of the costs of the disciplinary proceedings as a civil penalty

2    or assessment of a civil penalty not to exceed $10,000 per violation, or both.

3                                              6.

4                      **Violations – Repeated and Gross Negligence**

5                              Repeated Acts of Negligence

6        6.1    Licensee's care of Patients A through D as described in paragraphs 4.3 through

7    4.4.6 above represent repeated acts of negligence in the following ways:

8            6.1.1    In the absence of documented counseling and refusal for blood

9        transfusion, by failing to counsel and consent Patient A on blood transfusion, and by

10       failing to type and screen or cross Patient A preoperatively to prepare blood products in

11       anticipation of transfusion, Licensee's care fell below the standard of care and was

12       therefore negligent.

13           6.1.2    By ordering heparin for Patient A in the immediate post-operative period

14       despite the increased risk of bleeding from antiplatelet therapy, vitamin E, and fish oil,

15       Licensee's care fell below the standard of care and was therefore negligent.

16           6.1.3    By failing to treat Patient B as an urgent or emergent surgical case and

17       failing to take Patient B directly to the operating room after deciding to proceed with

18       surgery, Licensee's care fell below the standard of care and was therefore negligent.

19           6.1.4    By failing to place a nasogastric tube – with or without imaging – to

20       address Patient B's distended abdomen, Licensee's care fell below the standard of care

21       and was therefore negligent.

22           6.1.5    By failing to complete a physical exam and identify Patient C's

23       incarcerated inguinal hernias, Licensee's care fell below the standard of care and was

24       therefore negligent.

25           6.1.6    By failing to perform a complete assessment and document Patient C's

26       acute and severe conditions, including renal failure, acidosis, sepsis, hyperkalemia,

27       ///

Page 10 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1    perforated bowel obstruction, and small bowel ischemia and necrosis, Licensee's care fell

2    below the standard of care and was therefore negligent.

3          6.1.7   By failing to develop a treatment plan for Patient C's acute and severe

4    conditions, including renal failure, acidosis, sepsis, hyperkalemia, perforated bowel

5    obstruction, and small bowel ischemia and necrosis, Licensee's care fell below the

6    standard of care and was therefore negligent.

7          6.1.8   By ordered DVT prophylaxis with subcutaneous heparin for Patient D

8    despite the plan for surgery for acute appendicitis, Licensee's care fell below the standard

9    or care and was therefore negligent.

10         6.1.9   By failing to communicate with members of the care team who would

11   assume Patient D's care, Licensee's care fell below the standard of care and was

12   therefore negligent.

13   Repeated acts of negligence as described in paragraphs 6.1.1 through 6.1.9 is a violation of ORS

14   677.190(13) and is therefore grounds for disciplinary action.

15   Gross Negligence

16      6.2    Licensee's inability to successfully complete the common inguinal hernia repair

17   for Patient A's care, instead requiring a proctoring surgeon to assume the role of primary

18   surgeon, is an error of such magnitude that a willful indifference to patient wellbeing can be

19   inferred. Licensee's conduct was therefore grossly negligent, which is a violation of ORS

20   677.190(13) and grounds for disciplinary action.

21      6.3    By ordering an orally administered, hyperosmotic bowel prep for Patient B who

22   had a perforated gastric ulcer, Licensee demonstrated a reckless disregard for Patient B's

23   wellbeing which is grossly negligent, which is a violation of ORS 677.190(13) and grounds for

24   disciplinary action.

25      6.4    By failing to communicate with members of the care team who would assume

26   Patient B's care despite the urgent or emergent nature of his condition, Licensee demonstrated a

27   ///

Page 11 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1    willful indifference to Patient B's wellbeing, which is gross negligence and a violation of ORS

2    677.190(13), which is grounds for disciplinary action.

3        6.5    By failing to take Patient C directly to the operating room for emergency surgery

4    despite clear indications for incarcerated inguinal hernias and bowel perforation, Licensee

5    demonstrated a willful indifference to Patient C's wellbeing, which is gross negligence and a

6    violation of ORS 677.190(13), which is grounds for disciplinary action.

7        6.6    By failing to communicate with members of the care team who would assume

8    Patient C's care despite the urgent or emergent nature of his condition, Licensee demonstrated a

9    willful indifference to Patient C's wellbeing, which is gross negligence and a violation of ORS

10    677.190(13), which is grounds for disciplinary action.

11    7.

12    **Violations – Unprofessional or Dishonorable Conduct**

13    Danger to Health and Safety

14        7.1    By providing care that put Patients A through D at risk of harm, Licensee engaged

15    in conduct or a practice that might constitute a danger to the health or safety of a patient, thereby

16    committing unprofessional conduct as defined in ORS 677.188(4)(a), which is grounds for

17    discipline under ORS 677.190(1)(a).

18    Inability to Safely and Skillfully Practice

19        7.2    By failing to identify anatomical structures and by an inability to successfully

20    complete a routine acute appendectomy, Licensee demonstrated an inability to safely and

21    skillfully practice surgery, thereby committing unprofessional conduct as defined in ORS

22    677.188(4)(a), which is grounds for discipline under ORS 677.190(1)(a).

23        7.3    By failing to successfully complete an evaluation at CPEP to demonstrate his

24    clinical skills and medical competence, Licensee failed to demonstrate an ability to safely and

25    skillfully practice surgery, thereby committing unprofessional conduct as defined in ORS

26    677.188(4)(a), which is grounds for discipline under ORS 677.190(1)(a).

27    ///

1                                   8.

2                **Violation – Noncompliance with a Board Order or Request**

3          8.1      By failing to comply with the June 7, 2024, Order for Evaluation, specifically

4    failing to enroll in the required evaluations within 30 days and failing to complete an evaluation

5    at Acumen Assessments within 90 days and at CPEP within 150 days as ordered, Licensee

6    willfully violated a Board Order which is grounds for discipline under ORS 677.190(17).

7          8.2      By failing to appear for an interview with members of the Board's Investigative

8    Committee on December 5, 2024, as requested by the Board pursuant to ORS 677.320(5),

9    Licensee violated ORS 677.190(17), which is grounds for discipline.

10                                  9.

11                **Violation – Refusing an Invitation for Interview**

12         By failing to appear for an interview with members of the Board's Investigative

13   Committee on December 5, 2024, as ordered by the Board pursuant to ORS 677.415(9), Licensee

14   violated ORS 677.190(22), which is grounds for discipline.

15                                  10.

16         Committing unprofessional or dishonorable conduct, repeated negligence in the practice

17   of medicine, gross negligence in the practice of medicine, noncompliance with a Board order,

18   noncompliance with a Board request, and refusing an invitation for an interview, all as described

19   above, are each individually grounds for license discipline up to and including revocation, civil

20   penalties up to $10,000 per violation, and the costs of the proceeding under ORS 677.205(1) and

21   (2). Pursuant to OAR 137-003-0505(1)(i), the Board may impose the maximum penalties

22   against Licensee without amending its notice, up to and including revocation of license, a

23   $10,000 civil penalty per violation, and the costs of the proceeding.

24                                  11.

25         Licensee is entitled to a hearing as provided by the Administrative Procedures Act (ORS

26   chapter 183), Oregon Revised Statutes. Licensee may be represented by counsel at the hearing.

27   If Licensee desires a hearing, the Board must receive Licensee's written request for hearing

Page 13 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1    within twenty-one (21) days of the mailing of this Notice to Licensee.  Upon receipt of a request

2    for a hearing, the Board will notify Licensee of the time and place of the hearing. The address to

3    which the request for hearing may be sent is:

4                            Oregon Medical Board
                          1500 SW 1st Avenue, Suite 620
5                            Portland, OR  97201

6                                        12.

7          If Licensee requests a hearing, Licensee will be given information on the procedures,

8    right of representation, and other rights of parties relating to the conduct of the hearing as

9    required under ORS 183.413(2) before commencement of the hearing.

10                                       13.

11         In the event of a hearing, the Board proposes to assess against Licensee the Board's costs

12   of this disciplinary process and action, including but not limited to all legal costs from the

13   Oregon Department of Justice, all hearing costs from the Office of Administrative Hearings, all

14   costs associated with any expert or witness, all costs related to security and transcriptionist

15   services for the hearing and administrative costs specific to this proceeding in an amount not to

16   exceed $100,000, pursuant to ORS 677.205(2)(f).

17                                       14.

18         **NOTICE TO ACTIVE DUTY SERVICEMEMBERS**:  Active duty Servicemembers

19   have a right to stay these proceedings under the federal Servicemembers Civil Relief Act. For

20   more information contact the Oregon State Bar at 800-452-8260, the Oregon Military

21   Department at 503-584-3571 or the nearest United States Armed Forces Legal Assistance Office

22   through http://legalassistance.law.af.mil.  The Oregon Military Department does not have a toll-

23   free telephone number.

24                                       15.

25         Failure by Licensee to timely request a hearing, failure to appear at any hearing

26   scheduled by the Board, withdrawal of the request for hearing, or failure to appear at any hearing

27   scheduled by the Board on time will constitute waiver of the right to a contested case hearing.

1    Waiver of the right to a contested case hearing may result in a default order by the Board,

2    including the potential revocation of Licensee's medical license and assessment of such penalty

3    and costs as the Board deems appropriate under ORS 677.205. If the Board issues a final order

4    by default, the Board designates the discoverable material which comprises the file, including all

5    submissions by Licensee, as the record for the purpose of proving a prima facie case.

6                                              16.

7            Licensee may appeal any final order issued in this case by filing a petition for review

8    with the Oregon Court of Appeals within 60 days after it is served upon Licensee. See ORS

9    183.480 et seq.

10                         Dated this  3  day of  June              , 2025.

11

12                                OREGON MEDICAL BOARD
                                  State of Oregon
13

14                                _____

15                                NICOLE KRISHNASWAMI, JD
                                  Executive Director
16

17

18

19

20

21

22

23

24

25

26

27

Page 15 – NOTICE OF PROPOSED DISCIPLINARY ACTION – Jeremy Henry Conklin, DO

1
2

## CERTIFICATE OF MAILING

3
4

On June 3, 2025, I mailed the foregoing Notice of Proposed Disciplinary Action regarding
5  Jeremy Henry Conklin, DO, to the following parties:

6
7  **By: First Class Certified/Return Receipt U.S. Mail**
   **Certified Mail Receipt # 9589 0710 5270 1740 0722 93**

8
9  Jeremy Henry Conklin, DO
   1414 10th Ave, Apt 734E
10  Seattle, WA 98122

11
12
      Michele Sherwood
13  Michele Sherwood
     Investigations Supervisor
14  Oregon Medical Board

15
16
17
18
19
20
21
22
23
24
25
26
27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**CONFIDENTIAL PATIENT**

**IDENTIFICATION KEY**

| Patient Letter | Patient Name |
|---|---|
| A | David Ansted |
| B | Henry Dutra |
| C | Mark Pack |
| D | Lolita Morgan |



Tina Kotek, Governor

**Oregon Medical Board**
1500 S.W. First Ave., Suite 620
Portland, OR 97201
Voice (971) 673-2700
FAX (971) 673-2670
Web: www.oregon.gov/OMB

# NOTICE OF CONTESTED CASE RIGHTS
# AND PROCEDURES FOR BOARD LICENSEES

**Pursuant to ORS 183.413(2), you are entitled to be informed of the following:**

1. **Time and place of hearing.**
   The Notice of Hearing from the Office of Administrative Hearings informs you of the time, date, and place of the scheduled hearing.

2. **Issues to be considered at hearing.**
   The issues to be considered at hearing are set forth in the notice issued by the Oregon Medical Board (Board) entitled Complaint and Notice of Proposed Disciplinary Action and those issues related the notice that are properly before the presiding officer to this proceeding. You have the right to respond to all issues properly before the presiding officer and to present evidence and witnesses on those issues.

3. **Authority and Jurisdiction for Hearing.**
   The matter set for hearing is a contested case. The hearing will be conducted as provided in Chapter 183 of the Oregon Revised Statutes; the administrative rules of the Board, *Chapter 847; Oregon Revised Statutes (ORS) Chapter 677*, and the Attorney General's Office of Administrative Hearing Rules, OAR 137-003-0501 to 137-003-0700.

4. **Right to attorney.**
   You may be represented by an attorney at the hearing. Parties are ordinarily and customarily represented by counsel. You are not required to be represented by counsel, unless you are a Board, trust, corporation or association. If you are not represented at the hearing and during the hearing you determine that representation by an attorney is necessary, you may request a recess to allow you an opportunity to secure the services of an attorney. The hearing officer or administrative law judge will decide whether to grant such a request. The Board will be represented by an attorney. Legal aid organizations may be able to assist a party with limited financial resources.

5. **Administrative Law Judge.**
   The person presiding at the hearing is known as the administrative law judge (ALJ). The ALJ will rule on all matters that arise at the hearing, subject to Board consideration of matters transmitted for Board decision under OAR 137-003-0635 or matters subject to review by the Chief ALJ under OAR 137-003-0640. The ALJ will be assigned by the Chief ALJ from the Office of Administrative Hearings (OAH). The OAH consists of employees of, and independent contractors with, the Chief ALJ. The ALJ does not have the authority to make the final decision in the case. The final determination will be made by the Board.

6. **Discovery.**
   Discovery is permitted in this proceeding. Discovery is permitted as provided in OAR 137-003-0566, OAR 137-003-0567, OAR 137-003-0568, and OAR 137-003-0569. You must first ask the Board [and the other parties] to provide you with copies of documents or other information relevant to this proceeding. If you are not satisfied with the response of the Board [or the other parties], you may ask the ALJ to order production of the information you seek in accordance with applicable rules.

7. **Witnesses.**
A witness must testify under oath or affirmation to tell the truth. The Board or ALJ will issue subpoenas for witnesses on your behalf upon a showing that their testimony is relevant to the case and is reasonably needed by you to establish your position. If you are represented by an attorney, your attorney may issue subpoenas for attendance of witnesses at hearing. Payment of witness fees and mileage to the person subpoenaed is your responsibility.

8. **Order of evidence.**
A hearing is similar to a court proceeding but is less formal. Its general purpose is to determine the facts and whether the Board's proposed action is appropriate. The order of presentation of evidence is normally as follows:
   a. Testimony of witnesses and other evidence of Board in support of its proposed action.
   b. Testimony of your witnesses and your other evidence.
   c. Rebuttal evidence by the Board and by you.

9. **Burden of presenting evidence.**
The burden of presenting evidence to support an allegation or position rests upon the proponent of the allegation or position. If you have the burden of proof on an issue, or if you intend to present evidence on an issue in which the Board has the burden of proof, you should approach the hearing prepared to present the testimony of witnesses, including yourself, and other evidence that will support your position. All witnesses are subject to cross-examination and also to questioning by the ALJ.

10. **Admissible evidence.**
Relevant evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs is admissible and will be received. Evidence that is irrelevant, immaterial, or unduly repetitious is excluded. Hearsay evidence is often admissible. The fact that it is hearsay generally affects how much reliance the Board or ALJ will place on it in reaching a decision.
   There are four kinds of evidence:
   a. Knowledge of the Board or ALJ. The Board or ALJ may take "official notice" of facts based on the Board's or ALJ's knowledge in a specialized field. This includes notice of general, technical or scientific facts. The Board or ALJ may also take "judicial notice" of a fact that is not subject to reasonable dispute in that it is generally known or is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. You will be informed if the Board or ALJ takes "official notice" or "judicial notice" of any fact and you will be given an opportunity to contest any facts so noticed.
   b. Testimony of witnesses. Testimony of witnesses, including you, who have knowledge of the facts, may be received in evidence.
   c. Writings. Written documents including letters, maps, diagrams and other written material may be received in evidence.
   d. Experiments, demonstrations and similar means used to prove a fact. The results of experiments and demonstrations may be received in evidence.

11. **Objections to evidence.**
Objections to the admissibility of evidence must be made at the time the evidence is offered. Objections are generally made on one of the following grounds:
   a. The evidence is unreliable;
   b. The evidence is irrelevant or immaterial and has no tendency to prove or disprove any issue involved in the case;
   c. The evidence is unduly repetitious and duplicates evidence already received.

**12. Continuances.**
There are normally no continuances granted at the end of the hearing for you to present additional testimony or other evidence. However, if you can show that the record should remain open for additional evidence, the ALJ may grant you additional time to submit such evidence.

**13. Record.**
A record will be made of the entire proceeding to preserve the testimony and other evidence for appeal. This may be done by use of a tape or digital recorder or court reporter. The record is generally transcribed. If the record is not transcribed, you may obtain a copy of the tape recording upon payment of the costs of making a copy of the tape. If a court reporter is used, you may obtain a transcript or a copy of the court reporter's transcript upon payment of a transcription fee or other fee that the parties may agree upon.

**14. Proposed Order and Exceptions.**
The ALJ will issue a proposed order in the form of findings of fact, conclusions of law and recommended Board action. You will be provided with a copy and you will be given an opportunity to make written objections, called "exceptions," to the ALJ's recommendations. You will be notified when exceptions to the proposed order must be filed.

**15. Final Order.**
The Board will render the final order in this case. The Board may modify the proposed order issued by the ALJ. If the Board modifies the proposed order in any substantial manner, the Board in its order will identify the modification and explain why the Board made the modification. The Board may modify a proposed finding of "historical" fact made by an ALJ only if there is clear and convincing evidence in the record that the finding by the ALJ was wrong.

**16. Disciplinary Action.**
In the event the Board concludes that you have engaged in violations of the Medical Practice Act, the Board may in its discretion impose discipline by using any or all of the following methods set forth in ORS 677.205(2) to impose discipline:
   a. Suspend judgment.
   b. Place the licensee on probation.
   c. Suspend the license.
   d. Revoke the license.
   e. Place limitations on the license.
   f. Take such other disciplinary action as the board in its discretion finds proper, including assessment of the costs of the disciplinary proceedings as a civil penalty or assessment of a civil penalty not to exceed $10,000, or both.
   g. "Such other disciplinary action" may also include, but is not limited to, a reprimand and specific terms of probation and educational remediation.

**17. Appeal.**
If you wish to appeal the final order, you must file a petition for judicial review with the Oregon Court of Appeals within 60 days after the final order is served upon you. *See* Oregon Revised Statutes 183.482.

**18. <u>Notice to Active Duty Servicemembers.</u>**
Active Duty Servicemembers have a right to stay these proceedings under the federal Servicemembers Civil Relief Act. For more information contact the Oregon State Bar at 800-452-8260, the Oregon Military Department at 503-584-3571 or the nearest United States Armed Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military Department does not have a toll-free telephone number.

*OREGON MEDICAL BOARD*

## OREGON ADMINISTRATIVE RULES

**847-001-0005**
**Rules for Contested Cases**
(1) The Oregon Medical Board adopts the Attorney General's Uniform and Model Rules for Contested Cases of the Attorney General in effect on January 1, (2008), and all amendments thereto are hereby adopted by reference as rules of the Oregon Medical Board.
(2) The Board must accept a properly addressed hearing request that was not timely filed if it was postmarked within the time specified for timely filing unless the Board receives the request after the entry of the final order by default.
(3) The Board may accept a late hearing request other than one described in section (2) above only if:
(a) The failure to timely request a hearing was due to the serious illness of a party lasting 30 days or more, the terminal illness of a member of the party's immediate family, destruction of the party's home or practice site, reasonable reliance on a statement of the agency relating to procedural requirements, or from fraud, misrepresentation, or other misconduct of the agency; and
(b) The Board receives the request before the entry of a final order by default.
(4) Due to the complexity of the Board's cases, a party who requests a hearing must file a written answer within 30 days of a timely hearing request or, if the party requests discovery, 30 days after production is provided, whichever is later. However, in no case shall a party's initial written answer be accepted less than 10 days prior to the first day of any hearing scheduled on the matter.
(a) The written answer must include a statement of each defense, including any affirmative defenses, the party is raising. Failure to raise a particular defense in the answer will be considered a waiver of such defense.
(b) New matters alleged in the answer are presumed to be denied by the Board.
(c) The answer may be amended, but no later than 30 days after the answer response was due.
(d)(A) If the Board amends its notice without basing its amendment on one or more additional alleged violations, then a party that requested a hearing may amend its answer up to 30 days after the agency issues the amended notice or 10 days prior to hearing, whichever is earlier.
(B) If the Board amends its notice based on one or more additional alleged violations, then a party that requested a hearing may amend its answer up to 30 days after the Board issues the amended notice, 30 days after any additional production is provided, or 10 days prior to hearing, whichever is earliest.
(5) Section (4) of this rule does not apply to requests for hearing on orders of emergency license suspension.

[ED. NOTE: The full text of the Attorney General's Model Rules of Procedure is available from the office of the Attorney General or the Medical Board.]
**Statutory/Other Authority**: ORS 677.265
**Statutes/Other Implemented**: ORS 183.335, 183.341 & 677.275

**Statutory/Other Authority:** ORS 677.265
**Statutes/Other Implemented:** ORS 677.805

1                                  BEFORE THE

2                            OREGON MEDICAL BOARD

3                              STATE OF OREGON

4
        In the Matter of                    )
5                                           )
        JEREMY HENRY CONKLIN, DO            )      STIPULATED ORDER
6       LICENSE NO. DO190014                )
7                                           )

8                                     1.

9          The Oregon Medical Board (Board) is the state agency responsible for licensing,

10   regulating and disciplining certain health care providers, including physicians, in the State of

11   Oregon. Jeremy Henry Conklin, DO (Licensee) is a licensed physician (inactive status) in the

12   State of Oregon.

13                                    2.

14         On June 3, 2025, the Board issued a Notice of Proposed Disciplinary Action in which the

15   Board proposed to take disciplinary action against Licensee pursuant to ORS 677.205(2),

16   including revocation of license; a $10,000 civil penalty per violation; reprimand; and assessment

17   of costs of any contested case hearing on the matter not to exceed $100,000. The Board

18   proposed to take this disciplinary action for violations of the Medical Practice Act, specifically:

19   ORS 677.190(1)(a) unprofessional or dishonorable conduct, specifically ORS 677.188(4)(a) (any

20   practice or conduct that might constitute a danger to the health or safety of a patient) and ORS

21   677.188(4)(a) (inability to safely and skillfully practice medicine); ORS 677.190(13) gross and

22   repeated negligence in the practice of medicine; ORS 677.190(17) failure to comply with a board

23   order and failure to comply with a board request pursuant to ORS 677.320; and ORS

24   677.190(22) refusing an invitation for an informal interview with the board requested under ORS

25   677.415(9).

26   / / /

27   / / /

Page 1 – STIPULATED ORDER – Jeremy Henry Conklin, DO

1                                        3.

2        Licensee and the Board desire to settle this matter by the entry of this Stipulated Order.

3    Licensee understands that he has the right to a contested case hearing under the Administrative

4    Procedures Act (Oregon Revised Statutes chapter 183) and, by the signing and issuance of this

5    Order, Licensee fully and finally waives the right to a contested case hearing, understands and

6    acknowledges that this order is not subject to judicial review, and acknowledges and agrees that

7    this Order was signed freely, without fraud or duress.  Licensee neither admits nor denies, but the

8    Board finds that Licensee engaged in conduct as described in the June 3, 2025, Notice of

9    Proposed Disciplinary Action, and that this conduct violated the Medical Practice Act, to wit

10   ORS 677.190(1)(a), specifically ORS 677.188(4)(a); ORS 677.190(13); ORS 677.190(17); and

11   ORS 677.190(22).  Licensee understands that this Order is a public record and is a disciplinary

12   action that is reportable to the National Practitioner Data Bank and the Federation of State

13   Medical Boards.

14                                       4.

15       Licensee and the Board agree that the Board will close this investigation and resolve this

16   matter by entry of this Stipulated Order, subject to the following conditions:

17       4.1    Licensee surrenders his Oregon medical license while under investigation.

18       4.2    Licensee must not reapply for a medical license in the State of Oregon for at least

19   two years from the effective date of this Order.  If Licensee replies for a medical license in the

20   State of Oregon, he will be required to demonstrate medical competency.

21       4.3    Licensee must obey all federal and Oregon state laws and regulations pertaining

22   to the practice of medicine.

23       4.4    Licensee stipulates and agrees that any violation of the terms of this Order shall

24   be grounds for further disciplinary action under ORS 677.190(17).

25   / / /

26   / / /

27   / / /

Page 2 – STIPULATED ORDER – Jeremy Henry Conklin, DO

1                                    5.

2       This Order becomes effective the date it is signed by the Board Chair.

3

4              IT IS SO STIPULATED this _____ day of _____ 2025.

5

6                                    _____
                                     JEREMY HENRY CONKLIN, DO
7

8              IT IS SO ORDERED this _____ day of _____ 2025.

9
                                     OREGON MEDICAL BOARD
10                                   State of Oregon

11

12                                   _____
                                     JILL SHAW, DO
13                                   Board Chair

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Page 3 – STIPULATED ORDER – Jeremy Henry Conklin, DO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Exhibit ZZ**

Jeremy Conklin
1414 10th Ave, Apt 734E
Seattle, Washington 98122
(570) 764-0102
jhconklin@icloud.com



Tina Kotek, Governor

**Medical Board**
1500 SW 1st Avenue, Suite 620
Portland, OR 97201-5847
(971) 673-2700
FAX (971) 673-2669
www.oregon.gov/omb

June 7, 2024

PERSONAL AND CONFIDENTIAL
SENT VIA CERTIFIED RETURN RECEIPT MAIL
ARTICLE NO. #9589 0710 5270 0300 4482 40

Jeremy Henry Conklin DO
1414 10th Ave
Apt 734E
Seattle, WA 98122

Re: Order for Evaluation and Qualified Protective Order

Dear Dr. Conklin:

Enclosed is a copy of an Order for Evaluation and Qualified Protective Order that was issued by the Oregon Medical Board on June 7, 2024. The Order states that Licensee shall undergo a CPEP evaluation to assess whether any conduct, practice, or condition does or might affect Licensee's ability to safely and skillfully practice medicine. This must be completed within 150 days from the date this Order is signed and scheduled within 30 days.

Enclosed with this Order is a CPEP release of information form. Complete this form and return it to the Board prior to scheduling your appointment. Please inform the Board of your appointment date at least two weeks prior to the appointment.

The Order further states that Licensee shall undergo an Acumen evaluation to assess whether any conduct, practice, or condition does or might affect Licensee's ability to safely and skillfully practice medicine. This must be completed within 90 days from the date this Order is signed, and scheduled within 30 days.

Please contact me or Investigator Seidel at 971-673-2700 if you have any questions.

Sincerely,

Walter Frazier
Investigations Manager
Investigations/Compliance Unit

cc:    Lindsay Byrne, JD, Board Counsel

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1

BEFORE THE
OREGON MEDICAL BOARD

2  In the Matter of:

3  JEREMY HENRY CONKLIN, DO
   LICENSE NO. DO190014

4

5

6

Agency Case No. 23-0408

ORDER FOR EVALUATION AND
QUALIFIED PROTECTIVE ORDER
LIMITING USE AND DISCLOSURE

7                         **ORDER FOR EVALUATION**

8      1.      The Oregon Medical Board (Board) is the state agency responsible for licensing,

9  regulating and disciplining certain health care providers, including physicians, in the state of

10  Oregon. JEREMY HENRY CONKLIN, DO (Licensee) holds an osteopathic medical license in

11  the state of Oregon.

12      2.      Under ORS 677.420, the Board has the authority to direct and order a mental,

13  physical, or medical competency examination to assist the Board in determining whether

14  Licensee is fit to practice medicine with reasonable skill or safety.  Licensee is deemed to have

15  consented to the competency examination hereby ordered.

16      3.      Licensee must obtain the following evaluation(s) as further described in

17  Attachments A and B:

18              _X_ Center for Personalized Education for Professionals in Colorado, specific to:

19              General Surgery with emphasis on trauma and other acute presentations.

20              _X_ Acumen Assessments in Kansas

21              ____ Psychiatric Assessment

22              ____ Neurocognitive Assessment

23              ____ Substance Use Evaluation

24              ____ Substance Testing (hair, nails, and/or urine)

25              ____ Other _____

26      4.      The parties understand that this Order for Evaluation is not a disciplinary action,

27  is not a public document, and is not to be disclosed to the public.

Page 1 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
USE AND DISCLOSURE –Jeremy Henry Conklin, DO

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1       **QUALIFIED PROTECTIVE ORDER**

2       5.      The Oregon Medical Board (Board), pursuant to ORS 677.265(10), 676.175(1)

3   and OAR 847-001-0015(1)(a), to the extent necessary to conduct a full and proper investigation,

4   now issues this Qualified Protective Order to limit disclosure of information that is confidential

5   or privileged. The following is HEREBY ORDERED:

6           5.1     "Protected information" means all information pertaining to protected

7           health information and confidential investigatory information in the current case,

8           including any evaluation of Licensee, as well as any notes or reports related to such

9           evaluation. This is pursuant to ORS 676.175 and 677.425.

10          5.2     The protected information referenced in this order may be disclosed by the

11          Board pursuant to ORS 676.175(1), only as necessary for the Board to conduct a full and

12          proper investigation. This protected information may be used in connection with this case

13          only, and the Licensee and evaluator are restrained from using protected information, or

14          information obtained from such material, for any purpose other than this case. Licensee

15          and evaluator are further restrained from disclosing such protected information to anyone

16          other than Board staff.

17      **VIOLATIONS**

18      Failure to comply with the terms of this Order for Evaluation and Qualified Protective Order will

19  be considered a violation of ORS 677.190(17) and may result in disciplinary action by the Board.

20

21      DATED this 7th day of June , 2024.

22

23      _____
        NICOLE KRISHNASWAMI, JD

24      Executive Director
        for the

25      Oregon Medical Board

26

27

Page 2 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
USE AND DISCLOSURE –Jeremy Henry Conklin, DO

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1          ATTACHMENT A - CPEP

2

3          Pursuant to ORS 677.420, the Board orders Licensee to undergo a comprehensive

4   evaluation for the purpose of determining Licensee's fitness to practice medicine with reasonable

5   skill and safety to patients as follows:

6          1.   Licensee shall successfully complete an evaluation at the Center for Personalized

7               Education for Professionals in Colorado to assess whether any conduct, practice, or

8               condition does or might affect Licensee's ability to safely and skillfully practice

9               medicine.  Licensee shall enroll within 30 days of the date that this Order is signed

10              by the Board's Executive Director.

11         2.   Licensee shall sign any and all releases to allow for complete communication

12              between the Board and evaluators.  Releases must be in place at least two weeks

13              prior to the evaluation date.

14         3.   The costs of such an evaluation, including travel, lodging and all testing expenses,

15              shall be borne by Licensee.

16         4.   Licensee shall complete the evaluation within 150 days of the date that this Order

17              is signed by the Board's Executive Director.  The report resulting from the

18              evaluation shall be sent directly to the Board.

19         5.   Failure to comply with this Order by the dates specified will be considered a

20              violation of ORS 677.190(17) and may result in disciplinary action by this Board.

21

22

23

24

25

26

27

Page 3 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
USE AND DISCLOSURE –Jeremy Henry Conklin, DO

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1      ATTACHMENT B - ACUMEN

2

3      Pursuant to ORS 677.420, the Board orders Licensee to undergo a comprehensive

4    evaluation for the purpose of determining Licensee's fitness to practice medicine with reasonable

5    skill and safety to patients as follows:

6      1.    Licensee must successfully complete a Multidisciplinary Clinical and Forensic

7            Fitness to Practice Assessment at Acumen Assessments to assess whether any

8            conduct, practice, or condition does or might affect Licensee's ability to safely and

9            skillfully practice medicine.  Licensee shall enroll within 30 days of the date that

10           this Order is signed by the Board's Executive Director.

11     2.    Licensee shall sign any and all releases to allow for complete communication

12           between the Board and evaluators.  Releases must be in place at least two weeks

13           prior to the evaluation date.

14     3.    The costs of such an evaluation, including travel, lodging and all testing expenses,

15           shall be borne by Licensee.

16     4.    Licensee shall complete the evaluation within 90 days of the date that this Order is

17           signed by the Board's Executive Director.  The report resulting from the evaluation

18           shall be sent directly to the Board.

19     5.    Failure to comply with this Order by the dates specified will be considered a

20           violation of ORS 677.190(17) and may result in disciplinary action by this Board.

21

22

23

24

25

26

27

Page 4 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
USE AND DISCLOSURE –Jeremy Henry Conklin, DO

*CONFIDENTIAL DOCUMENT – NOT FOR PUBLIC RELEASE*

1

| **CERTIFICATE OF MAILING** |

2

3

4   On June 7, 2024, I mailed the foregoing Order for Evaluation and Qualified Protective Order
    Limiting Use and Disclosure regarding Jeremy Henry Conklin, DO, to the following parties:

5

6

7

8   **By: First Class Certified/Return Receipt U.S. Mail**
    **Certified Mail Receipt # 9589 0710 5270 0300 4482 40**

9

    Jeremy Henry Conklin DO
10  1414 10th Ave
    Apt 734E
11  Seattle, WA 98122

12

13

      Joshua Paul
14  Joshua Paul
    Compliance Coordinator
15  Oregon Medical Board

16

17

18

19

20

21

22

23

24

25

26

27

    Page 5 - ORDER FOR EVALUATION AND QUALIFIED PROTECTIVE ORDER LIMITING
    USE AND DISCLOSURE –Jeremy Henry Conklin, DO



# OREGON MEDICAL BOARD

## CONSENT FOR THE
## RELEASE OF CONFIDENTIAL INFORMATION

I, ____Jeremy Henry Conklin, DO_____, hereby authorize the Oregon Medical Board and

_____

(Name of person / entity / facility disclosing information)

_____

(Street address of person / entity / facility)

_____

(City, State Zip)                                                (Phone)

to share, communicate and disclose the following information about my health:

- Medical Records
- Mental health records
- Evaluations and/or treatment records from this and/or other programs

for the purpose of allowing documentation of my status for licensing, legal, or credentialing purposes, and to facilitate collection of collateral information.

This consent is subject to revocation at any time, except to the extent that the program which is to make the disclosure has already taken action in reliance upon it. If not previously revoked, this consent will terminate two years from the date of my signature.

Information disclosed is protected by Federal confidentiality rules (42 CFR part 2). The federal rules prohibit further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

**I have read this authorization and I understand it.**

By: _____    Date_____
        (Signature of individual)

**Oregon Medical Board** | 1500 SW 1ˢᵗ Ave, Suite 620 | Portland, Oregon 97201
971.673.2700 or 877.254.6263 | Fax: 971.673.2669 | www.Oregon.gov/OMB

Level 3 - Restricted



# OREGON MEDICAL BOARD

## CONSENT FOR THE
## RELEASE OF CONFIDENTIAL INFORMATION

I,  ___Jeremy Henry Conklin, DO___ , hereby authorize the Oregon Medical Board and

_____

(Name of person / entity / facility disclosing information)

_____

(Street address of person / entity / facility)

(City, State Zip)                                                    (Phone)

to share, communicate and disclose the following information about my health:
- Medical Records
- Mental health records
- Evaluations and/or treatment records from this and/or other programs

for the purpose of allowing documentation of my status for licensing, legal, or credentialing purposes, and to facilitate collection of collateral information.

This consent is subject to revocation at any time, except to the extent that the program which is to make the disclosure has already taken action in reliance upon it. If not previously revoked, this consent will terminate two years from the date of my signature.

Information disclosed is protected by Federal confidentiality rules (42 CFR part 2). The federal rules prohibit further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal Rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient.

**I have read this authorization and I understand it.**

By: _____    Date_____
(Signature of individual)

**Oregon Medical Board** | 1500 SW 1ˢᵗ Ave, Suite 620 | Portland, Oregon 97201
971.673.2700 or 877.254.6263 | Fax: 971.673.2669 | **www.Oregon.gov/OMB**